GW/2012R00782

```
                    FILED _____    ENTERED
                    LOGGED _____   RECEIVED

                    MAR - 4 2013
                    AT GREENBELT
                    CLERK, U.S. DISTRICT COURT
                    DISTRICT OF MARYLAND
                                      DEPUTY
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. PWG 13 CR 0100 |
| | : | |
| v. | : | Conspiracy to Export to an Embargoed |
| | : | Country, 50 U.S.C. §§ 1702, 1705 and 31 |
| ALI SABOONCHI | : | C.F.R. §§ 560.203 and 560.204; |
| and | : | Unlawful Export to an Embargoed |
| ARASH RASHTI MOHAMMAD, | : | Country, 50 U.S.C. §§ 1702 and 1705; |
| Defendants | : | Aiding and Abetting, 18 U.S.C. § 2 |
| | : | |

...oOo...

### INDICTMENT

### COUNT ONE

**Conspiracy to Export to an Embargoed Country**

The Grand Jury for the District of Maryland charges that:

1.  At all times material to the Indictment, **ALI SABOONCHI (SABOONCHI)** was a citizen of the United States, a resident of Maryland, and was located in Maryland.

2.  At all times material to the Indictment, **ARASH RASHTI MOHAMMAD (RASHTI)** was a citizen and resident of the Islamic Republic of Iran (Iran) and was located in Iran.

3.  At times material to the Indictment, **SABOONCHI** created and operated Ace Electric Company in Maryland.

4.  At all times material to the Indictment, **RASHTI** was listed as a Sales Manager of the business Darya Saze Aria Zamin (DSAZ), located at #26, 6th Floor, Tejarat Bank (Sarv Branch) building, Sarv Square, Tehran, Iran. **RASHTI** also was listed as the Chief Executive Officer of the business General DSAZ, FZ-LLC, located at Amenity Center, 12th Floor, Tower 1,

P.O. Box 35678, Abu Dhabi, Ras Al Khaimah (RAK), United Arab Emirates (UAE).

5. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq*, establishes criminal penalties for willful violations of Presidential Orders issued in times of national emergency and for violations of regulations implementing those orders.

6. Between March and May 1995, the President issued a series of Executive Orders, pursuant to his authority under the IEEPA, finding that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy and economy of the United States. In order to deal with that threat, the President imposed economic sanctions against Iran, to include a trade embargo (the Iran Trade Embargo), and authorized the Secretary of the Treasury to take such action necessary to carry out the purposes of the Executive Orders.

7. In order to implement the Iran Trade Embargo and other economic sanctions imposed by the Executive Orders, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR). The ITSR prohibit, among other things, the unauthorized export, re-export, sale or supply to Iran, directly or indirectly, of any goods or services from the United States or by a United States person, without prior authorization from the OFAC. The ITSR further prohibit any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR, including the unauthorized export of goods or services from the United States to a third country if the goods or services were intended or destined for Iran. The Iran Trade Embargo and the ITSR remained in full force and effect at all times relevant to this Indictment, and would have precluded the unauthorized export of goods

Case 8:13-cr-00100-PWG   Document 1   Filed 03/04/13   Page 3 of 15

or services to any Iranian entities.

8. Beginning in November 2009, **RASHTI** communicated with **SABOONCHI** to begin obtaining industrial parts and components from American companies for customers in Iran.

9. At no time relevant to this Indictment did **SABOONCHI** or **RASHTI**, or the companies and individuals associated with them, apply for, receive, or possess a license or authorization from the OFAC to export, re-export, sell or supply goods or services, of any description, to or for Iran.

10. Beginning in or about November 2009, and continuing up to and through the date of this Indictment, in the District of Maryland and elsewhere,

ALI SABOONCHI
and
ARASH RASHTI MOHAMMAD,

defendants herein, did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to knowingly and willfully export and cause to be exported goods and services from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control, in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

11. The objects of the conspiracy were:

    a. to provide services to Iranian businesses which sought to purchase American manufactured industrial goods and components;

    b. to supply entities in Iran with American manufactured industrial goods and

components;

        c.      to evade the prohibitions and licensing requirements of the Iran Trade Embargo, the ITSR, and the IEEPA; and

        d.      to conceal the prohibited activities and transactions from detection by the United States government through deceit and other means so as to avoid penalties and disruption of the illegal activity.

12.    It was part of the conspiracy that **RASHTI**, located in Iran, had **SABOONCHI** in Maryland create and operate Ace Electric Company for the purpose of obtaining goods to be sent to Iran.

13.    It was further part of the conspiracy that **RASHTI** and his co-conspirators solicited purchase orders and business from customers in Iran for United States-origin industrial parts and components.

14.    It was further part of the conspiracy that **RASHTI** and his co-conspirators requested that **SABOONCHI** and others obtain price quotes for, order, and/or purchase United States-origin industrial parts and components for subsequent export to Iran, all of which were subject to United States export regulations.

15.    It was further part of the conspiracy that **SABOONCHI** received requests from other Iranian-based individuals to obtain price quotes for, order, and/or purchase United States-origin industrial parts and components for subsequent export to Iran, all of which were subject to United States export regulations.

16.    It was further part of the conspiracy that **RASHTI** on occasion arranged for **SABOONCHI** to make payment for orders that **RASHTI** and his co-conspirators had placed

with American companies, take delivery of the goods, and ship the goods to co-conspirators in UAE.

17. It was further part of the conspiracy that **RASHTI** arranged for **SABOONCHI** to ship, or have shipped, the goods he purchased to entities located in the UAE, and **RASHTI** would further arrange for the entities in the UAE to send the goods on to him and his customers in Iran.

18. It was further part of the conspiracy that **RASHTI** paid **SABOONCHI** for the goods and associated shipping and other costs by wire transfers and other deposits to the bank accounts of **SABOONCHI** and his wife.

19. It was further part of the conspiracy that **SABOONCHI** worked with **RASHTI** and others on numerous occasions to acquire from the United States goods to be sent to customers in Iran, including the following transactions:

**Export of Cyclone Separators to Iran**

20. On February 20, 2010, **RASHTI** received a request from the Shazand Arak Oil Refining Company in Arak, Iran, which is an entity of the Iranian Ministry of Petroleum, seeking to acquire two cyclone separators, which are used in pipelines to separate impurities such as sand from liquids, manufactured by an American company. Beginning in September 2010, **SABOONCHI** dealt with a supply company located in Baltimore, Maryland (hereafter Company A) to obtain a quote and purchase the two cyclone separators, which he ultimately did on November 17, 2010, for the total cost of $2,114.53.

21. On November 17, 2010, **SABOONCHI** falsely advised Company A that the cyclone separators were for use in the United States and told Company A to ship them to an

5

address he used in Boyds, Maryland. On December 10, 2010, **SABOONCHI** received the cyclone separators from Company A. On December 27, 2010, he sent them to General DSAZ in UAE, as directed by **RASHTI**. **RASHTI** thereafter arranged for delivery to a co-conspirator in UAE for ultimate delivery to Iran.

### Export of Thermocouples to Iran

22. Beginning in June 2010, **RASHTI** tried to obtain quotes for thermocouples, which are manufactured by an American company and are used to measure temperatures of liquids and gasses in industrial applications in the chemical and petrochemical fields, for Petrochemical Kala Company (PKC) in Iran. On September 20, 2010, **RASHTI** sent **SABOONCHI** a request to get a quote on six specific thermocouples from a company located in Minnesota (hereafter Company B). On November 11, 2010, **SABOONCHI** ordered six thermocouples of the model number that **RASHTI** had instructed him to order. Company B responded on November 15 with a quote for a total price of $1,284. On November 22, 2010, **SABOONCHI**, at the direction of **RASHTI**, falsely told Company B that the ultimate destination for the thermocouples was Turkey.

23. On November 23, **SABOONCHI** told Company B to ship the items to an address he used in Boyds, Maryland, and send the bill to him at his home address in Rockville, Maryland. Company B shipped the thermocouples by FedEx from its location in Minnesota to the address provided by **SABOONCHI** on January 19, 2011. On February 3, 2011, **SABOONCHI** provided **RASHTI** with the tracking number for his shipment of the products to the address used by **RASHTI** in UAE. On February 6, 2011, the package arrived in UAE. **RASHTI** then emailed **SABOONCHI** confirming the delivery and offered to deposit the shipping costs into

SABOONCHI's wife's account at Bank Melli in Iran. On February 8, 2011, **RASHTI** arranged for delivery of the goods to a co-conspirator in UAE for ultimate delivery to Iran.

### Export of Stainless Steel Filter Elements to Iran

24. On October 18, 2010, a buyer with PKC in Iran requested that **RASHTI** obtain 10 units of a 30 micron Stainless Steel filter element with a listed part number from an American company (hereafter Company C) located in Texas. Company C had patented a specialty filtering system called the Swirlklean Bypass Filter, which is used primarily in the oil and gas industry and can be used in water plants, hydrocarbon plants, and nuclear plants. The requested filter elements are used in a Model 1 Swirlklean Bypass Filter. **RASHTI** thereafter arranged for another person to place the order with Company C. However, the other person was unable to transfer funds to Company C to pay for the order.

25. On December 6, 2010, **RASHTI** asked **SABOONCHI** to pay the invoice amount of $151.53 directly to Company C, which **SABOONCHI** did. **RASHTI** thereafter reimbursed **SABOONCHI** for paying the invoice. Thereafter, Company C shipped the goods directly to an address provided by **RASHTI** in UAE, for ultimate transport to PKC in Iran.

### Export of Swirlklean Bypass Filters to Iran

26. On January 11, 2011, **RASHTI** contacted the buyer at PKC in Iran, referred to a telephone conversation they previously had, and attached a description of a Swirlklean Model I Bypass Filter and associated components. Subsequent emails between them established that PKC wanted four of the filters. **RASHTI** thereafter placed the order with Company C in Texas, who issued an invoice for $1,911.03 for four Swirlklean Model I Bypass Filters and associated components.

27. On April 12, 2011, **RASHTI** asked **SABOONCHI** to pay the invoice amount directly to Company C, which **SABOONCHI** did. **RASHTI** thereafter reimbursed **SABOONCHI** for paying the invoice. Thereafter, Company C shipped the goods directly to an address provided by **RASHTI** in UAE, for ultimate transport to PKC in Iran.

### Export of Flow Meters to Iran

28. On December 18, 2010, a representative of A.R.P.C., an Iranian petroleum company, sent an attachment to **RASHTI** that was a request for three parts for a Brooks Compact Prower Meter manufactured by an American company, with a listed model number and specifications. This type of flow meter is used primarily in industrial applications to measure the flow of water but could be adjusted to measure other liquids and gasses. On April 14, 2011, an employee of **RASHTI** emailed **SABOONCHI** asking for price and delivery time on an attached list, which was the same that A.R.P.C. provided. On April 18, 2010 **SABOONCHI** emailed a company in Maryland (hereafter Company D), and asked for a quote and delivery time on the same attached list.

29. Further communications resulted in the issuance of a final invoice on August 2, 2011 by Company D to **SABOONCHI** for three Brooks Flow Meters at a cost of $5,856 plus shipping. **SABOONCHI** paid a total of $6,224.88 for the three meters and shipping and was reimbursed by **RASHTI** for those costs. On September 24, 2011, **SABOONCHI** shipped the three meters from Germantown, Maryland to General DSAZ in UAE, for ultimate delivery by **RASHTI** to A.R.P.C. in Iran.

### Export of Actuator Springs to Iran

30. On January 13, 2011, a buyer at PKC in Iran sought a price quote from **RASHTI**

8

for an item described on an attachment as a spring for an actuator, with a specific part number, manufactured by an American company. The actuator (also called a regulator or valve) is used to control the flow rate of a liquid. On February 26, 2011 an employee of DSAZ emailed **SABOONCHI** for a price quote and delivery time and attached a description of the same item that **RASHTI** had received from PKC. On March 3, **SABOONCHI** sought a price quote from a company in Pennsylvania (hereafter Company E) and included the attachment he had received from DSAZ. On March 4, Company E provided **SABOONCHI** a quote.

31. On March 17, 2011 **SABOONCHI** emailed Company E to complete an order for three springs and provided his credit card information and a shipping address in Baltimore, Maryland. On March 25, 2011 Company E shipped the springs to **SABOONCHI** and on March 28, 2011 Company E charged his credit card $112.07 for the parts, tax, and shipping costs. **SABOONCHI** thereafter shipped the springs to the address provided by **RASHTI** in UAE, for ultimate transport to PKC in Iran.

### Export of Numerous Industrial Parts to Iran

32. On March 16, 2011, **RASHTI** received an email with an attachment from a representative of A.R.P.C. in Iran which contained a list of numerous industrial parts, including hydraulic valves and connectors, manufactured by an American company. On March 17, 2011 **RASHTI** sent the list to **SABOONCHI** and asked him to get a quote on the parts from a supply company in Pennsylvania (hereafter Company F), which **SABOONCHI** did. After receiving a quote and checking with **RASHTI**, **SABOONCHI** ordered the parts from Company F and instructed that they be shipped directly to General DSAZ in UAE.

33. The parts were sent to UAE in several shipments beginning on March 31, 2011,

9

and continuing into June 2011. **SABOONCHI** was charged separately for each shipment, resulting in total charges of $7,067, and was reimbursed by **RASHTI** for those costs. **RASHTI** thereafter made arrangements for delivery of the parts to A.R.P.C. in Iran.

### Export of Pumps and Valves to Iran

34. In email exchanges starting on July 24, 2012, **SABOONCHI** attempted to fill an order for an individual identified as Mehdi Mohammadi, who was located in Iran, for liquid pumps and check valves manufactured by an American company. Mohammadi wanted to know if **SABOONCHI** accepted Rial (Iranian currency) payment to family members in Iran and also if shipment would be direct to Iran or through Dubai. **SABOONCHI** advised he would not send anything straight through to Iran but provided an outline of a possible delivery plan to ship the goods *via* China. In late August 2012, **SABOONCHI** ordered the requested pump and check valves from a company in Pennsylvania (hereafter Company G). The pumps in question have oil, gas, energy, aerospace, and defense applications. Company G sent the parts to **SABOONCHI** in Maryland in two shipments, with the first order ($396.53 including freight) being shipped on August 29, 2012 and the second order ($1,923.95 including freight) sent on September 17, 2012.

35. In late August 2012, **SABOONCHI** requested assistance from an individual identified as Ehsan Naghshineh located in Iran. On August 27, 2012, **SABOONCHI** asked Naghshineh about shipping through Honk Kong and China. **SABOONCHI** revealed that the purchaser of the goods is in Iran. On September 20, 2012, **SABOONCHI** advised Naghshineh that the package arrived. **SABOONCHI** mailed the items on September 22, 2012 to an address in Shenzen, China, where it arrived in early October 2012. Images of the purchased items were then sent from China to **SABOONCHI**.

36. On October 7, 2012, **SABOONCHI** inquired about the package and asked for Naghshineh's telephone number in Iran to provide it to his friend Mehdi Mohammadi, which he did. On October 23, 2012, Naghshineh advised **SABOONCHI** the package arrived and would be delivered that day to Mehdi Mohammadi. On October 25, 2012, Naghshineh confirmed to **SABOONCHI** that the package was delivered per their previous discussion.

50 U.S.C. §§ 1702, 1705
31 C.F.R. §§ 560.203, 560.204

## COUNT TWO

### Unlawful Export to an Embargoed Country

1. The allegations set forth in paragraphs 1-9 and 11-21 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. Beginning in or about February 2010, and continuing through at least January 2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to do so, of certain goods, to wit, cyclone separators, and also services, from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F.R. §§ 560.203, 560.204

## COUNT THREE

### Unlawful Export to an Embargoed Country

1. The allegations set forth in paragraphs 1-9, 11-19, and 22-23 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. Beginning in or about June 2010, and continuing through at least February 2011, in the District of Maryland,

**ALI SABOONCHI**
and
**ARASH RASHTI MOHAMMAD,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to do so, of certain goods, to wit, thermocouples, and also services, from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F.R. §§ 560.203, 560.204

## COUNT FOUR

### Unlawful Export to an Embargoed Country

1. The allegations set forth in paragraphs 1-9, 11-19, and 28-29 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. Beginning in or about December 2010, and continuing through at least September 2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to do so, of certain goods, to wit, flow meters, and also services, from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F.R. §§ 560.203, 560.204

## COUNT FIVE

### Unlawful Export to an Embargoed Country

1. The allegations set forth in paragraphs 1-9, 11-19, and 34-36 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. Beginning in or about July 2012, and continuing through at least October 2012, in the District of Maryland,

**ALI SABOONCHI,**

defendant herein, did knowingly and willfully export and cause the exportation, and attempt to do so, of certain goods, to wit, pumps and valves, and also services, from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F.R. §§ 560.203, 560.204

Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

March 4, 2013
Date

15