**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **Criminal No PWG-13-0100** |
| | * | |
| **ALI SABOONCHI** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**TO DEFENDANT'S PRE-TRIAL MOTIONS**

The United States of America, by and through its undersigned counsel, responds as follows to the pre-trial motions filed by the defendant and his counsel.

**I.      Procedural History**

On March 4, 2013, following a joint investigation by the Federal Bureau of Investigation (FBI) and United States Immigration and Customs Enforcement, Homeland Security Investigations (HSI), the defendant was indicted by a federal grand jury on a charge of conspiracy to export goods and services to Iran, and four substantive counts of same, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, and the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. §§ 560.203 and 560.204.  He was arrested on March 7, 2013.  On March 27, 2013, Magistrate Judge Jillyn Schulze ordered the defendant released from pre-trial detention on a $500,000 appearance bond secured by agreements to forfeit $226,300 of equity in property located in Virginia, and $282,000 of equity in property located in Maryland.  In addition, the court ordered that the defendant be placed on electronic monitoring and be restricted to his residence in Maryland except for pre-approved travel to Morgan State University for work and/or educational classes. On May 16, 2013, Magistrate Judge Schulze modified the defendant's conditions of release to

allow for pre-approved doctor visits and visits with counsel in Washington, D.C., and use of a computer not accessible to the internet.

On August 22, 2013, a superseding indictment was issued by the grand jury with the following changes/additions: 1) two additional individuals identified as co-conspirators in the original indictment are now named as co-defendants; 2) the starting date of the conspiracy is pushed back pushed back from November 2009 to September 2009; 3) additional acts in furtherance of the conspiracy are identified; 4) one new substantive count alleging another export violation is added; and 5) some of the background and definitional language contained in Count One of the original indictment has been reorganized.  All of the modifications/additions in the superseding indictment are based on the existing evidence previously provided to the defense in discovery and do not alter the nature and scope of the conspiracy charge alleged in the original indictment.

Three email search warrants were executed in the underlying investigation.  On July 24, 2012, Magistrate Judge William Connelly issued a warrant for the defendant's account ali.saboonchi@gmail.com, co-defendant Rashti's account arash.bs@gmail.com, and an account used by Rashti's employee, saideh.rah@gmail.com.  On September 19, 2012, Magistrate Judge Schulze issued a warrant for ali.saboonchi@gmail.com, arash.bs@gmail.com, and another of the defendant's accounts - alsaboon@gmail.com.  On November 19, 2012, Judge Connelly issued a warrant for alsaboon@gmail.com and the defendant's business accounts for his company Ace Electric, aceelecricco@gmail.com and aceelecticco@gmail.com.  All login IP addresses for the defendant's email accounts resolved to locations in the United States. Almost all login IP addresses for the accounts used by Rashti and his employee resolved to locations in Iran..

The majority of the defendant's email communications with his Iranian co-conspirators and associates were in Farsi.  The excerpts of email and chat communications with those individuals that are referenced in the indictment and herein, including quotations, are taken from the English translations completed by FBI translators.

## II.     Factual Summary

The defendant is a dual citizen of the United States and Iran.  The defendant obtained a Bachelor's degree in Industrial Engineering from Isfahan University of Technology (IUT) in Iran where his father is a professor.  He recently obtained a Masters degree in Systems Engineering from Morgan State University.  He is currently working on his Ph.D. in the same program.

### A.     Export-related Activities in late 2009/early 2010

#### 1.     Attempt to Acquire Industrial Camera System

On September 1, 2009, Mohsen Hosseyni, using a Hotmail account resolving to an IP address in Iran, emailed the defendant and asked him to get prices on an industrial camera system to be used in processing steel manufactured by Mobarakeh Steel, a company located in Isfahan, Iran.  Hosseyni stated that Company J, whose website he provided, would not sell to Iran.  The defendant responded that he would do his best to obtain the requested items.  On September 10, an engineer from Company J emailed the defendant and asked him to describe the application and technical requirements for the system he sought, and to provide the sales order number if the order was a duplicate for an existing system.  The defendant forwarded the message to Hosseyni asking for the details and stating that the price would be $3500 to $4000.  Hosseyni responded that he had obtained responsive information from the factory (Mobarakeh Steel), but cautioned the defendant that he could not share that with the U.S. company.  He told the defendant if he deemed it appropriate, to tell the company that the sales order number was

unavailable and that the system had been seen in the shop and was being used to determine the edge of a steel sheet.

On November 9, after some emails relaying technical information from Company J, the defendant asked Hosseyni whether he should purchase the equipment for shipment to his own address and then mail it overseas, make the purchase from Europe for shipment to Iran, or send the equipment through Dubai, which was his preference.  Hosseyni responded that he wanted it quickly, so however the defendant deemed advisable was fine with him.  Subsequent emails between the defendant and Hosseyni suggest that the transaction was never completed.

### 2.       Solicitation of Iranian Business

On October 29, 2009, the defendant exchanged emails with an individual named Mohammad Nemati, who, based on the content of the email chain, appeared to be located in Iran. Nemati asked if the defendant was interested in any business, and claimed that the defendant "went to America and forgot about us."  The defendant replied that he was in the "trade business," and if there was any business, he would be at Nemati's "service"  Nemati asked if he could be the defendant's "partner in Iran," and the defendant replied, "If anyone in Iran needs something from here I can find it for him/her.  Yes.  You can also look for customers like anybody else.  We can purchase anything and send it to them.  Of course you need to receive a deposit so that the buyer guarantees the payment."

### 3.       Creation of Ace Electric and Initial Exchanges with Rashti

On November 19, 2009, Rashti sent an email to the defendant asking for his response by November 22 regarding their negotiation about a trading company.  The email implied that the defendant and Rashti had previously discussed forming a business relationship.  In his signature block, Rashti identified himself as a Sales Manager for Darya Sazeh Aria Zamin Co. (DSAZ)

located at a specific address in Tehran, Iran.  (In other email exchanges, Rashti also identified himself as an employee of General DSAZ FZ-LLC located at a post office box address for the Amenity Center, a type of virtual office service, in RAK, UAE.)  On November 20, 2009, the defendant replied that he would start with a few projects until "we get a better business perspective of each other."

On November 21, Rashti requested the defendant's price and delivery time on two industrial cooler systems and provided a link to the manufacturer's website.  Rashti also provided information about a freight forwarding company that could provide the defendant with shipping cost information once he obtained a quote and the package size and weight.  The defendant gave Rashti prices from the internet for the cooler systems, but Rashti advised that the defendant could get a better price if he sent the inquiry from a "trading company."  When the defendant asked for the destination address, Rashti responded with the address for what he stated was a trading company in the UAE named Agrifirm International.  The listed address was at the Fairmont hotel in Dubai, UAE, which is a high-end resort hotel with guest rooms, apartments, and offices.

On the same date, Rashti sent the defendant a request for an order from another U.S. company for seventy industrial hydraulic filters and provided a link to the company's website. On November 23, the defendant told Rashti that he had difficulty getting a quote from the company, saying that if they found out that the order was for overseas, they would not sell the items, "and if not, they need [a] company name."  The defendant suggested that once he registers his own company, he might be able to buy the product for shipment to his own address.

In a chat session on December 1, the defendant described restrictions placed on importers/exporters and requirements for registering his business.  On December 18, 2009, the

defendant registered Ace Electric Co. with the Maryland Department of Assessments and Taxation.  On his trade name application, the defendant identified himself as the owner of the business, provided a business address in Rockville, Maryland (which was the location of his purported residence), and described the business as "residential and commercial electrical low and high voltage and trading (export and import)."  On December 29, the defendant advised Rashti that he had opened his own company.  Rashti later provided the defendant with the graphic logo for Ace Electric, and helped to set up email and messaging services for the company through a web hosting service.

On January 6, 2010, Rashti directed the defendant to tell an unspecified entity that a particular request (not specified) was from a supplier in Iraq.  During this same time frame, the defendant and Rashti discussed obtaining quotes from two different companies.  When the defendant encountered difficulties getting certain of those products, Rashti told him to seek equivalent products from other suppliers.  On March 9, 2010, Rashti sent the defendant a list of sixteen of his customers in Iran, including oil refineries, a steel company, petrochemical companies, and shipping companies.

### B.  Export-related Activities in 2010 and 2011

All of the transactions identified in the indictment are established through email and chat communications between the defendants, their coconspirators and associates, and corroborated by bank records, shipping records, and records from the various U.S. companies (identified in the indictment and herein by letter) from which products were obtained or sought to be obtained.

### 1.  Cyclone Separators / Company A

On February 20, 2010, Rashti received an inquiry from Shazand Arak Oil Refining Company (SAORC) in Arak, Iran, seeking a quote on two cyclone separators.  SAORC is an

entity of the Iranian Ministry of Petroleum and was one of the companies listed on the Iranian client list Rashti had previously sent to the defendant.  In June 2010, Rashti unsuccessfully tried to obtain a quote on the separators from another source.  Starting on September 28, 2010, the defendant tried to pursue the request through Company A.  Several email exchanges followed between the defendant and Rashti regarding the details and pricing for the order.  On November 15, 2010, the defendant informed Company A that he wanted to order two of the separators.

On November 17, 2010, a Company A representative asked the defendant to either confirm that the order was for a domestic customer, or provide the identity of the end user and final destination.  The defendant responded, "we do stuck (*sic* – meaning stock) them and use it for domestic customer," and indicated that the products be sent to Ace Electric at an address in Boyds, Maryland.  (This address was the residence an individual known to the defendant.)  In connection with the order, which cost $2,114.53 and was paid via a charge to the defendant's credit card, Company A provided a terms and conditions statement to the defendant that read in pertinent part:

> DESTINATION: All products sold are for domestic use only, unless specifically documented otherwise by purchaser.  Export and reexport sales must comply in all respects with the law and regulations of the United States, the intended use and destination must be documented and approved by [Company A], and minimum billing is two hundred and fifty (250) dollars net.

On December 10, 2010, Company A shipped the cyclone separators via United Parcel Service (UPS) to Ali Saboonchi/Ace Electric Company at the address in Boyds, Maryland.  The items were listed as weighing 14 pounds.  UPS records confirm that the package was delivered on December 13, 2010.  On December 27, 2010, the defendant shipped the items by Federal Express (FedEx) to Rashti's attention at the Amenity Center in UAE.  The items were listed on the shipping records as a "Cyclone Separator" with "Electrical Equipment," weighing a total of

14 pounds with a claimed value of $100.  FedEx records show that the package was delivered in UAE on January 2, 2011.  On that same day, an Amenity Center receptionist emailed Rashti to quote him the Aramex courier charge and get confirmation of the party to whom they would ship the Company A package they received through the defendant. Rashti confirmed that it would be shipped to Mr. Abdolaziz at a listed address in Dubai and that they could mention their listed address for DSAZ in Tehran to Abdolaziz.

## 2.    Thermocouples / Company B

Beginning in June 2010, Rashti tried to obtain quotes on behalf of Petrochemical Kala Company (PKC) in Iran for thermocouples.  A series of emails with another middleman and possible sources of supply resulted in identification of the model numbers needed, but no sales were completed.   On September 20, 2010, Rashti asked the defendant to get a quote from Company B on six listed thermocouples.  The defendant emailed Company B with the request and attached the product list that Rashti had given him.  Company B responded that the model numbers provided were not valid, and discussed having the defendant provide specifications to identify the correct models needed.  On September 21, Rashti sent PKC a link to Company B's thermocouple catalog.   On September 30, PKC sent a purchase order along with some pages from the catalog back to Rashti with certain items highlighted.   Rashti forwarded this to the defendant.

On November 1, 2010, Rashti told the defendant to order five of one of the model number thermocouples.  The other items on the initial list were not pursued based on emails between Rashti and PKC.  On November 11, the defendant ordered four of the model number that Rashti had specified from Company B.  Rashti had the defendant increase the number of units to six, and Company B responded with an updated quote of $1,284 on November 15, which

the defendant forwarded to Rashti.  On November 17, Company B asked the defendant, "what country is the ultimate destination?"  The defendant forwarded the email to Rashti, who responded that the defendant should say a company called Spin Control in Turkey, for which he provided a weblink.  On November 22, the defendant falsely advised Company B that Spin Control in Turkey was the ultimate destination.  The next day, he told Company B to ship the items to the address in Boyds, Maryland, and send the bill to him at the address in Rockville, Maryland.

On January 19, 2011, Company B shipped the thermocouples to the defendant by FedEx and charged the purchase price to the defendant's credit card.  On February 3, the defendant provided Rashti with the UPS tracking number for his subsequent shipment of the products to UAE.  On February 6, a receptionist at the Amenity Center in UAE emailed Rashti that Company B's package sent by Ace Electric had arrived and sought delivery instructions.  Rashti then emailed the defendant confirming the delivery.  The defendant told Rashti that he could deposit the UPS shipping costs into a bank account used by his wife who was living in Iran at the time.  On February 8, the defendant provided Rashti with his wife's name and account number at Bank Melli in Iran.   On that same day, Rashti told the Amenity Center receptionist to send the package to the Mohammad Amin Nazar Company at a listed address in Dubai, which she confirmed she did the next day.

### 3.    Swirlklean Filter Elements and Filter / Company C

On October 18, 2010, a buyer with PKC in Iran emailed Rashti about obtaining ten units of a 30 micron stainless steel filter element with a listed part number from Company C.  The company had previously patented a specialty filtering system called the Swirlklean Bypass Filter.  On October 22, Rashti emailed Marjan Maroufi of B&A Trading FZCO in Dubai, UAE, and

asked her to "transfer money to their account and order 10 units."  Maroufi ordered the units from Company C.  On October 30, Maroufi forwarded an email she had received from Company C with an attached invoice for the ten units, total cost $151.53, and asked Rashti to confirm the order, which he did.  On November 4, Maroufi emailed Rashti and said: "Please don't ask me to send any Dollar currency as it is very difficult for Iranian nationality and is not guaranteed if they block the money, this time I did it with so many complications."  Maroufi was subsequently unable to transfer the money to Company C.

On December 6, Rashti asked the defendant to transfer payment to Company C for the invoice, which he attached.  Rashti also indicated that Spin Control, the company he had previously told the defendant to falsely reference as an end-user for the thermocouple purchase from Company B, would transfer the money to the defendant's account the next day.  Rashti contacted Spin Control and arranged the money transfer to the defendant's Capital One account. The defendant gave Company C his credit card information along with a copy of the invoice initially issued to B&A Trading.  The charged amount was reduced by $20 because the fee for receiving a wire transfer was deleted since the defendant was using a credit card.

On December 10, Company C emailed the defendant and Maroufi confirming that the order had been finalized, and attached the credit card receipt and shipping details.  The defendant forwarded the message and attachments to Rashti.  Company C shipped the package by UPS directly to General DSAZ in UAE.  Maroufi emailed Rashti and told him she would let him know when the shipment arrived, and added: "please note entering Ajman Mina is very difficult, kindly give me one day notice for any Ajman Mina vessel."  Rashti responded by asking Maroufi to call him.

On January 11, 2011, Rashti emailed the buyer at PKC in Iran, referred to a telephone conversation they had, and attached a description of a Swirlklean Model I filter and associated components.  Subsequent emails between them established that PKC wanted four of the filters.  On February 14, Rashti's employee emailed the buyer and attached a copy of Company C's catalog showing the Swirlklean filter.  Rashti subsequently placed the order with Company C.

On April 12, during a Gmail chat, Rashti asked the defendant to send the money ($1,911.03 US) to Company C for the purchase.  Rashti said he would put the equivalent amount of money into the defendant's account.  The defendant confirmed that he gave the money to Company C by echeck and provided Rashti the confirmation number for the purchase.  In a Gmail chat the following day, Rashti confirmed that he put $1,912 into the defendant's (Bank of America) account from Iran.  On April 21, Company C emailed the defendant and Rashti the UPS tracking number for the shipment, which it had shipped directly to the UAE address provided by Rashti.

On April 24, the Amenity Center receptionist emailed Rashti that she had received the package with the four filters and sent him copies of the documents received with the shipment.  On April 27, Rashti confirmed to the receptionist that the package was to be sent to the Mohammad Amin Nazar Company in Dubai.  On May 1, the receptionist informed Rashti that the package, and others, were picked up the preceding day.

### 4.     Flow Meters / Company D

On December 18, 2010, a representative of A.R.P.C., an Iranian petroleum company listed on the customer list Rashti had provided to the defendant, sent an attachment to Rashti requesting three flow meters with a listed model number and specifications.  On March 28, 2011, the representative emailed Rashti's employee with specifications for their needs.  On April 14,

the employee emailed the defendant asking for price and delivery time on an attached list which was the same as that previously provided by A.R.P.C.  On April 18, the defendant emailed a request to Company D for a quote and delivery time, and attached what he had received from Rashti's employee.  On April 19, Company D responded with a quote of $1,782 for the specific flow meter.  The defendant forwarded the email and quote to Rashti and his employee.  On April 20, the employee forwarded a quote to A.R.P.C.

On June 20, the defendant forwarded to Rashti an amended quote he received from Company D increasing the quantity to three of the same flow meters.  On June 22, the defendant placed the order by email, paid for it with his credit card, and directed that it be shipped to him at the address in Boyds, Maryland.  The next day, the defendant advised Company D that his billing address was his purported home address in Potomac, Maryland.  Additional emails among all the parties clarified specifications for the flow meters needed, resulting in a revised quote being issued to the defendant by Company D on July 22, with a total cost of $5,856.  The defendant forwarded the revised quote to Rashti, and on July 27 told Company D to proceed with the order.  On August 2, Company D issued a final invoice to the defendant confirming the order.

On September 2, the defendant advised Rashti that he had been charged $6,224.88 for the order, which included Company D's shipping costs.  The defendant asked Rashti how much had been deposited into his account to cover the costs.  On September 22, the defendant told Rashti that the order was on its way and that he would send an invoice separately.  On September 24, the defendant sent the package from Germantown, Maryland, via UPS, to General DSAZ in UAE.  On October 5, Rashti emailed the receptionist at the Amenity Center in UAE and attached a copy of the invoice for the flow meters, and the receptionist responded that she would present it at the post office.  On October 6, the receptionist advised Rashti that she had the package.

### 5.      Actuator Springs / Company E

By email on January 13, 2011, the buyer at PKC in Iran sought a price quote from Rashti for items described on an attachment as a set of springs for an actuator with a specific part number.   On February 26, Rashti's employee sent an email to the defendant asking for a price quote and delivery time, and attached a description of the same items requested by PKC.   On March 3, the defendant emailed Company E, included the attachment he had received from Rashti's employee, and sought a price quote.   The defendant and Rashti discussed this order during a Gmail chat on the same date.   On March 4, Company E provided the defendant with a quote of $49.20 per spring, which the defendant forwarded to Rashti.   During a Gmail chat on March 11, the defendant asked Rashti if he wanted to complete the order.   On March 17, the defendant told Company E to complete an order for three of the same item, and provided his credit card information, a shipping address in Baltimore, Maryland (that was the residence of an acquaintance of the defendant), and a billing address at his purported home in Potomac, Maryland.   On March 28, Company E charged the defendant's card $112.07 for the parts, tax, and shipping costs.   On April 14, the receptionist at the Amenity Center emailed Rashti that the parcel containing the items from Company E had arrived from the defendant.

### 6.      Industrial Parts / Company F

On about March 16, 2011, Rashti and his employee received an email with an attachment from a representative of A.R.P.C.   The attachment contained a list of items numbered 9 through 30, which were various industrial part numbers and quantities, including hydraulic valves and connectors.   Rashti first obtained a quote for the items from another source, which he sent back to A.R.P.C.   On March 17, Rashti sent the list to the defendant, asked him to get a quote on the parts from Company F, and provided the company's contact information.   The defendant then

emailed Company F asking for a quote and attached the list originally provided by A.R.P.C. Company G responded with a quote on March 23, which the defendant forwarded to Rashti. Rashti asked that the defendant try to get the tax removed because of "the export" (which the defendant later accomplished by setting up an account with Company F). The defendant provided Company F with the name and shipping address of General DSAZ in UAE. After numerous email and chat communications between the defendant and Rashti, and the defendant and Company F, the parts were subsequently sent in several shipments from Company F because of back orders on some of the items. Ultimately, the total cost to the defendant for the parts and shipping came to $7,067, which he paid by credit card.

Between April 4 and April 11, 2011, multiple shipments from Company F containing items originally sought by A.R.P.C. were delivered to Rashti's UAE address. After being advised by a receptionist at the Amenity Center through various email exchanges (in some instances with attached copies of the packing lists and invoices) that the packages had been received, Rashti directed that the packages be forwarded to "Sam Tayeb," and then subsequently asked that they be sent to "Amin."

On April 6, the defendant sent Rashti information about his credit card used to make the purchases from Company F. Rashti then emailed an individual at a trading company with a UAE email address requesting that $7,067 to cover the defendant's purchases be wired to his account using two or three separate wires. A single wire of the full amount was completed on April 11, and Rashti sent the defendant a copy of the wire transfer.

### 7.     Attempt to Obtain Industrial Components

In May 2011, Rashti caused two separate inquiries to be made for a list of thermoelectric industrial components -- one inquiry from Iran to the manufacturer (Company K), and another

from the defendant to the manufacturer's U.S. distributor (Company L).   The distributor ultimately became suspicious and denied the purchase.

On May 3, 2011, the defendant received a request from one of Rashti's employees to determine a price offer and time of delivery for items listed in an attachment, which contained approximately twenty-nine thermoelectric industrial components.   That same day, the defendant submitted a request to Company L seeking a quote for the components contained in an attachment identical to the one sent by Rashti's employee.   The Company L representative asked the defendant to identify the location of the end-user so he could provide the quote.   The defendant responded later that same day advising that the order was for General D-SAZ FZ-LLC located in UAE and provided the email address and contact numbers for Rashti's employee.   He also identified "a company that [he does] business" with as a reference, and listed contact information for a representative of Company F.

On the same day, May 3, the defendant sent an email to the Company F representative and advised that he had just placed a large order with the manufacturer and had provided the representative's name and contact information as a business reference.   The defendant asked that if the representative was contacted, he not inform the company that all of the defendant's orders with Company F had gone overseas because he believed that was an issue of concern.   Instead, the defendant asked the Company F representative that he state that the defendant's orders with Company F were a combination of local and overseas orders, which the defendant felt would sound better.

On May 4, 2011, the Company L representative informed the defendant that a quote would not be submitted for the requested components because "it was already quoted by the factory for the customer in Iran."   The defendant responded the next day asking if representative

15

was certain, and indicated that he had gotten the order from a company in UAE.  The defendant stated, "that sounds weird," and "if that's the case don't worry about it and thanks for letting me know."  On May 5, 2011 Rashti's employee was advised by Company K that no offer would issue since the project had already been quoted by the company's distributor for Iran and others.

On May 7, 2011, during a Gmail chat, Rashti advised the defendant that he had seen the denial of the quote.  The defendant stated, "we screwed up."  Rashti apologized, explaining that they had mixed up the list somewhat between their two inquiries.  The defendant further explained that when the guy saw the long list he grew suspicious.  Rashti blamed his client. Rashti told the defendant that he should explain to the company representative that the purchase request came from the "Emirates."  The defendant said he had done so when asked about the end-user.  Rashti went on to state if someone asked them, they should say they got the order from a client in Iraq and "we did not know that this is from Iran."  Rashti then told the defendant to tell that to the company, to which the defendant responded that the company representative was probably "not going to say hi to us anymore."  Rashti told the defendant not to worry about it.

### C.     Export-related Activities in 2012

#### 1.     Pumps and Check Valves / Company G

In email exchanges starting on July 24, 2012, the defendant attempted to fill an order for co-defendant Mehdi Mohammadi for liquid pumps and check valves.  IP records available for the email address utilized by Mohammadi resolved almost exclusively to Iran.  Mohammadi's emails with the defendant in late July 2012 included one in which Mohammadi wanted to know if the defendant accepted Rial (Iranian currency) payment to family members "here" (meaning Iran) and also if shipment would be direct to Iran or through Dubai.  In his response the same day, the defendant advised he doubted he would send anything straight through.  On July 25,

2012, Mohammadi wanted to know how the defendant's friend in Dubai sent a package to Iran. The defendant responded with an outline of a possible delivery plan. In subsequent exchanges, the defendant advised Mohammadi that he was trying to ship the goods via China, which he believed would be cheaper.

In late August 2012, the defendant ordered the requested pumps and check valves, based on their availability, from Company G. Around the same time, the defendant requested assistance from co-defendant Eshan Naghshineh to get the parts shipped into Iran. IP records available for the email address utilized by Naghshineh resolve almost exclusively to Iran. On August 27, 2012, the defendant asked Naghshineh about shipping through China or elsewhere. The defendant revealed the purchaser of the goods was in Naghshineh's area, meaning Iran. On September 20, 2012, the defendant advised Naghshineh that the package had arrived. Company G records reflect that the defendant ordered the parts in question, and they were shipped to him in Maryland in two parts on August 29 and September 17, 2012, respectively. The defendant mailed the items on September 22, 2012, to an address in Shenzhen, China, to the attention of a company called "Xinyuanjiang Electronics." The package arrived in China in early October 2012, and images of the products were taken and sent back to the defendant. The images match parts of the same description, make and model as those sold to the defendant by Company G.

On October 7, 2012, the defendant inquired about the package and asked to provide his phone number in Iran so he could give it Mohammadi. On October 23, 2012, Naghshineh advised the defendant that the package had arrived (in Iran) and would be delivered that day (to Mohammadi) . On October 25, 2012, the defendant verified the package was delivered per their previous discussion. Naghshineh confirmed it was delivered as previously discussed.

### 2.        LCD Modules, Pumps and Industrial Parts / Companies H and I

On December 27, 2012, Naghshineh asked the defendant if he could obtain some items for him to be transshipped to him through Hong Kong.  The defendant suggested it would be best to coordinate shipment in two stages with Mohammadi (referred to as his "friend," but referenced by name in other prior and subsequent email exchanges with Naghshineh).  On January 3, 2013, Naghshineh asked the defendant to purchase fifty LCD modules and five magnifying lenses from Company H, and provided web links for those products and ebay web links for carbide end mills that he also wanted the defendant to buy.  The defendant purchased the LCD modules from Company H that same day, at a total cost of $421.15, for shipment to his Parkville, Maryland, residence.  Between January 3 and January 11, 2013, the defendant purchased, or attempted to purchase, various carbide end mills via the ebay web links provided by Naghshineh.

On January 9, 2013, the defendant told Naghshineh that Mohammadi had two orders that included industrial washers and a "large and heavy motor," that would be combined with Naghshineh's items for shipment to China.  The defendant had previously ordered Mohammadi's item, which included a pump and related parts, from Company I on January 2, 2013.  Company I shipped the items to the defendant's Parkville residence in separate shipments during the following weeks.  On January 15, 2013, Naghshineh advised the defendant that the items ordered by him and Mohammadi would be separated once received in Hong Kong.

On January 21, 2013, Mohammadi told the defendant how much money he was transferring toward the total payment of $17,500 for the items ordered from Company I.  (The defendant had advised Naghshineh on January 13, 2013, that he had not yet received Mohammadi's payment of between "15-20.")  On January 23, 2013, the defendant directed

18

Naghshineh to determine how much he owed to the defendant for their transaction, to include the defendant's commission, and they discussed calculation of the expenses for subsequent shipment of the merchandise from Hong Kong to Iran.   On February 1, 2013, the defendant shipped the industrial parts and components obtained for Mohammadi and Naghshineh from Company H and Company I to China for subsequent shipment to Iran.

### D.      Defendant's Post-Arrest Statement

Shortly after his arrest on March 7, 2013, the defendant executed a written Miranda waiver and gave a lengthy statement to the arresting agents.   Throughout his interview, the defendant was less than candid regarding his export-related activities and, when confronted directly by the agents with specific evidence, sought to minimize actions he had taken to facilitate unlawful exports to Iran.

The defendant stated that he started Ace Electric in 2009 to do part-time work as an electrician.  He started to do "trading" when his electrician work slowed down.  He described his "trading" work as buying and selling industrial equipment.  Though he indicated that he was not aware of what the items he obtained were used for, he stated that the items were not "critical," and thus, he was comfortable sending them out of country.   He knew he needed to be more careful if an item required identification of the end-user and was uncomfortable sending those types of items.  He identified his personal and business email accounts and acknowledged use of both in connection with his business.   He indicated that he communicated with his overseas business partners through email, electronic chats and telephone.   He acknowledged having a bank account in Iran, but stated that the government automatically opened the account while he was a student there.

The defendant stated that he had sent a modem to China to a company called "Vahid Tech," with offices in Dubai, UAE.  He was unsure whether the company had an office in Iran. He knew, as of a few years ago, that shipping items that were used in Iran was problematic.

Initially the defendant denied doing business with DSAZ, but claimed that Rashti's name sounded familiar.  Upon further questioning, the defendant acknowledged that he had done one business deal with Rashti, but stopped doing business with him when Rashti asked him to obtain something "critical."  He stated that the value of the one shipment he did for Rashti, which he sent to Dubai, was $6,000 and involved a local business whose salesperson was "Patrick."  The defendant claimed he lost money on the transaction, and as a result, began requiring payment for others prior to purchasing requested items.  The defendant stated that his last contact with Rashti was two summers ago.

The defendant stated that he met Mehdi Mohammadi in high school in Iran, and knew that Mohammadi was an Iranian citizen who worked for a Chinese company.  He claimed that he did not know where Mohammadi resided.  Mohammadi wanted him to obtain items for him in the U.S. because the same items were more expensive to obtain in China.  The defendant said he had contact with Mohammadi as recently as a few days prior to his arrest, and the last transaction he did for Mohammadi involved obtaining an Edwards pump.  He shipped the pump to Mohammadi in China, but had no idea where the items went from there.  He stated that he did not ask the ultimate destination as it was not his problem where the items went or how they were used.  The defendant indicated that Mohammadi would wire funds to him for payment for their transactions, but recently, because the process was taking longer, Mohammadi was giving payment to the defendant's family members in Iran.  The defendant's family would bring money to him when they visited the United States.

The defendant stated that he knew Eshan Naghshineh from attending IUT. He knew Naghshineh was an Iranian citizen, but claimed he did not know where Naghshineh resided. He indicated that Naghshineh was in the industrial equipment business in Iran and was doing that while attending IUT. He acknowledged that he obtained small items for Naghshineh, such as computer numeric control bits, drill bits, and the like.

The defendant said that he had only shipped two orders for customers in the past two years. He reiterated that he would not inquire as to the end-user of items he shipped, and did not want to know if the items were sent to Iran after he sent them to Dubai or elsewhere. The defendant was then confronted with a December 2009 email from Rashti showing Rashti's signature block bearing an Iranian address. The defendant stated that he had not paid attention to Rashti's signature block. The defendant was then shown the March 2010 email from Rashti to which Rashti's client list was attached. The defendant acknowledged receiving the email and attached list, and stated that he did not care if items he obtained were subsequently sent to Iran since he was not sending the items there himself. He indicated that he never liked sending items to Iran directly, but even if knew the items were going to Iran, he was okay with that because he was not the one sending the items to Iran.

The defendant then acknowledged that he was introduced to Rashti through a friend or family member who had recommended that Rashti contact the defendant to acquire items. (Later in the interview, the defendant said Rashti is the cousin of his paternal uncle's wife.) The defendant again claimed there was only one completed deal and shipment for Rashti, at which point the agents confronted the defendant with various emails detailing the transactions between him and Rashti involving the acquisition of industrial parts from various of the companies

identified in the indictment.   With one exception, the defendant said he did recall the transactions, though he acknowledged they had clearly occurred.

The defendant was also shown documents relating to the purchase of pumps from Company G.  The defendant also did not recall the order.  However, he stated that Naghshineh was not initially involved in the deal, and he subsequently introduced him to Mohammadi so they could communicate directly about acquiring the relevant products.  After being shown an email from Mohammadi detailing that the requested pumps would ultimately end up in Iran, the defendant reiterated that he did not care where items ended up after he shipped them to Dubai or China, since he did not send them directly to Iran himself.  The defendant stated further that if he definitely knew items he obtained were ultimately going to Iran, he would still complete the sale and send the items to UAE or China for subsequent delivery to Iran.

After being shown a number of his electronic chats with Naghshineh, the defendant acknowledged that he believed, "most probably," that the requested pumps would have been forwarded to Iran after being received in China.  He then stated that he did, in fact, know that the items were going to Iran, but he was not concerned about that since he was only shipping them to China.   The defendant also acknowledged that the address to which he had sent the pump products was not the same address used by Mohammadi in China.

The defendant was shown a number of wire transfers to his bank account.  He stated that he did not like receiving large wire transfers because he then had to pay taxes on the amount. The defendant did not recall the transfers, but claimed that monies received in 2010 and 2011 were either from his family wiring money to him from Iran, or for his work for Rashti.

The defendant stated that he tried to get a 20% profit on transactions he handled, but usually got less.  He stated he tried to get 15% for one deal with Rashti.  He indicated that he had

packages shipped to his home, which he then shipped overseas. He utilized various addresses in Maryland belonging to friends, though he tried not to use them in connection with his export business. If he received a business package at these addresses, he would not alert his friends until the last minute. In some instances, he would receive calls from his friends that a package of his had been delivered to their address. The defendant acknowledged that he used FedEx, UPS and the Postal Service to ship packages overseas.

Throughout the interview, the defendant reiterated that the actual end-user of the items he obtained was "none of my business." When asked if he agreed that the Iranian government had a hand in private industry in Iran, he stated that was true, but said it was a complicated issue.

The defendant said he stopped doing business with Rashti for two reasons: first, Rashti didn't deal with him anymore after the defendant lost money on one of their deals; and second, the defendant did not like obtaining the oil-related industrial parts that Rashti wanted because the parts might be obtained to support the government of Iran. (The defendant was also asked why he had sent Rashti a copy of his research paper at Morgan State relating to (and titled) engineering software development for NASA. The defendant could not remember why he would have done that. He also stated that if, while visiting Iran, he was asked what he was working on at school, he would provide the information since his work with NASA was not "critical.")

The defendant stated that his latest transaction was with Mohammadi for grease cartridges that he would send to China, but stated "they could be Iran, that's what I'm thinking." He acknowledged having obtained a recent large quote for Mohammadi from Company G, but stated that he would not do deals worth more than $10,000 in case he needed to cover expenses if the buyer backed out. He said he was currently doing business with just Mohammadi and

Naghshineh, but did not like doing much for Naghshineh because he made little or no money on Naghshineh's transactions.

Throughout the interview, the defendant reiterated his belief that as a United States citizen, he should be free to sell equipment to whomever he wished.  The defendant referred to Iran as "home."

## III.    Motion to Suppress Evidence

On March 31, 2012, at 9:47PM, the defendant and his wife were stopped in their vehicle by Customs and Border Patrol (CBP) agents as they attempted to enter the United States via the Rainbow Bridge in Niagara Falls, New York.  At the time, the defendant's wife was traveling under a U.S. immigrant visa and Iranian passport.  During the course of the initial stop, a query of law enforcement databases revealed that the defendant was the subject of an ongoing investigation.  The defendant and his wife were escorted to a secure secondary inspection area where they were interviewed separately starting at 10:00PM.  Per standard procedure, the defendant was asked about his travel and his destination, and directed to remove the contents of his pockets for inspection.  The defendant was found to have two cell phones and a thumb drive in his possession, all of which were detained by CBP/HSI agents pursuant to their border search authority.  The devices were forwarded to HSI Baltimore shortly thereafter for inspection.  The defendant's vehicle was also searched.  At 12:25AM, approximately two and half hours after the initial border stop, the defendant and his wife were released from secondary inspection and allowed to proceed into the United States.

On April 4, 2012, a computer forensic agent with HSI Baltimore forensically imaged the defendant's seized thumb drive and cell phones and analyzed their contents.  The thumb drive was found to contain evidence that the defendant had worked for an Iranian company between

March and July 2007.  One of the cell phones, an Apple Iphone, was found to contain contact information for a sales representative with Company F (referenced herein and in the indictment). (This was same company representative the defendant had asked to provide a false reference on his behalf.  *See* Section B.7, *infra*.)  The identified electronic media stored on the thumb drive and the Apple Iphone was seized as evidence of IEEPA and OFAC violations.

On April 13, 2012, two Baltimore HSI agents met with the defendant to return his thumb drive and cell phones.  The defendant confirmed that the thumb drive and Apple Iphone belonged to him and were used for his academic work.  He stated that the other cell phone found in his possession belonged to a friend and was being used by the defendant for its GPS function. The agents asked the defendant to explain the 2007 internship he did for a company in Iran that was referenced on a resume found on his thumb drive.  The defendant stated that he had worked as an unpaid intern in Iran for a few months approximately six to seven years ago.  The defendant was asked about his understanding of the rules and restrictions in place with doing business and performing work with, or for, Iranian entities as a United States person.  The defendant said he was aware rules were put in place one to two years ago, and indicated that as a result, it was very difficult for Iranian students in the United States to obtain money from their parents in Iran.  He stated that knew U.S. persons were not allowed to use Iran Airlines because of the sanctions.  The defendant claimed that he was unaware that an OFAC license was required for him to participate in an unpaid internship in Iran.  The HSI agents explained that OFAC is a division within the United States Treasury and has a website that details what types of activities are allowed under the Iranian Transaction Regulations.  It was explained to the defendant that one must usually obtain a license from OFAC prior to conducting or performing business with, or on behalf of, Iranian entities.  The agents wrote "Office of Foreign Asset Control under the

Department of the Treasury" and the abbreviation "OFAC" on the back of the property receipt given to the defendant.

The defendant now seeks to suppress: 1) evidence obtained from the border search of his thumb drive and two cell phones detained by CBP and HSI agents, on the grounds that the search was unlawful since it was executed at a location away from the border without reasonable suspicion; 2) his statements to the CBP agents while being questioned at the border, on the grounds that the questioning amounted to an un-Mirandized custodial interrogation; and 3) his statements on April 13, 2012, to the HSI agents who returned his detained property, on the grounds that those statements were the product of the allegedly unlawful border search, and thus, "fruit of the poisonous tree."  The defendant's claims are without merit.

### A.    The Search of the Defendant's Laptop Constituted a Routine Border Search

The border search authority granted to Customs authorities is broad and codified in numerous statutes and regulations authorizing, among other things: 1) inspection and search of any vehicle or vessel and all persons, packages and cargo therein, 19 U.S.C. § 1581(a); 2) inspection and search of all persons, baggage, and merchandise arriving from foreign countries, 19 C.F.R. § 162.6; 3) detention and search of all persons entering the U.S. from foreign countries, 19 U.S.C. § 1582.  Customs officials have the authority to detain property until it has been inspected and examined, found to comply with the law, and "cleared" for release.  19 U.S.C. § 1499.  After goods are presented for examination, Customs officials generally have five days, excluding weekends and holidays, in which to either release or detain those goods; if not released within those five days, the goods are deemed detained.  19 U.S.C. § 1499(c)(1). Customs officials must "make a final determination with respect to the admissibility of detained

merchandise" within thirty days after the merchandise is presented for examination. 19 U.S.C. § 1499(c)(5)(A).

Border searches constitute are a long-recognized exception to the Fourth Amendment's warrant and probable cause requirements. *United States v. Ramsey*, 431 U.S. 606, 621 (1977). "[S]ince a port of entry is not a traveler's home, his expectation of privacy there is substantially lessened." *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005), (internal quotation marks omitted). As such, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 532, 538 (1985). The Supreme Court has consistently held suspicionless border searches "reasonable simply by virtue of the fact that they occur at the border," *Ramsey*, 431 U.S. at 616, where "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith…." *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004).

In *Ickes,* the Fourth Circuit concluded that searches of a laptop or other electronic media may occur during a border search without reasonable suspicion. 393 F.3d at 504-506 (finding that search of computer and disks found in a car at the border fell within the scope of searches permitted by 19 U.S.C. § 1581(a)). *See also United States v. Linarez–Delgado,* 259 Fed.Appx. 506, 508 (3d Cir.2007) ("Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search."); *United States v. Bunty*, 617 F.Supp.2d 359, 364-65 (E.D.Pa. 2008) (search of computer equipment at border was a routine search not requiring reasonable suspicion); *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (reasonable suspicion not required to search laptop or other personal electronic storage devices at the border).

The defendant acknowledges that he had no expectation of privacy in his phone and thumb drive at the border, and thus, those items were properly subject to search by Customs agents. Defendant's Motion to Suppress at 8. He alleges, however, that once the devices were removed for inspection to Baltimore, the search was transformed into an "extended border search" requiring reasonable suspicion. The defendant's argument is incorrect.

As the Ninth Circuit noted in its opinion in *United States v. Guzman-Padilla*, 573 F.3d 865 (9th Cir. 2009), upon which the defendant relies, an extended border search is defined as a search that takes place away from the border "after the actual entry has been effected," meaning the person or property has cleared an initial Customs checkpoint and entered the country. *Id.* at 877 (internal quotations marks omitted). *See United States v. Bilir*, 592 F.2d 735, 740 (D.Md. 1979) (noting that in many instances, an extended border search "away from the actual border results from deliberate delay by customs officers who have observed an actual border crossing by known suspects but who then follow and only conduct their search at some distance from the border despite repeated intervening opportunities). Extended border searches are thought to be more intrusive on an individual's expectation of privacy since entry has already been affected. For this reason, "[i]n order to execute an extended border search, there must be a reasonable certainty of a recent border crossing, and reasonable suspicion of criminal activity. *Id.* at 877-89.

That heightened expectation of privacy associated with an extended border search is not present when, as is the case here, items were detained at the border and custody of those items was never returned to the defendant or otherwise cleared through Customs. Even though the defendant was released and allowed to enter the U.S., his cell phone and thumb drive remained in the custody of Customs officials and were never cleared for entry. They stayed in the custody of Customs agents while searched. The forensic search in Baltimore was simply a continuation

of the original border search in Niagara Falls and did not implicate any heightened expectation of privacy requiring reasonable suspicion to search. If no suspicion was required at the border to search the defendant's laptop, then no suspicion was required to continue that search in Baltimore.[1]

### B.    The Defendant's Statements

During the roughly two and a half hours that the defendant was delayed at the border for questions and the search of his vehicle and belongings, he was not free to go, but neither was he handcuffed, jailed or otherwise restrained. He was asked routine questions regarding his travel and identity, and nothing more. The government does not intend to introduce any statements made by the defendant during the border stop on March 31, 2012.

---

[1]  The Ninth Circuit, siting *en banc*, recently held in *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013), that reasonable suspicion is required to conduct a forensic examination of a laptop detained during a border search. In that case, the defendant was stopped and searched at the Mexico/Arizona border and subsequently allowed to enter the country. His laptop was detained and taken to the ICE office in Tuscon, Arizona, for forensic exam, during which child pornography was found. First, the court reaffirmed its stance on what constitutes an extended border search, specifically stating, contrary to the defendant's argument in this case, that "[a] border search of a computer is not transformed into an extended border search simply because the device is transported and examined beyond the border." Id. at 961. However, the court went on to hold that a forensic exam on a laptop, which it likened to a "computer strip search," would be intrusive in both scope and duration given the large amounts of data that can be stored on the device. Thus, the court concluded, reasonable suspicion of criminal activity would be required to proceed with a forensic border search of a laptop. *Id.* at 962-68.

The Ninth Circuit's opinion appears to be an anomaly in the border search jurisprudence. In his dissenting opinion on the reasonable suspicion issue, Circuit Judge Callahan noted that the Supreme Court has been willing to raise the possibility that some level of suspicion might be justified in highly intrusive searches of one's person, but has never suggested that property be differentiated on the type of "sliding intrusiveness scale" imposed by the majority opinion. *Id.* at 975-76, citing *Flores-Montano*, 541 U.S. at 152. Citing the Fourth Circuit's opinion in *Ickes*, *supra*, the Judge Callahan stated, "the Fourth Circuit has recognized what the majority does not: "electronic devices are like any other container that the Supreme Court has held may be searched at the border without reasonable suspicion." *Id.* at 976. "If the government may search the content of a briefcase, car, or mobile home that transits the border, there is no reason it should not also be able to search the contents of a camera, tablet, or laptop that enters the country. All of those things are capable of storing, and often do store, private information. *Id.* at 977.

The standard sought to be imposed by the *Cotterman* majority on computer border searches is in direct contradiction to the law in this Circuit, not binding on this Court, and inapposite to the rationale and basis for the border search exception to the Fourth Amendment.

The government does intend to introduce statements made by the defendant on April 13, 2012, to the two HSI agents who returned his detained property. The defendant met voluntarily with the agents and was free to leave at any time. He was not under arrest and voluntarily answered questions. The defendant claims that the statements resulted from an unlawful border search and thus, were "fruit of the poisonous tree." The defendant's allegation falls given the legality of the border search as articulated above, and the fact that the statements resulted from a voluntary interview in a non-custodial setting.

## IV.     Motion to Exclude Evidence

The defendant seeks to exclude: 1) evidence of communications made by co-defendants and others, alleging, pursuant to Fed.R.Evid. 402 and 403, that such evidence is irrelevant and prejudicial; and 2) evidence of acts beyond October 25, 2012, alleging, pursuant to Fed.R.Evid. 402 and 404, that such evidence is prejudicial and inadmissible evidence of other bad acts.

The issue raised by the defense with respect to acts post-October 2012 may be moot at this juncture given that the superseding indictment specifically identifies those additional acts that the government had intended to prove as part of the original charged conspiracy. That aside, the defendant's argument is also without legal basis. Rule 404(b) of the Federal Rules of Evidence prohibits admission of evidence of a crime, wrong, or other act extrinsic to the charged offense in order to prove a person's bad character and propensity to have committed the charged crime. However, evidence of

> [a]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence. Evidence of uncharged conduct is not other crimes evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or if evidence of the uncharged conduct is necessary to complete the story of the crime on trial.

*United States v. Palacios*, 677 F.3d 234, 245 (4th Cir. 2012), quoting *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009).

In this case, the defendant is charged in a conspiracy with named and unnamed individuals extending from in or about September 2009 to in or about March 2013.  As the Fourth Circuit has consistently held, a charge of conspiracy need not identify every act underlying the charge.  If specific acts sought to be introduced into evidence are committed in furtherance of the conspiracy, or otherwise necessary to provide a complete picture of the charged crime, they are admissible even though not specifically described in the indictment.  *Id.*, citing *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004).  *See also, e.g., United States v. Christ*, 513 F.3d 762 (7th Cir 2008); *United States v. Milstein*, 481 F.3d 132 (2nd Cir. 2007).

A similar analysis allows for the inclusion of acts and communications committed by co-conspirators.  It is a well-settled that co-conspirators are agents of one another.  *Pinkerton v, United States*, 328 U.S. 640 (1946).  A defendant is liable not only for his conduct in furtherance of the conspiracy, but also "for the conduct of co-conspirators that could be reasonably foreseen as a necessary part of the conspiracy or a natural consequence of it."  *United States v. Carrington*, 301 F.3d 204, 211 (4th Cir. 2002), citing *Pinkerton*, 328 U.S. at 647.  Moreover, "each co-conspirator need not take an overt act in order to be convicted of conspiracy so long as one conspirator does so."  *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005).

The acts undertaken by all of the co-defendants were part and parcel of the charged conspiracy, furthered the objects of the conspiracy, and were necessary to achieving those objects.  The law of conspiracy makes these acts not only relevant to the defendant's charged conduct, but attributable to him just as if he had committed those acts himself.  The defendant

has provided no legal authority that supports exclusion of the acts of his co-conspirators in furtherance of the charged conspiracy.  His motion should be denied.

## V.      Motion to Strike Surplusage

The defendant seeks to have the Court strike certain words contained in paragraphs 24, 28 and 34 of the original indictment, pursuant to its discretion under Fed.R.Crim.P. 7(d).  The defendant claims that said words are inflammatory, prejudicial and unnecessary to establish the elements of the charged conspiracy.

The Fourth Circuit has held, consistent with other circuit courts, that a motion to strike surplusage "'should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'"  *United States v. Williams*, 445 F.3d 724, 733(4th Cir. 2006), quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C.Cir. 1998). "'[I]nformation that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand," and even if the information is irrelevant, it "need not be struck if there is no evidence that the defendant was prejudiced by its inclusion.'"  *Id.* at 733-34, quoting *United States v. Hedgepeth*, 434 F.3d 609, 612 (3rd Cir. 2006).

The challenged language (identified in italics below) is now phrased in a slightly different manner in the superseding indictment and is contained within the initial background section of Count 1 under the heading "Defendants and Entities:"

| Original Indictment | Superseding Indictment |
| --- | --- |
| ¶24 - Company C had patented a specialty filtering system called the Swirlklean Bypass Filter, which is used primarily in the oil and gas industry *and can be used in water plants, hydrocarbon plants, and nuclear plants*. | ¶11 - Company C … was a manufacturer/ supplier of specialty filtering systems, including its patented Swirlklean Bypass Filter used primarily in the oil and gas industry, *with possible uses in water, hydrocarbon and nuclear plants*. |

¶28 – This type of flow meter is used primarily in industrial applications to measure the flow of water *but could be adjusted to measure other liquid and gasses*.

¶12- Company D … was a supplier of process control equipment, including flow meters primarily used in industrial applications to measure the flow of water *and/or liquids and other gasses*.

¶34 – *The pumps in question have oil, gas, energy, aerospace, and defense applications.*

¶15 - Company G … was a supplier of industrial fluid power, automation and motion control products, including liquid pumps and check valves *having oil, gas, energy, aerospace and defense applications.*

The challenged language does nothing more than generally describe the items being procured by the defendant and his co-conspirators, and provide the jury with a basic understanding of the nature of the conspirators' unlawful procurement activities.  The items sought and/or obtained by the defendants were not insignificant trinkets; rather, they were industrial parts and components that were obtained for use by Iranian entities, be they private or government controlled.

More importantly, the defendant was not providing parts to his co-defendants in a vacuum.  The government has no intention of arguing that the defendant was directly associated with Iranian government industries, as the defendant suggests, nor is that implied by the challenged language.  However, the defendant was aware of Rashti's industrial and government-related clients for whom he was seeking to obtain products.  He had been given Rashti's client list.  The components sought by Rashti were consistent with the types of items that his clients would be seeking.  The industrial applications in which those components could be used, even when defined in the extremely limited and general terms the defendant seeks to exclude, are clearly relevant and material to establishing context for the nature, manner and means of the conspiracy, and the defendants' communications and actions in furtherance of the conspiracy.  Moreover, the potential for prejudice to the defendant is simply not present given the very

general descriptions of the items sought, combined with the defendant's knowledge of the Rashti's client base.  The defendant's motion is without merit and should be denied.

**VI.      Motion in Limine to Exclude Lay Opinion Testimony**

The defendant seeks to exclude any lay opinion testimony regarding U.S. foreign policy on Iran, IEEPA and IEEPA-based criminal charges, and the Government of Iran's control of the oil and gas industry, and its nuclear, military, law enforcement and terrorist-related activities. The defendant alleges that these subjects require "specialized knowledge" and thus, are outside the purview of permissible lay opinion testimony.

First and foremost, the government does not intend to introduce opinion testimony regarding any of these subjects.  What the government will seek to introduce is factual testimony necessary to establish violations of the ITSR as charged in the indictment.  A witness from the Office of Foreign Assets Control (OFAC), the agency charged with administering the ITR, will be called to establish: 1) the OFAC licensing requirement for transactions with Iran under the trade embargo; 2) the OFAC licensing process; 3) the fairness and transparency of that process (i.e., regarding notice); 3) the determination by OFAC that the activities of the defendants were subject to the embargo; and 5) the defendants' lack of authorization from OFAC to conduct those activities, which is a specific element of the charged IEEPA offenses.

The charged conspiracy notices two provisions of the ITSR contained in Title 31 of the Code of Federal Regulations.  Section 560.204 prohibits "the exportation, re-exportation, sale or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran," unless a license is obtained from the OFAC.  Section 560.203 prohibits "any transaction by any United

States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions" contained in the ITSR.

As previously noted herein, the defendant was made aware in March 2010 that Rashti, his main business partner, was procuring items on behalf of industrial and government-related companies in Iran, one of which is specifically identified in the indictment as an entity of the Iranian Ministry of Petroleum.   Upon receiving Rashti's list, a simple search of public information on the internet would have revealed that certain of Rashti's clients were government-related entities.

An essential and relevant component of the ITSR provisions the defendant is accused of violating is establishing to whom the defendant supplied goods and services.   Moreover, the government must prove that the defendant acted willfully in providing said goods and services. Rule 403 requires exclusion of evidence "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995) (internal quotation marks omitted).   The mere fact that the evidence might damage the defendant's case is not enough – the evidence must be *unfairly* prejudicial, and the "unfair prejudice must *substantially* outweigh the probative value of the evidence." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) (internal quotation marks omitted) (emphasis added).

There is no basis for the defendant's assertion that somehow the jury will be "excited to irrational behavior" as a result of learning that some of Rashti's clients were entities associated with the Government of Iran.   The government has no intention of introducing any evidence, argument or opinion regarding the nefarious activities of the Iranian government as alleged in the

defendant's motion.  Rather, the government's focus will be on what the defendant knew, what he did in the face of that knowledge, and how his actions violated the law.  The defendant was provided with a client list by his co-conspirator in furtherance of the charged conspiracy.  The government is entitled to explain that evidence by identifying those named entities, and, if applicable, any publicly known connection to the Government of Iran.  Such a limited identification does not rise to the level of unfair prejudice justifying exclusion under Rule 403.  The defendant's motion should be denied.

WHEREFORE, for the reasons stated herein, the government respectfully requests that the defendant's motions be denied in their entirety.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:  _____/s/_____
     Christine Manuelian
     Assistant United States Attorney
     36 S. Charles Street, 4th Floor
     Baltimore, MD  21201
     410-209-4852