1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MARYLAND

3                         SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,    ) CRIMINAL ACTION
                                  ) NO. 13-0100-PWG
6               Plaintiff,        )
                                  )
7    v.                           ) Greenbelt, Maryland
                                  )
8    ALI SABOONCHI,               ) Monday, September 23, 2013
                                  ) 1:30 p.m.
9               Defendant.        )

10             The testimony of KELLY BAIRD in the
     above-entitled case which came on for motions hearing before
11   the Honorable Paul W. Grimm, United States District Court
     Judge.

12

     APPEARANCES:
13

                   OFFICE OF THE UNITED STATES ATTORNEY
14                 BY:  CHRISTINE MANUELIAN, ESQUIRE
                   36 S. Charles Street
15                 4th Floor
                   Baltimore, Maryland  21201
16                 (410) 209-4852
                        Appeared on behalf of the Plaintiff
17
                   FERRARI & ASSOCIATES, P.C.
18                 BY:  ERICH C. FERRARI, ESQUIRE
                   BY:  MARGARET S. VERVERIS, ESQUIRE
19                 1455 Pennsylvania Avenue, N.W.
                   Suite 400
20                 Washington, D.C.  20004
                   (202) 280-6370
21                     Appeared on behalf of the Defendant

22

23

     OFFICIAL COURT REPORTER:
24   Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25     ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

 1          THE COURT:  Agent Baird, come on up and get

 2    sworn in, please.

 3          THE DEPUTY CLERK:  Please raise your right hand.

 4                    KELLY BAIRD,

 5        the witness herein, having first been duly sworn on

 6        oath, was examined and testified as follows:

 7          THE DEPUTY CLERK:  You may have a seat.  Please

 8    speak directly into the microphone and please state your

 9    first and last name.

10          THE WITNESS:  Kelly Baird.

11          THE DEPUTY CLERK:  And please spell your first

12    and last name.

13          THE WITNESS:  K-E-L-L-Y, B-A-I-R-D.

14          THE DEPUTY CLERK:  Thank you.

15                    DIRECT EXAMINATION

16    BY MS. MANUELIAN:

17    Q.    Agent Baird, by whom are you employed?

18    A.    I am a Homeland Security Investigations special agent.

19    Q.    How long have you been in that position?

20    A.    A little over seven years.

21    Q.    Do you have any prior law enforcement experience?

22    A.    Prior to that, I was a federal agent for a different

23    federal agency, and then before that, I was a police officer

24    in Delaware for three years.

25    Q.    What other federal agency?

Baird - Direct

1  A.   The Federal Protective Service in Washington, D.C.

2  Q.   Now, are you familiar with Mr. Saboonchi?

3  A.   I am.

4  Q.   And what role do you have with respect to this

5  particular case?

6  A.   I am the co-case agent.

7  Q.   And with what other agency have you worked on this

8  case?

9  A.   The FBI.

10  Q.   Are you presently -- where are you presently assigned

11  in Baltimore?

12  A.   The Baltimore special agent -- excuse me, special in

13  charge agent officer.

14  Q.   Special agent in charge?

15  A.   In charge at Baltimore.

16  Q.   Do you actually sit at a particular location?

17  A.   I do.  I am a member of the FBI Joint Terrorism Task

18  Force, and I sit at the FBI office.

19  Q.   Now, I'd like to direct your attention to March 31st

20  of 2012.  On that day, did you receive information that

21  Mr. Saboonchi had been stopped at the Rainbow Bridge in

22  Buffalo at the border?

23  A.   I did.

24  Q.   And who did -- who advised you of that?

25  A.   I don't recall if I first received an email regarding

 1   that encounter or the Customs and Border Protection Officer

 2   Burkhardt telephoned me.

 3   Q.    Okay.  So is there an internal system in which you

 4   might be notified if someone who is a subject of yours is

 5   stopped at the border?

 6   A.    Yes.

 7   Q.    In this particular instance, had you entered

 8   information into the TECS database that HSI uses with

 9   respect to Mr. Saboonchi being someone of interest in the

10   case you were investigating?

11   A.    I did.

12   Q.    And had your investigation begun prior to when this

13   stop took place?

14   A.    Yes, it did.

15   Q.    When you received information about the stop, do you

16   recall what specifically was told to you by -- well, let me

17   ask you first:  Do you recall speaking with CBP Officer

18   Burkhardt at some point in time that evening?

19   A.    Yes, I do.

20   Q.    Do you recall what he told you?

21   A.    He told that -- told me that they had encountered

22   Mr. Saboonchi at the border.

23   Q.    Anything else?

24   A.    He just more or less was asking if I had wanted

25   anything done, and I just instructed that if there were any

1    electronic media found, I would like it detained.

2    Q.    Did you discuss your case any further with -- the

3    details of your investigation any further with Officer

4    Burkhardt?

5    A.    No.

6    Q.    What was your purpose in seeking to have any

7    electronic media detained?

8    A.    I wanted to be able to look at that media pursuant to

9    our border authority.

10   Q.    Now, what is the nature of your boarder authority as

11   an HSI special agent versus what Officer Burkhardt testified

12   to with respect to his role as a CBP officer?

13   A.    We all have the same authority where we can exercise

14   boarder search authority as a designated Customs officer.

15   Q.    Would you be able to go to the border and actually

16   physically stop an individual like the CBP does?

17   A.    Yes.

18   Q.    Do you do that on a -- in the normal course?

19   A.    How it traditionally works is I work with CBP

20   hand-in-hand.  I tend to speak with them if I know someone

21   is going to be traveling around the border, and then I go

22   out as well to the port.  Traditionally, it's Dulles

23   International Airport.

24   Q.    And in this particular instance, did Officer Burkhardt

25   indicate that he would detain whatever media was found and

                              Baird - Direct

1    forward it to you?

2    A.    Yes.  Yes, he did.

3    Q.    Now, would he have personally forwarded it or did you

4    receive it from someone else?

5    A.    How it works in my experience is CBP will detain it

6    until an HSI agent responds and actually physically detains

7    the property and then forwards it on to me.

8    Q.    All right.  And in this case, is that what happened?

9    A.    Yes.

10   Q.    Who did you receive the media from?

11   A.    Special Agent O'Rourke, who is out of the Buffalo

12   office.

13            MS. MANUELIAN:  And just for documentation, your

14   Honor, I am going to go ahead, and, with respect to

15   Government's Exhibit 3, I would like to move for admission

16   if there is no objection.

17            MR. FERRARI:  No objection, your Honor.

18            THE COURT:  Let me just make sure I have got --

19   all right.  Exhibit 3 is admitted.

20   BY MS. MANUELIAN:

21   Q.    Exhibit 3 is up on the screen.  Agent Baird, what is

22   this?

23   A.    This is email contact between Agent O'Rourke and

24   myself.  He just let me know that the media was on its way

25   via FedEx.

Baird - Direct

1    Q.    And the email you are referring to is actually at the

2    bottom here dated April 2nd of 2012.  Is that correct?

3    A.    Yes.

4    Q.    And then Exhibit 4, which we already put into

5    evidence, what is this document?

6    A.    This is the Customs Form 6051-D, which is a detention

7    notice and custody receipt for detained property.

8    Q.    Now, there are a whole bunch of signatures at the

9    bottom.  Who actually completed this form initially?

10   A.    On the first line, it was Agent O'Rourke.

11   Q.    And what does this reflect, this --

12   A.    Basically, this reflects what would have taken place

13   at the border.  When media is detained from someone, this

14   form is filled out and a copy is given to whoever the media

15   is detained from, and then we retain the original form.

16   Q.    Okay.  Now, there is a chain of custody on the bottom.

17   Your name actually appears here on the third line.  Is that

18   correct?

19   A.    Yes.

20   Q.    So could you tell us what, what this is documenting?

21   A.    Basically, it's the chain of custody.  What would have

22   happened is O'Rourke retained it at the border, and then the

23   package would have been received in the box, and then I just

24   immediately took the sealed package to our computer forensic

25   agent, who is the second line there, Agent Mycel, and I

1   turned it over to him on April 4th.

2   Q.    And then, at some point in time, you took the media

3   back out and returned it to Mr. Saboonchi?

4   A.    Yes, on April 13th.

5   Q.    And the signature here next to Mr. Saboonchi's name,

6   do you know if he actually signed this document?

7   A.    He did, in my presence.

8   Q.    How do you know?

9   A.    He did it in my presence on the 13th.

10  Q.    And then the second page of this document is what?

11  A.    Just the FedEx receipt from the property.

12  Q.    Okay.  This indicates a date of 4/2 of 2012.  Is that

13  correct?

14  A.    That's correct.

15  Q.    That would have been when Agent O'Rourke sent this to

16  you?

17  A.    Yes.

18  Q.    Now, can you explain to the Court why it is that you

19  requested, in this particular case, that media, any

20  electronic media be forwarded to you as opposed to being

21  examined at the border?

22  A.    The purpose is to maintain the integrity of the

23  evidence.  When electronic media is viewed or plugged into

24  another computer, date stamps can change.  And in this

25  situation, it is my standard practice to, when I have an

1    open investigation, to turn that media over to our computer

2    forensic agents who are trained in evidence preservation.

3    Q.    Were you aware of whether or not there was any

4    forensic -- there were any forensic agents available up in

5    Buffalo to conduct a search at that time?

6    A.    I am not aware.

7    Q.    Would you have asked any forensic agents there to

8    conduct the search of the media?

9    A.    My standard practice is to have the media sent to my

10   computer forensic agents in Baltimore.

11   Q.    And what is your understanding as to whether or not

12   that is something within your boarder search authority?

13   A.    The -- when media is detained at the border, it

14   doesn't make entry to the U.S., so having it sent to a

15   different location for examination doesn't change the

16   authority of the border search.

17   Q.    In this particular instance -- oh, did you -- let me

18   just go back to March 31st.  Did you tell or direct Officer

19   Burkhardt to ask any specific questions of Mr. Saboonchi

20   other than the routine questions asked during an inspection?

21   A.    No, I did not.

22   Q.    What were -- what was the purpose of your wanting to

23   conduct a forensic search of this media that was in the

24   defendant's possession?

25   A.    I wanted to see if there was evidence of export

1    violations.

2    Q.    What other things do you look for as an HSI agent when

3    you are assessing documentation in the possession of an

4    individual at the border?

5    A.    Any evidence of criminality, whether it relates to a

6    Customs violation, an Immigration violation, things that can

7    be terrorism, national security related, or if people are

8    trying to evade duties, we have the right to look for

9    merchandise.  All of those parameters.

10   Q.    Now, at the time that this -- you were advised of the

11   stop, had you had any prior knowledge that Mr. Saboonchi was

12   traversing the border or had traversed the border just prior

13   to that?

14   A.    I knew that he had frequent travel to Iran.

15   Q.    Were you aware of the fact that he had left the

16   country just prior to being stopped at the Buffalo border?

17   A.    No.  I -- I did not know.

18   Q.    Can you tell the Court, very briefly, what knowledge

19   you had, just generally, had developed at that point prior

20   to March 31st of 2012 in your investigation?

21   A.    In the fall of 2010, the FBI received information that

22   there had been an inquiry to a company in Vermont regarding

23   specialized technology that has applications with industrial

24   medical or military applications.  They then referred that

25   inquiry to the FBI, and that was done by a person named Ali,

1    and then a telephone number that I believe we eventually

2    related back to Mr. Saboonchi.

3    Q.    So when you say that was done by a person named Ali,

4    the individual making the inquiry was Mr. Saboonchi?

5    A.    Yes.  Yes, it was.  I had another ongoing

6    investigation where I had placed a record in our system

7    because Mr. Saboonchi was a, a person of interest in another

8    investigation, and then --

9    Q.    In another investigation in Baltimore?

10   A.    Yes, another HSI investigation.

11   Q.    Okay.

12   A.    And then in the beginning of 2012, late 2011, early

13   2012, I had been contacted by another HSI agent out of a

14   different office who indicated that Mr. Saboonchi had become

15   a person of interest in an export violation case concerning

16   exports to Iran.

17              And then in early March --

18              THE COURT:  Hold on.  Slow down.  When was that?

19              THE WITNESS:  In late December, 2011, early

20   2012, another HSI agent had contacted me, based upon my

21   prior flag in the system, that Mr. Saboonchi had come up as

22   a person of interest in his investigation, which was

23   concerning illegal export to Iran, export violation case.

24              And then in March of 2012, early March, the

25   first week or so, we started receiving subpoena returns

Baird - Direct

1    pertaining to Mr. Saboonchi, which included Federal Express

2    records as well as credit card records.  And after looking

3    at that, in particular, a FedEx Airway bill, we noted that

4    he was the shipper, using his name and the business Ace

5    Electric, shipper of what he listed as cyclone separator to

6    the United Arab Emirates, and that also listed a receiver's

7    name.

8                We then did open search inquiries of that name,

9    address, and telephone number listed on the Airway bill and

10   found that there was a company in the UAE that was also

11   linked to another company in Tehran.  The companies dealt

12   with industrial parts and things of that nature.

13               And then on March 29th, the FBI and I

14   interviewed several people from Geiger Pumps where --

15               THE COURT:  G-E-I-G-E-R?

16               THE WITNESS:  G-E-I-G-E-R.

17               -- where we confirmed that Mr. Saboonchi had

18   made the purchase of two cyclone separators valued at

19   approximately $2100.  And the company representatives

20   related to us that they have every customer designate the

21   end user and use for this.  And Mr. Saboonchi had told that

22   company that the end user was domestic use only.

23               And then we linked -- they confirmed that it was

24   about $2100.  Excuse me.  And then also on March 30th,

25   another interview was conducted with another supplier that

Baird - Direct

1    Mr. Saboonchi had had contact with where purchases were made

2    over the course of April of 2011, and the person at the

3    company said that either the purchases were made for resale

4    or stocking of a company.

5    BY MS. MANUELIAN:

6    Q.    Based upon the nature of the items?

7    A.    Yes.

8    Q.    Okay.  And you said that you were receiving subpoena

9    returns.  What types of subpoenas had you -- had been issued

10   at that juncture?  What was the nature?  Was it a Grand Jury

11   trial subpoena?  What kind of subpoena?

12   A.    It was Grand Jury subpoenas.

13   Q.    You had mentioned you had received shipping records.

14   Had you received some returns on other types of documents?

15   Business records?

16   A.    Credit card bills as well that listed numerous

17   purchases from different vendors for Mr. Saboonchi.

18   Q.    All right.  Was there anything unusual about the

19   vendors that you were seeing purchases apparently from in

20   comparison to this electric company that Mr. Saboonchi

21   seemed to have?

22   A.    Just that there were numerous purchases for varying

23   dollar amounts, in the thousands of dollars.

24   Q.    Did you receive -- had you received, at that point,

25   just prior to March 31st, any other types of documents?

Baird - Direct

1   Phone records?  Business records?  Service provider records?

2   Anything like that?

3   A.    There were a lot of subpoenas in the works prior to

4   that, and I don't recall if we had received them.  We may

5   have received in a Google response pertaining to email

6   accounts used, but I, I don't recall offhand.

7   Q.    All right.  And I think also with respect to the

8   interview of the Geiger Pump Company, did they advise you of

9   any other interactions that they had had with Mr. Saboonchi

10  or any other orders that he had placed?

11  A.    I recall the two cyclone separators that he had done

12  mainly communicating through email with them.

13  Q.    Okay.  During the interview of the second company, did

14  you learn of the identity of a salesperson with whom

15  Mr. Saboonchi had had dealings?

16  A.    We did.  The vice president of the company, who was

17  interviewed, indicated that Mr. Saboonchi would have dealt

18  with only one customer service representative who was

19  identified as Patrick Gross.

20  Q.    Are you familiar with a report that was prepared of

21  the interview of the Geiger Pump personnel?

22  A.    I am.

23  Q.    Okay.

24          MS. MANUELIAN:  And if I could just have a

25  moment, your Honor.

Baird - Direct

1        THE COURT:  Sure.

2    BY MS. MANUELIAN:

3    Q.    Do you have any recollection of, in that report, of

4    referring to another transaction that Mr. Saboonchi was

5    involved in in August of 2011 that he indicated was destined

6    for a Turkish company?

7    A.    I don't recall offhand.

8    Q.    After you had the opportunity to have the media

9    forensically examined, what did you receive from your

10   forensic examiner to look through?

11   A.    How we do it in Baltimore is they will image the

12   media, and then I will go into the computer forensic lab and

13   take a look at whatever has been detained.  And they will

14   also do a, a product that has different links with telephone

15   numbers and whatnot on it, and what I found on there was a

16   resume of Mr. Saboonchi indicating that he had been employed

17   for a company in Iran.

18   Q.    Anything else?

19   A.    And the telephone numbers off of the iPhone had a list

20   -- had a telephone number for Patrick Gross.

21   Q.    Now, I don't know if you testified to this:  The

22   amount that was reflected on the FedEx Airway bill for the

23   cyclone separators, how much was reflected as the value of

24   those items?

25   A.    $100, which was --

Baird - Direct

1    Q.    And the actual value, you learned, was how much?

2    A.    Over $2100.

3    Q.    So, in that case, would there have been any kind of

4    Custom duties or other fees that would have been paid if the

5    amount was actually reflected as $2100?

6    A.    The reporting requirements are triggered at $2500, but

7    through experience and training, I find when people tend to

8    undervalue stuff, it's to keep things below the radar.

9    Q.    Did you find anything else that you thought was

10   relevant to your examination with respect to any export

11   violations or Customs duty violations on the information

12   that was obtained on the media, the, the thumb drive that

13   was taken, and, and/or the cell phones?

14   A.    No.

15   Q.    So at what point in time -- what did you decide to do

16   with those items?

17   A.    Based upon the fact that there was employment listed

18   with an Iranian entity, as well as the telephone number for

19   Patrick Gross that was linked to the transaction with R.G.

20   Group, I seized that, but the third telephone was turned

21   back over to Mr. Saboonchi.

22   Q.    Now, when you say you seized the media, at the time it

23   actually was received by you, was it considered seized at

24   that juncture?

25   A.    No.  At that point, it's detained pending review.

Baird - Direct

1  Q.   And at some point in time, did you return items to

2  Mr. Saboonchi?

3  A.   I did.  On April 13th.

4  Q.   Did anybody accompany you to meet with Mr. Saboonchi

5  to return the items?

6  A.   Yes, another Homeland Security Investigations special

7  agent.

8  Q.   Can you tell us how that meeting took -- came about

9  and what occurred?

10          THE COURT:  Could I ask a clarifying question?

11  Please forgive me.

12          When you made the decision to seize as a result

13  of what your computer forensic analyst told you had been

14  found, the resume that reflected employment with an Iranian

15  company, and Mr. Gross' telephone number, the information at

16  that point had been extracted in a, in an imaged file

17  containing the contents of the two cell phones and the thumb

18  drive.  Correct?

19          THE WITNESS:  Yes.

20          THE COURT:  So that you were able to return the

21  electronic media, which collectively is two cell phones and

22  a thumb drive, to Mr. Saboonchi on the 13th of April because

23  the forensic data that had been imaged was within still the

24  custody of HSI.  Correct?

25          THE WITNESS:  Yes, your Honor, although --

1        THE COURT:  And that's the seizure?  The seizure

2    is keeping that which had been imaged.  Correct?

3        THE WITNESS:  Yes, your Honor.  Although, I do

4    want to clarify, the cell phone that was not identified as

5    belonging to Mr. Saboonchi, those -- that media was

6    destroyed.

7        THE COURT:  Correct.  That was because it was

8    not identified as belonging to him?

9        THE WITNESS:  Yes.

10        THE COURT:  Okay.  Thank you.  That clarified

11    it.  I understand that there is a distinct terminology

12    difference within HSI between detained and seized, that the

13    seizure decision was made after having reflected -- taken

14    into consideration what was disclosed by the forensic

15    examination, but it was the imaged file that was, quote,

16    unquote, seized.  The cell phone that was identified as

17    belonging to Mr. Saboonchi, and the zip drive, thumb drive

18    were returned to him?

19        THE WITNESS:  Yes, your Honor.

20        THE COURT:  And they contained whatever they

21    contained at the time it was imaged.  Correct?

22        THE WITNESS:  Yes, your Honor.

23        THE COURT:  I am clear now.

24    BY MS. MANUELIAN:

25    Q.    Before we move into your contact with Mr. Saboonchi on

Baird - Direct

1    April 13th, if I could just refresh your recollection, I

2    want to go back to some specific information I had asked you

3    about that you may have received during your interview of

4    Geiger Pump.

5                    MS. MANUELIAN:  And your Honor, if I could, I'd

6    just like to check --

7                    THE COURT:  If we could make sure we distinguish

8    when these interviews took place with regard to March 31st,

9    2012, before or after.

10                   MS. MANUELIAN:  Yes.

11                   MR. FERRARI:  No objection.

12                   THE COURT:  Thank you, Mr. Ferrari.

13   BY MS. MANUELIAN:

14   Q.    Agent Baird, just highlighting one of the reports of

15   an interview, and ask you if that helps refresh your

16   recollection about having received some additional

17   information concerning other transactions Mr. Saboonchi had

18   done with Geiger Pump?

19   A.    Yes.

20   Q.    And what was that in relation to?

21   A.    This is in relation to an inquiry on August 1st of

22   2011, where Mr. Saboonchi was unsure if an item was destined

23   for export.  A representative from Geiger had questioned

24   Mr. Saboonchi where this piece of equipment was going, and

25   Mr. Saboonchi said he was not sure.

Baird - Direct

1    Q.    If you can flip over to the second page and to the

2    next page as well.

3    A.    (Witness complies.)

4              Later follow-up from Mr. Saboonchi to Geiger

5    Pump indicated that on August 3rd, this part would have been

6    destined and sold for a company in Turkey.

7              THE COURT:  2000 what?

8              THE WITNESS:  2011.

9    BY MS. MANUELIAN:

10   Q.    That was the date of the inquiry by Mr. Saboonchi to

11   Geiger Pump.  Is that correct?

12   A.    Yes.

13   Q.    And you learned about this on what date?  What was the

14   date of the interview that you did with the Geiger

15   representatives?

16   A.    March 29th, 2012.

17   Q.    Okay.  All right.  Let's go back now to April 13th of

18   2012.  Can you tell us how these -- your interaction with

19   Mr. Saboonchi took place?

20   A.    Yes.  Mr. Saboonchi and I arranged to have him come to

21   the Customs House, where Agent Matney and I went outside of

22   the Customs House, onto the street, where we met

23   Mr. Saboonchi at his vehicle.  At that time, I turned over

24   the three items to him, made sure that they were all there,

25   signed the appropriate forms, and, more or less, had a

Baird - Direct

1    discussion with him.

2                    I asked him about his employment at the place in

3    Iran that was on the resume, and then went and said -- I

4    asked questions, If he was aware of sanctions that were in

5    place pertaining to Iran?, if he was aware that certain

6    business practices, either conducting with or on behalf of

7    Iranian entities, required permission from the Office of

8    Foreign Asset Control?

9                    Mr. Saboonchi said he was aware that there were

10   restrictions and sanctions in place for one to two years

11   prior to that date.

12                   He also volunteered that friends of his here in

13   the U.S. that were students were having trouble receiving

14   funds from their family, and he also knew that U.S. persons

15   were not allowed to use Iran airlines.

16                   And at the conclusion of that meeting, Agent

17   Matney and I advised Mr. Saboonchi that in order to conduct

18   business on behalf of Iranian entities, or for Iranian

19   entities, he needed to seek permission or make a

20   determination through OFAC, for which he was required to --

21                   THE COURT:  You used an acronym.  I am sorry.

22                   THE WITNESS:  The Office of Foreign Asset

23   Control, OFAC.

24                   THE COURT:  And the acronym is O-F-A-C?

25                   THE WITNESS:  Yes, your Honor.

Baird - Direct

1          THE COURT:  Thank you.

2          THE WITNESS:  I advised him that, prior to

3    engaging in any business with Iran, he needed to look at the

4    OFAC, Office of Foreign Asset Control, website and make an

5    inquiry to them to seek permission.

6    BY MS. MANUELIAN:

7    Q.    During the course of this interaction with

8    Mr. Saboonchi, did you have any weapons drawn or displayed?

9    A.    No.

10   Q.    Did you have any weapons in a holster that were, that

11   were in plain sight?

12   A.    No.  We would have been concealed.

13   Q.    Did you -- was Mr. Saboonchi free to leave or go --

14   A.    Yes.

15   Q.    -- at any point in time?

16   A.    Yes.

17   Q.    Did Mr. Saboonchi ask to -- or did you tell

18   Mr. Saboonchi that he had to answer your questions?

19   A.    No.

20   Q.    Did he at any point in time ask any questions of you?

21   A.    He did.

22   Q.    What did he ask?

23   A.    He asked why his wife had not received her actual

24   lawful permanent resident card, and I offered to check into

25   that for him, and he gave me her name and date of birth and

                            Baird - Direct

1    I made a notation to check into that.

2    Q.    Okay.

3              MS. MANUELIAN:  I'd like to move into evidence

4    Exhibit 2.

5              MR. FERRARI:  No objection, your Honor.

6              THE COURT:  Okay.  Is this receipt for property?

7              MS. MANUELIAN:  Yes, your Honor.

8              THE COURT:  Got it.  It's admitted.

9    BY MS. MANUELIAN:

10   Q.    Can you identify this, Agent Baird?

11   A.    Yes.  That's a receipt for property used for when we

12   return property to someone.

13   Q.    Did you complete this form?

14   A.    I did.

15   Q.    And what's the information that he reflected here with

16   respect to the property identification?

17   A.    "Received by" is who the property is going to and the

18   address he would have provided.  And then "Received from" is

19   my information.  And then listed below is specifically the

20   items that were returned.  And then on the bottom is who

21   received it, and then who received from, and then the

22   witness.

23   Q.    And is this -- did Mr. Saboonchi sign this in your

24   presence?

25   A.    Yes, on 6A.

Baird - Direct

1    Q.    And is that your signature as well as the signature of

2    Agent Matney?

3    A.    Yes, it is.

4    Q.    Now, there is another page --

5              THE COURT:  Quick question just on that.  I am

6    hoping it will expedite it.

7              There were two cell phones and a thumb drive

8    seized.  Correct?

9              THE WITNESS:  Yes.

10             THE COURT:  Or detained?

11             THE WITNESS:  Detained until seizure.

12             THE COURT:  Correct.  One was destroyed because

13   it was not Mr. Saboonchi's.  Correct?

14             THE WITNESS:  The imaged material was destroyed.

15             THE COURT:  So the items one, two, and three --

16   the iPhone was Mr. Saboonchi's.  Correct?

17             THE WITNESS:  Yes, your Honor.

18             THE COURT:  The Sony was the telephone from

19   which an image was made, and that was destroyed.  Correct?

20             THE WITNESS:  Yes, your Honor.

21             THE COURT:  The image of that, of that cell

22   phone.  Correct?

23             THE WITNESS:  Yes, your Honor.

24             THE COURT:  And the third item is the thumb

25   drive, as it says?

Baird - Direct

1              THE WITNESS:  Yes, your Honor.

2              THE COURT:  So all three of the tangible devices

3     that were taken from Mr. Saboonchi were returned to him.

4     The only thing destroyed was the contents of the forensic

5     imaging of the Sony Experia?

6              THE WITNESS:  Yes, your Honor.

7              THE COURT:  Now I understand.  I thought the

8     actual phone was destroyed.  I misunderstood.

9     BY MS. MANUELIAN:

10    Q.    What we have here is page 2.  It has a name and some

11    other information on the top.

12              First of all, where was this -- what is that?

13    Who notated it and where was it notated?

14    A.    That is his wife's name and date of birth that he

15    provided and my notation to look into the card production,

16    which was on the reverse side of my paperwork that I

17    maintained.

18    Q.    Of the property receipt?

19    A.    Yes.

20    Q.    Now, if you had not found the resume that indicated

21    that, at some point in time, Mr. Saboonchi had engaged in

22    some employment in Iran, would you have still given an

23    advisement with respect to the sanctions and the OFAC

24    restrictions?

25    A.    Yes, I would have.

1    Q.    Why is that?

2    A.    Because at that point, I felt that he was engaged in

3    export violations and wanted to make sure he knew what the

4    regulations were and that permission was needed.

5    Q.    During the entirety of your exchange with

6    Mr. Saboonchi, was he cooperative?

7    A.    Yes.

8    Q.    Did he indicate any hesitancy in speaking to you or

9    answering your questions?

10   A.    No.

11   Q.    About how long did this actual interaction take place?

12   A.    It was quick.  No more than ten minutes.

13   Q.    And during that time, did you all remain outside the

14   front of the HSI building?

15   A.    Yes.

16   Q.    Did he remain outside of his vehicle while he was

17   speaking with you?

18   A.    Yes.

19   Q.    Did you see him depart the area before you went back

20   in the building, or did you go into the building first?  Do

21   you recall?

22   A.    I don't recall.

23   Q.    Do you recall if you had any other contact with

24   Mr. Saboonchi after that interaction on April 13th and

25   before he was arrested later, a year, approximately a year

Baird - Direct

1    later?

2    A.    I don't -- I don't think so.  I don't recall.

3    Q.    Okay.  Have you had other occasions, Agent Baird, in

4    which you have asked that electronic media be detained and

5    sent to you here in Baltimore to have a forensic analysis

6    done?

7    A.    Yes, I have.

8    Q.    Based on your knowledge of your border authority under

9    the, under the statutes and rules that you are -- that you

10   work under, did you have any belief that you needed to have

11   reasonable suspicion of some sort of unlawful activity prior

12   to requesting that the media be detained and searched at the

13   border?

14   A.    No.

15          MS. MANUELIAN:  Your Honor, if I could just have

16   a minute.  I think I am almost done.  I just want to make

17   sure I haven't missed anything.

18          THE COURT:  Appreciate it.  And then just FYI, I

19   have a clarifying couple of questions, and then I think we

20   have been at this for two hours, so I am going to let our

21   court reporter have a ten-minute break so you can take a

22   look at your list of questions and see what you want to ask.

23          We will come back, I will allow you to do your

24   examination, let there be any redirect, and then I think at

25   that point, the evidence will be over and I will be ready to

Baird - Direct

1    let you make any final arguments that you want to make.  I

2    have read all the materials you have kindly submitted to me

3    in your primary and your supplemental submissions, I have

4    read them carefully and I appreciate them, and as I said, I

5    plan to rule this afternoon.

6              MR. FERRARI:  Thank you, your Honor.

7    BY MS. MANUELIAN:

8    Q.    Agent Baird, just one other question.  Was there

9    anything that you took from this, from the media, anything

10   that you found in the media, which was very limited, that in

11   any way influenced or affected the investigation that you

12   continued on Mr. Saboonchi?

13   A.    No.

14             MS. MANUELIAN:  I have nothing further.

15             Oh, just one moment, your Honor.  Just a

16   clarification.

17   BY MS. MANUELIAN:

18   Q.    You may have already stated this.  The cyclone

19   separators, according to the information that you received

20   from Geiger Pump prior to Mr. Saboonchi's border stop, did

21   they provide you information with respect to whether or not

22   Mr. Saboonchi had said where those items were destined to

23   go?

24   A.    Yes.  He indicated they were destined for domestic use

25   here in the U.S.

Baird - Direct

1   Q.     And the individual who was identified on the FedEx

2   Airway bill as having been sent the cyclone separators by

3   Mr. Saboonchi, who was that?

4   A.     Arash Rashti.

5   Q.     That's one of the codefendants in this case?

6   A.     Correct.

7                 MS. MANUELIAN:  Nothing further, your Honor.

8                 THE COURT:  Okay.  Now, just chronology wise, I

9   want to put a line on the calendar and just make sure I

10  accurately know what you knew prior to March 31st, 2012,

11  when you got the response from Buffalo and Officer Burkhardt

12  that Mr. Saboonchi was at the border.

13                You said that you, yourself, had initiated in

14  the investigation of Mr. Saboonchi as a person of interest.

15  Correct?

16                THE WITNESS:  He, he had fallen into several

17  other investigations as a --

18                THE COURT:  Okay.

19                THE WITNESS: -- other ongoing investigations as

20  a person of interest.

21                THE COURT:  In connection with export

22  violations?

23                THE WITNESS:  The one out of another office was,

24  yes.

25                THE COURT:  And in March 6, 2012, you started

Baird - Direct

1   getting Grand Jury subpoenas, which included Federal Express

2   shipping information, credit card information.  Is that

3   correct?

4           THE WITNESS:  Yes, your Honor.

5           THE COURT:  Did it also include cell phone

6   information?

7           THE WITNESS:  We had requested them, but an

8   analysis hadn't been completed yet.

9           THE COURT:  Okay.  And the Federal Express

10  shipping information included evidence that Ace Electric

11  Company had shipped something to the United Arab Emirates,

12  which, through your interviews with Geiger, you are looking

13  at the information you got from your subpoenas, and whatever

14  investigation you did led you to believe that this was one

15  of the cyclone separators purchased from Geiger and sent to

16  the UAE.  Correct?

17          THE WITNESS:  The actual Airway bill listed

18  cyclone separator on it.

19          THE COURT:  Right.  And you had that prior to

20  March 31st?

21          THE WITNESS:  Yes, the beginning of March.

22          THE COURT:  Now, the company in UAE, is that

23  D-S-A-Z?

24          THE WITNESS:  General DSAZ.

25          THE COURT:  D-S-A-Z?

Baird - Direct

1           THE WITNESS:  Yes, your Honor.

2           THE COURT:  And the individual's name was one of

3   the co-defendants?

4           THE WITNESS:  Yes, Arash Rashti.

5           THE COURT:  The interview with the Geiger folks

6   was at 3/29.  Correct?

7           THE WITNESS:  Yes, your Honor.

8           THE COURT:  So that's March 29, 2012.

9           And on March 30th, 2012, you had an interview

10  with another supplier of industrial equipment that was of

11  similar type of industrial merchandise that would be subject

12  to the trade restrictions.  Is that right?

13          THE WITNESS:  Trade restrictions to embargoed

14  countries.

15          THE COURT:  Right.  And was that in connection

16  with Mr. Saboonchi?

17          THE WITNESS:  Yes.

18          THE COURT:  Do you recall the name of that

19  supplier?

20          THE WITNESS:  RG Group.

21          THE COURT:  R?

22          THE WITNESS:  RG.

23          THE COURT:  "G" as in "Georgia"?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Okay.  I think I got it.

Baird - Direct

1          Let's take a ten-minute break so our court

2   reporter can take a break, you can take a look at your notes

3   and make sure you are prepared for whatever examination you

4   want to do, and then we will come back and proceed in the

5   direction that I had set.

6          Ten minutes means ten minutes, not 30.

7          (Recess taken from 3:06 p.m. until 3:16 p.m.)

8          THE COURT:  All right.  Mr. Ferrari, do you have

9   any questions, sir?

10          MR. FERRARI:  Yes, your Honor.

11          THE COURT:  Have a seat.  Be comfortable.

12          MS. MANUELIAN:  Judge, if Mr. Ferrari doesn't

13   mind, I think it might help you, and I am sure Mr. Ferrari

14   won't object, Geiger is referenced as Company A in the

15   indictment.

16          THE COURT:  Okay.

17          MS. MANUELIAN:  And RG Group is Company F.  I

18   don't think Mr. Ferrari would have an objection to that, at

19   least for clarity's sake so you can follow what's going on.

20          THE COURT:  Got it.

21          MR. FERRARI:  No objection, your Honor.

22          THE COURT:  Thank you.

23          MR. FERRARI:  Thank you.

24                  CROSS-EXAMINATION

25   BY MR. FERRARI:

Baird - Direct

1    Q.    Good afternoon, Agent Baird.  I am Erich Ferrari.  I

2    am an attorney for Mr. Saboonchi.  I have a few questions.

3    I won't keep you up there too long.

4              You had mentioned that when Agent Burkhardt had

5    called, that you had requested any electronic media.

6    Correct?

7    A.    Yes.

8    Q.    Were you aware that it was cell phones and a USB drive

9    at that time?

10   A.    No.

11   Q.    Okay.  So it could have been anything that was on --

12   either in his vehicle or that he had possession of

13   physically.  Correct?

14   A.    Yes.

15   Q.    And when I say "he," I am referring to Mr. Saboonchi.

16   A.    Yes.

17   Q.    And you spoke at some length about the border

18   authority, and that you have the same rights to conduct a

19   border search as a CBP officer.  Is that correct?

20   A.    Yes.

21   Q.    And where does your understanding of that authority

22   come from?

23   A.    19 U.S.C., and there is various subsections within

24   that that give us our border authority.

25              THE COURT:  Let me just say this, Mr. Ferrari.

1          MR. FERRARI:  Yes, your Honor.

2          THE COURT:  You, by all means, make whatever

3    questions you feel like doing, but the question of authority

4    is a question of law, not of fact.  If you wish to explore

5    her understanding, that's fine.  I mean, she is no doubt

6    aware of the border searches of electronic devices, memos,

7    the Privacy Impact Assessment of August 25th, 2009, which is

8    about 40 pages' long that goes through all chapter and verse

9    of what HSI believes is the justification for what they do.

10   Whether it is or is not is the Court's responsibility, but

11   certainly that's the source from which the people who

12   operate under that protocol are going to be basing their

13   decisions.

14          You are welcome to question all you want.  It

15   just is not particularly relevant to the decisions that I

16   have to make, but I am not going to restrict your

17   examination at all.

18          MR. FERRARI:  I do understand that, your Honor.

19   I thank you for that.

20   BY MR. FERRARI:

21   Q.   My question is more as to what training you had to

22   understand those statutes.  Maybe I can re-ask the question.

23          What training did you receive that gave you that

24   understanding as opposed to what particular legal

25   authorities you are operating under?

Baird - Cross

1    A.    I received specialized training conducted by

2    Immigration and Customs Enforcement at the Federal Law

3    Enforcement Center in Brunswick, Georgia, where we focused

4    specifically on our Customs as well as Immigration

5    authority.  And then we also have follow-up legal updates

6    that are provided by our headquarters, as well as online

7    training in reference to our border search authority.

8    Q.    So your understanding of this authority comes from ICE

9    itself, or HSI now.  Is that correct?

10   A.    I, I, I am asking you just to clarify that question.

11   I'm sorry.

12   Q.    Your training that you are provided is provided by the

13   agency for which you work; it's not provided by Customs

14   Border Protection.  Is that correct?

15   A.    It's provided by my agency.

16   Q.    And you had indicated that you would have the ability

17   to go and conduct an examination at the border search.

18          Would you do that in conjunction with CBP

19   officers, or could you go on your own and just stop vehicles

20   and pull them into inspection?

21   A.    No.  It's customary to work with CBP.  They are the

22   primary people at the border, but we work hand-in-hand with

23   them.

24   Q.    You work hand-in-hand, but if you had to, would you be

25   able to work independent of them?

Baird - Cross

1    A.    No.  I would not stop a vehicle at a land border.

2    Q.    And although you may have similar authority to conduct

3    border searches, you, yourself, are not a Customs official

4    or officer.  Is that correct?

5    A.    Yes, I am a Customs officer.  I am designated as a

6    Customs officer.

7    Q.    As a -- under the Customs Border Protection or under

8    ICE?

9    A.    Under Homeland Security.

10   Q.    I apologize.  Homeland Security.

11         You had mentioned that when you met with

12   Mr. Saboonchi on April 13th, he was coming to pick up some

13   items.  Is that correct?

14   A.    Yes.

15   Q.    And you had asked him questions about restrictions, if

16   he knew there was restrictions on doing business with Iran.

17   Is that correct?

18   A.    Yes.

19   Q.    And those questions were made in the context of you

20   inquiring into his internship with a company.  Is that

21   correct?

22   A.    Yes.

23   Q.    That company was Kavoosh Niroo, was it not?

24   A.    Yes.

25         THE COURT:  Could you a spell that, sir, because

Baird - Cross

1    I am sure it's going to be hard.

2              MR. FERRARI:  Yes, your Honor.  K-A-V-O-O-S-H,

3    N-I-R-O-O.

4    BY MR. FERRARI:

5    Q.    Now, on the resume, itself, that was obtained from

6    viewing the thumb drive, did the resume indicate that that

7    company was in Iran, or is it something Mr. Saboonchi told

8    you?

9    A.    From what I recall, it was in Iran, on the resume.

10   Q.    It's stated on the resume?

11   A.    Yes.

12   Q.    And did you ask him if the company was actually in

13   Iran?

14   A.    I -- I don't recall specifically.

15   Q.    Okay.  Do you remember writing a report about this

16   interaction that you had with Mr. Saboonchi?

17   A.    Yes.

18   Q.    Did you review that report prior to coming to court

19   today?

20   A.    I did.

21   Q.    Do you have a copy of that report with you now?

22   A.    It's on the table over there.

23             MR. FERRARI:  Your Honor, if I may approach the

24   witness.

25             THE COURT:  Sure.  Let her refresh her

Baird - Cross

1   recollection.

2                    (Document passed to the witness.)

3                    THE WITNESS:  Thank you.

4                    THE COURT:  I think she is finished.

5                    MR. FERRARI:  Thank you.

6   BY MR. FERRARI:

7   Q.    If I can call your attention, Agent Baird, to, I

8   believe it is around five paragraphs down on the middle of

9   what's indicated on page 3, it mentioned that, "He confirmed

10  he worked for a company in Iran."

11                   Does that refresh your recollection as to

12  whether or not you asked the question?

13  A.    Yes.

14  Q.    So you did ask the question, If he worked in Iran?

15  A.    Yes.

16  Q.    But it's also your recollection that the company in --

17  or the resume indicated that company was actually located in

18  Iran?

19  A.    I thought it may have been.

20  Q.    Well, why would you -- my question is:  Why would you

21  ask a question about whether or not it was located in Iran

22  if it was actually indicated on the resume it was located in

23  Iran?

24  A.    If I wasn't sure, I would definitely confirm about the

25  location of where it was.

Baird - Cross

1    Q.    Why wouldn't you be sure if it was stated on the

2    resume that it was located in Iran?

3    A.    I just don't recall specifically.

4    Q.    You don't recall?

5    A.    Mm-hmm.

6    Q.    Now, you had this conversation with him in regards to

7    this internship you had with this company, this Kavoosh

8    Niroo company, and you indicated there was restrictions on

9    doing business with Iran.  Is that correct?

10   A.    Yes.

11   Q.    Did you indicate that there are restrictions on

12   working for an Iranian company?

13   A.    I had told him that he had needed to seek permission

14   if he was doing business with companies in Iran.

15   Q.    Seek permission from whom?

16   A.    The Office of Foreign Asset Control.

17   Q.    And that's what you referred to previously as OFAC.

18   Correct?

19   A.    Yes.

20   Q.    And when you said "doing business," you weren't

21   specifically speaking to working for an Iranian company?

22   A.    Is it okay if I refresh --

23              THE COURT:  Sure.

24              THE WITNESS: -- my recollection?

25              I specifically asked him about doing business,

1    as well as performing work with or for Iranian entities as a

2    U.S. person.

3    BY MR. FERRARI:

4    Q.    Did you ask him, or indicate to him, rather, at any

5    time that he was prohibited from exporting products to Iran?

6    A.    I didn't actually say it, but Agent Matney had

7    mentioned about restrictions on export.

8    Q.    Would that have been something that would have gone

9    into your report?

10   A.    I did not notate that in there.

11   Q.    Is this a case about exporting products to Iran?

12   A.    It is.

13   Q.    Do you feel that would have been relevant to have been

14   included in the report?

15   A.    It would have been helpful.

16   Q.    So when you -- my understanding is that the agent, the

17   HSI agent that was with you at this time exclusively stated

18   to Mr. Saboonchi he was prohibited from exporting goods to

19   Iran?

20   A.    She had mentioned about exportation to Iran.

21   Q.    To Iran.  Of goods or of services?

22   A.    I don't recall explicitly.

23   Q.    Is it your understanding that both goods and services

24   are prohibited from being exported to Iran?

25   A.    There are -- you can seek permission, and then there

Baird - Cross

 1   is also exceptions for informational materials, health aids,

 2   things like that.

 3   Q.    Now, Mr. Saboonchi had mentioned that he knew he

 4   couldn't fly on Iran airlines.  Is that correct?

 5   A.    Yes, he mentioned that.

 6   Q.    In your understanding, was he correct in stating that?

 7   A.    I have not researched it independently.

 8   Q.    But you did mention that there are exceptions.

 9   Correct?

10   A.    Yes.

11   Q.    Do you know if there is any exceptions for travel?

12   A.    On Iran airlines?  No, I am unaware of that.

13   Q.    You are unaware of that.

14         And you had mentioned this licensing program

15   that OFAC has to Mr. Saboonchi.  Is that correct?

16   A.    Yes.

17   Q.    And what did you actually say about the licensing

18   program?

19   A.    I said that he should refer to OFAC, and I gave him

20   the website.

21   Q.    You gave him the website?

22   A.    Yes.

23   Q.    Did he have any paper to write that website down?

24   A.    I wrote it on the back of the property receipt that I

25   gave him.

Baird - Cross

1  Q.    Okay.  And did -- you gave him the website.  Did you

2  give him any phone numbers?

3  A.    Not that I can recall.

4  Q.    Was there a particular contact person he should

5  contact at OFAC?

6  A.    I don't think I provided a specific name.

7  Q.    Is it your understanding as to whether or not there

8  are numerous divisions within OFAC?

9  A.    Yes.

10  Q.    Are there any agents that -- sorry.  Are there any

11  divisions within that agency that deal specifically with

12  licensing?

13  A.    I just gave him the, the website for him to refer to

14  and do his own research.

15  Q.    But you didn't go into the prohibitions other than,

16  You can't do business with Iran, and your -- the other agent

17  saying, You can't export goods to Iran?

18  A.    Or performing or doing business with as well.

19  Q.    Okay.  Now, you had mentioned a March 29th, 2012,

20  meeting.  Was that with Geiger Pumps or was that with RG

21  Group?

22  A.    Geiger Pumps.

23  Q.    With Geiger Pumps.

24        And if I recall correctly, you stated that

25  Saboonchi, Mr. Saboonchi had initially stated he didn't know

1   where the goods were going?

2   A.    That was for the second order.  The first one, for the

3   cyclone separators, he told Geiger they were destined for

4   domestic use here in the U.S.

5   Q.    Did he mention that he was going to stock those

6   products; do you recall?

7   A.    I don't recall.

8   Q.    Did Mr. Saboonchi, in that -- and I guess I am

9   referring to the second interview, this March 29th -- did he

10  indicate that the goods would be going to Turkey, in

11  particular?

12  A.    The second transaction?

13  Q.    The second transaction.

14  A.    Yes, for a Turkish company.

15  Q.    Now, you mentioned that he had asked you, once your

16  inquiry was over, he had asked you about his wife's legal

17  permanent resident card.  Is that correct?

18  A.    Yes.

19  Q.    Did he ask you any other questions?

20  A.    Not that I recall.

21  Q.    He didn't ask you why he was stopped?

22  A.    He may have.

23  Q.    He may have.

24          And do you have any recollection of your

25  response to him or what --

1   A.      Pretty much the answer I give to everyone, that you

2   are subject to random inspection at the border.

3   Q.      You never at any time indicated anything else to him

4   other than, he is subject to random inspection?

5   A.      Not that I recall.

6   Q.      Now, you had mentioned that the reason you asked this

7   -- and you can correct me if I am wrong in my understanding

8   of what you said -- but you had asked, told him about OFAC

9   was to have an opportunity to explain the OFAC regulations.

10  Is that correct?  Or did I misunderstand?

11  A.      The purpose was to admonish him about the sanctions in

12  place with doing business for or on behalf of Iranian

13  entities as a U.S. person.

14  Q.      And if you weren't in the position of having to return

15  electronic media to him, did you have any plans to provide

16  that admonishment to him?

17  A.      No.

18  Q.      Were there any plans that you had to inform him on

19  OFAC regulations?

20  A.      Not at that time.

21  Q.      Let's go back to OFAC for a second.  Are you aware

22  that there is an enforcement division inside of OFAC?

23  A.      Yes.

24  Q.      Do you know what distinguishes a case that would go to

25  an OFAC enforcement division versus one that would come for

Baird - Cross

1   prosecution through the criminal justice system?

2   A.    No.

3   Q.    Have you, in the course of your training and your

4   understanding in this area, did you take any training or

5   review any materials to inform you about the underlying

6   statutes at play in these cases?

7   A.    I received training while at the Federal Law

8   Enforcement Training Center that was specific to Immigration

9   and Customs, which had a block pertaining to export

10  violations, and then just read materials since they are no

11  longer training me on that.

12  Q.    Are you familiar with the International Emergency

13  Economic Powers Act?

14  A.    Yes.

15  Q.    Are you familiar with the indictment in this case?

16  A.    Yes.

17  Q.    Are you familiar that the indictment charges

18  Mr. Saboonchi with various counts of violating that statute?

19  A.    Yes.

20  Q.    Are you aware that in 1705 of that statute, that there

21  are both civil and criminal penalties?

22  A.    Yes.

23  Q.    Are you aware that the criminal penalties require

24  willfulness?

25  A.    Yes.

Baird - Cross

1    Q.    Are you aware that willfulness has been determined --

2    well, I won't go there.  That's within the purview of the

3    Court.

4                MR. FERRARI:  No further questions, your Honor.

5                THE COURT:  Any questions?

6                MS. MANUELIAN:  One question, your Honor.

7                       REDIRECT EXAMINATION

8    BY MS. MANUELIAN:

9    Q.    I just want to clarify, Agent Baird, do you, as part

10   of your duties, provide admonishments to companies or

11   individuals with respect to export restrictions, OFAC

12   restrictions, and the like similar to what you did here with

13   Mr. Saboonchi?

14   A.    Individuals, yes.

15   Q.    And what prompts, what prompts those admonishments?

16   A.    If we see possible money transfer coming to and from

17   Iran, or if we suspect someone of possible export

18   violations.

19   Q.    And do you also do admonishments of that sort to

20   companies in your jurisdiction as well?

21   A.    No, I do not.

22   Q.    Are there other agents in your agency that do that?

23   A.    Yes.

24                MS. MANUELIAN:  I have nothing further, your

25   Honor.

 1          THE COURT:  Just one clarifying question, and

 2    then questions, if either of you have any questions based

 3    upon mine, please feel free to ask it.

 4          You made reference to, during the investigation

 5    that took place before the March 31st, 2012, border events,

 6    and that there was a transaction with Geiger Company that

 7    involved shipment that ultimately went to the United Arab

 8    Emirates.  There was another transaction, and I don't know

 9    what company it was with, where I heard you say, if I heard

10    correctly, that Mr. Saboonchi had told the company that the

11    items were to be sent to Turkey.  Do you recall that?

12          THE WITNESS:  Yes.

13          THE COURT:  And were those items, in fact, sent

14    to the UAE or to Turkey?

15          THE WITNESS:  I am not sure.  I am not sure

16    about the specifics of that transaction.  It was all with

17    Geiger Pumps.

18          THE COURT:  Okay.  Fine.  That was my only

19    question.  I just wanted to make sure I understood that.

20          And if anyone has any questions, first

21    Ms. Manuelian and then Mr. Ferrari, any questions based upon

22    that?

23          MS. MANUELIAN:  No, your Honor.

24          MR. FERRARI:  Your Honor, if I may?

25          THE COURT:  Yeah.

1          MR. FERRARI:  One quick question.

2                    RECROSS-EXAMINATION

3     BY MR. FERRARI:

4     Q.    Agent Baird, in carrying -- you are the case agent on

5     this case, as indicated earlier, correct?

6     A.    Co-case.

7     Q.    Co-case agent.  But you were familiar in the case --

8     were you involved in preparing materials to apply for

9     subpoenas, search warrants, things of that nature?

10    A.    The majority of that was done by Agent Abagnale.

11    Q.    Were you involved in that process at all?

12    A.    A little bit.

13    Q.    Did you have -- you had input into what went in there,

14    into those affidavits?

15    A.    The majority of the work was done by Agent Abagnale.

16    Q.    I understand that.  But you had some input?

17    A.    I assisted with interviews, and, I mean, Agent

18    Abagnale carried the majority of the case work with this.

19    Q.    Sure, I get that.

20              Did you review those affidavits before they were

21    submitted to the Court and pursuant subpoenas?

22    A.    I did.

23    Q.    Did you use any knowledge or evidence obtained from

24    the border search that's at issue here today in assisting

25    Agent Abagnale in procuring those search warrants or

Baird - Recross

1    subpoenas?

2    A.    I relayed my findings to Agent Abagnale.

3              MR. FERRARI:  No further questions, your Honor.

4              THE COURT:  May the witness step down?

5              MS. MANUELIAN:  Yes, your Honor.

6              THE COURT:  All right, ma'am, you may return to

7    your seat.

8              It's my understanding that that concludes the

9    evidentiary portion.  Correct?

10             MS. MANUELIAN:  That concludes the evidentiary

11   portion, your Honor.

12             THE COURT:  All right.

13

14                       - - - - -

15

16

17

18

19

20

21

22

23

24

25

Baird - Recross

1                          INDEX TO TESTIMONY

2

3     WITNESSES FOR THE GOVERNMENT:

4     KELLY BAIRD                                              PAGE

5          Direct examination by Ms. Manuelian           2
           Cross-examination by Mr. Ferrari             33
6          Redirect examination by Ms. Manuelian        46
           Recross-examination by Mr. Ferrari           48
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2              I, Renee A. Ewing, a Certified Realtime

3     Reporter, do hereby certify that the foregoing

4     is a true and correct transcript of the above pages of the

5     proceedings taken on the date and time previously stated in

6     the above matter; that the testimony of witnesses and

7     statements of the parties was correctly recorded in machine

8     shorthand by me and thereafter transcribed under my

9     supervision with computer-aided transcription to the best of

10    my ability; and that I am neither of counsel nor kin to any

11    party in said action, nor interested in the outcome thereof.

12

13

                    _____
14                    RENEE A. EWING
                      CERTIFIED REALTIME REPORTER
15                      October 6, 2013

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [1] - 15:25
**$2100** [4] - 12:19, 12:24, 16:2, 16:5
**$2500** [1] - 16:6

**1**

**13-0100-PWG** [1] - 1:5
**13th** [8] - 8:4, 8:9, 17:3, 17:22, 19:1, 20:17, 26:24, 36:12
**1455** [1] - 1:19
**15:03:53** [1] - 29:23
**15:34:40** [1] - 48:21
**1705** [1] - 45:20
**19** [1] - 33:23
**1:30** [1] - 1:8
**1st** [1] - 19:21

**2**

**2** [3] - 23:4, 25:10, 50:5
**2000** [1] - 20:7
**20004** [1] - 1:20
**2009** [1] - 34:7
**2010** [1] - 10:21
**2011** [6] - 11:12, 11:19, 13:2, 15:5, 19:22, 20:8
**2012** [17] - 3:20, 7:2, 8:12, 10:20, 11:12, 11:13, 11:20, 11:24, 19:9, 20:16, 20:18, 29:10, 29:25, 31:8, 31:9, 42:19, 47:5
**2013** [2] - 1:8, 51:15
**202** [1] - 1:20
**209-4852** [1] - 1:16
**21201** [1] - 1:15
**23** [1] - 1:8
**25th** [1] - 34:7
**280-6370** [1] - 1:20
**29** [1] - 31:8
**29th** [4] - 12:13, 20:16, 42:19, 43:9
**2nd** [1] - 7:2

**3**

**3** [4] - 6:15, 6:19, 6:21, 38:9

**3/29** [1] - 31:6
**30** [1] - 32:6
**301** [1] - 1:24
**30th** [2] - 12:24, 31:9
**31st** [8] - 3:19, 9:18, 10:20, 13:25, 19:8, 29:10, 30:20, 47:5
**33** [1] - 50:5
**344-3227** [1] - 1:24
**36** [1] - 1:14
**3:06** [1] - 32:7
**3:16** [1] - 32:7
**3rd** [1] - 20:5

**4**

**4** [1] - 7:4
**4/2** [1] - 8:12
**40** [1] - 34:8
**400** [1] - 1:19
**410** [1] - 1:16
**46** [1] - 50:6
**48** [1] - 50:6
**4th** [2] - 1:15, 8:1

**6**

**6** [2] - 29:25, 51:15
**6051-D** [1] - 7:6
**6A** [1] - 23:25

**A**

**Abagnale** [5] - 48:10, 48:15, 48:18, 48:25, 49:2
**ability** [2] - 35:16, 51:10
**able** [4] - 5:8, 5:15, 17:20, 35:25
**above-entitled** [1] - 1:10
**accompany** [1] - 17:4
**according** [1] - 28:19
**accounts** [1] - 14:6
**accurately** [1] - 29:10
**Ace** [2] - 12:4, 30:10
**acronym** [2] - 21:21, 21:24
**Act** [1] - 45:13
**action** [1] - 51:11
**ACTION** [1] - 1:5
**activity** [1] - 27:11
**actual** [5] - 16:1,

22:23, 25:8, 26:11, 30:17
**additional** [1] - 19:16
**address** [2] - 12:9, 23:18
**admission** [1] - 6:15
**admitted** [2] - 6:19, 23:8
**admonish** [1] - 44:11
**admonishment** [1] - 44:16
**admonishments** [3] - 46:10, 46:15, 46:19
**advise** [1] - 14:8
**advised** [4] - 3:24, 10:10, 21:17, 22:2
**advisement** [1] - 25:23
**affected** [1] - 28:11
**affidavits** [1] - 48:14
**afternoon** [2] - 28:5, 33:1
**agency** [7] - 2:23, 2:25, 3:7, 35:13, 35:15, 42:11, 46:22
**Agent** [25] - 2:1, 2:17, 6:11, 6:23, 7:10, 7:25, 8:15, 19:14, 20:21, 21:16, 23:10, 24:2, 27:3, 28:8, 33:1, 33:4, 38:7, 40:6, 46:9, 48:4, 48:10, 48:15, 48:17, 48:25, 49:2
**agent** [19] - 2:18, 2:22, 3:6, 3:12, 3:13, 3:14, 5:11, 6:6, 6:21, 7:25, 10:2, 11:13, 11:20, 17:7, 40:16, 40:17, 42:16, 48:4, 48:7
**agents** [6] - 9:2, 9:4, 9:7, 9:10, 42:10, 46:22
**ahead** [1] - 6:14
**aided** [1] - 51:9
**AIDED** [1] - 1:25
**aids** [1] - 41:1
**airlines** [3] - 21:15, 41:4, 41:12
**Airport** [1] - 5:23
**Airway** [5] - 12:3, 12:9, 15:22, 29:2, 30:17
**ALI** [1] - 1:8

**Ali** [2] - 10:25, 11:3
**allow** [1] - 27:23
**allowed** [1] - 21:15
**almost** [1] - 27:16
**AMERICA** [1] - 1:5
**amount** [2] - 15:22, 16:5
**amounts** [1] - 13:23
**analysis** [2] - 27:5, 30:8
**analyst** [1] - 17:13
**answer** [2] - 22:18, 44:1
**answering** [1] - 26:9
**apologize** [1] - 36:10
**APPEARANCES** [1] - 1:12
**Appeared** [2] - 1:16, 1:21
**applications** [2] - 10:23, 10:24
**apply** [1] - 48:8
**appreciate** [2] - 27:18, 28:4
**approach** [1] - 37:23
**appropriate** [1] - 20:25
**April** [10] - 7:2, 8:1, 8:4, 13:2, 17:3, 17:22, 19:1, 20:17, 26:24, 36:12
**Arab** [3] - 12:6, 30:11, 47:7
**Arash** [2] - 29:4, 31:4
**area** [2] - 26:19, 45:4
**arguments** [1] - 28:1
**arranged** [1] - 20:20
**arrested** [1] - 26:25
**assessing** [1] - 10:3
**Assessment** [1] - 34:7
**Asset** [4] - 21:8, 21:22, 22:4, 39:16
**assigned** [1] - 3:10
**assisted** [1] - 48:17
**assisting** [1] - 48:24
**ASSOCIATES** [1] - 1:17

**attention** [2] - 3:19, 38:7
**attorney** [1] - 33:2
**ATTORNEY** [1] - 1:13
**August** [4] - 15:5, 19:21, 20:5, 34:7
**authorities** [1] - 34:25
**authority** [15] - 5:9, 5:10, 5:13, 5:14, 9:12, 9:16, 27:8, 33:18, 33:21, 33:24, 34:3, 35:5, 35:7, 35:8, 36:2
**available** [1] - 9:4
**Avenue** [1] - 1:19
**aware** [12] - 9:3, 9:6, 10:15, 21:4, 21:5, 21:9, 33:8, 34:6, 44:21, 45:20, 45:23, 46:1

**B**

**B-A-I-R-D** [1] - 2:13
**BAIRD** [3] - 1:10, 2:4, 50:4
**Baird** [12] - 2:1, 2:10, 2:17, 6:21, 19:14, 23:10, 27:3, 28:8, 33:1, 38:7, 46:9, 48:4
**Baltimore** [8] - 1:15, 3:11, 3:12, 3:15, 9:10, 11:9, 15:11, 27:5
**based** [6] - 11:20, 13:6, 16:17, 27:8, 47:2, 47:21
**basing** [1] - 34:12
**become** [1] - 11:14
**beginning** [2] - 11:12, 30:21
**begun** [1] - 4:12
**behalf** [5] - 1:16, 1:21, 21:6, 21:18, 44:12
**belief** [1] - 27:10
**believes** [1] - 34:9
**belonging** [3] - 18:5, 18:8, 18:17
**below** [2] - 16:8, 23:19
**best** [1] - 51:9
**between** [2] - 6:23, 28:12
**bill** [5] - 12:3, 12:9, 15:22, 29:2, 30:17

**bills** [1] - 13:16
**birth** [2] - 22:25, 25:14
**bit** [1] - 48:12
**block** [1] - 45:9
**boarder** [3] - 5:10, 5:14, 9:12
**border** [31] - 3:22, 4:5, 4:22, 5:9, 5:15, 5:21, 7:13, 7:22, 8:21, 9:13, 9:16, 10:4, 10:12, 10:16, 27:8, 27:13, 28:20, 29:12, 33:17, 33:19, 33:24, 34:6, 35:7, 35:17, 35:22, 36:1, 36:3, 44:2, 47:5, 48:24
**Border** [3] - 4:1, 35:14, 36:7
**bottom** [4] - 7:2, 7:9, 7:16, 23:20
**box** [1] - 7:23
**break** [3] - 27:21, 32:1, 32:2
**Bridge** [1] - 3:21
**briefly** [1] - 10:18
**Brunswick** [1] - 35:3
**Buffalo** [5] - 3:22, 6:11, 9:5, 10:16, 29:11
**building** [3] - 26:14, 26:20
**bunch** [1] - 7:8
**Burkhardt** [8] - 4:2, 4:18, 5:4, 5:11, 5:24, 9:19, 29:11, 33:4
**business** [14] - 12:4, 13:15, 14:1, 21:6, 21:18, 22:3, 36:16, 39:9, 39:14, 39:20, 39:25, 42:16, 42:18, 44:12
**BY** [22] - 1:14, 1:18, 1:18, 2:16, 6:20, 13:5, 15:2, 18:24, 19:13, 20:9, 22:6, 23:9, 25:9, 28:7, 28:17, 32:25, 34:20, 37:4, 38:6, 40:3, 46:8, 48:3

## C

**calendar** [1] - 29:9
**card** [6] - 12:2, 13:16, 22:24, 25:15, 30:2, 43:17

**carefully** [1] - 28:4
**carried** [1] - 48:18
**carrying** [1] - 48:4
**case** [21] - 1:10, 3:5, 3:6, 3:8, 4:10, 5:2, 6:8, 8:19, 11:15, 11:23, 16:3, 29:5, 40:11, 44:24, 45:15, 48:4, 48:5, 48:6, 48:7, 48:18
**cases** [1] - 45:6
**CBP** [8] - 4:17, 5:12, 5:16, 5:19, 6:5, 33:19, 35:18, 35:21
**cell** [10] - 7:25, 16:13, 17:17, 17:21, 18:4, 18:16, 24:7, 24:21, 30:5, 33:8
**Center** [2] - 35:3, 45:8
**certain** [1] - 21:5
**certainly** [1] - 34:11
**Certified** [1] - 51:2
**CERTIFIED** [1] - 51:14
**certify** [1] - 51:3
**chain** [2] - 7:16, 7:21
**change** [2] - 8:24, 9:15
**chapter** [1] - 34:8
**charge** [3] - 3:13, 3:14, 3:15
**charges** [1] - 45:17
**Charles** [1] - 1:14
**check** [3] - 19:6, 22:24, 23:1
**CHRISTINE** [1] - 1:14
**chronology** [1] - 29:8
**civil** [1] - 45:21
**clarification** [1] - 28:16
**clarified** [1] - 18:10
**clarify** [3] - 18:4, 35:10, 46:9
**clarifying** [3] - 17:10, 27:19, 47:1
**clarity's** [1] - 32:19
**clear** [1] - 18:23
**CLERK** [4] - 2:3, 2:7, 2:11, 2:14
**co** [4] - 3:6, 31:3, 48:6, 48:7
**co-case** [3] - 3:6, 48:6, 48:7
**co-defendants** [1]

- 31:3
**codefendants** [1] - 29:5
**collectively** [1] - 17:21
**comfortable** [1] - 32:11
**coming** [3] - 36:12, 37:18, 46:16
**communicating** [1] - 14:12
**companies** [4] - 12:11, 39:14, 46:10, 46:20
**company** [29] - 10:22, 12:10, 12:11, 12:19, 12:22, 13:3, 13:4, 13:20, 14:13, 14:16, 15:6, 15:17, 17:15, 20:6, 30:22, 36:20, 36:23, 37:7, 37:12, 38:10, 38:16, 38:17, 39:7, 39:8, 39:12, 39:21, 43:14, 47:9, 47:10
**Company** [5] - 14:8, 30:11, 32:14, 32:17, 47:6
**comparison** [1] - 13:20
**complete** [1] - 23:13
**completed** [2] - 7:9, 30:8
**complies** [1] - 20:3
**COMPUTER** [1] - 1:25
**computer** [7] - 7:24, 8:24, 9:1, 9:10, 15:12, 17:13, 51:9
**COMPUTER-AIDED** [1] - 1:25
**computer-aided** [1] - 51:9
**concealed** [1] - 22:12
**concerning** [3] - 11:15, 11:23, 19:17
**concludes** [2] - 49:8, 49:10
**conclusion** [1] - 21:16
**conduct** [7] - 9:5, 9:8, 9:23, 21:17, 33:18, 35:17, 36:2
**conducted** [2] - 12:25, 35:1
**conducting** [1] - 21:6

**confirm** [1] - 38:24
**confirmed** [3] - 12:17, 12:23, 38:9
**conjunction** [1] - 35:18
**connection** [2] - 29:21, 31:15
**consideration** [1] - 18:14
**considered** [1] - 16:23
**contact** [6] - 6:23, 13:1, 18:25, 26:23, 42:4, 42:5
**contacted** [2] - 11:13, 11:20
**contained** [2] - 18:20, 18:21
**containing** [1] - 17:17
**contents** [2] - 17:17, 25:4
**context** [1] - 36:19
**continued** [1] - 28:12
**Control** [4] - 21:8, 21:23, 22:4, 39:16
**conversation** [1] - 39:6
**cooperative** [1] - 26:6
**copy** [2] - 7:14, 37:21
**correct** [42] - 7:2, 7:18, 8:13, 8:14, 17:18, 17:24, 18:2, 18:7, 18:21, 20:11, 24:8, 24:12, 24:13, 24:16, 24:19, 24:22, 29:6, 29:15, 30:3, 30:16, 31:6, 33:6, 33:13, 33:19, 35:9, 35:14, 36:4, 36:13, 36:17, 36:21, 39:9, 39:18, 41:4, 41:6, 41:9, 41:15, 43:17, 44:7, 44:10, 48:5, 49:9, 51:4
**correctly** [3] - 42:24, 47:10, 51:7
**counsel** [1] - 51:10
**countries** [1] - 31:14
**country** [1] - 10:16
**counts** [1] - 45:18
**couple** [1] - 27:19
**course** [4] - 5:18, 13:2, 22:7, 45:3
**court** [3] - 27:21, 32:1, 37:18

**COURT** [68] - 1:1, 1:23, 2:1, 6:18, 11:18, 12:15, 15:1, 17:10, 17:20, 18:1, 18:7, 18:10, 18:20, 18:23, 19:7, 19:12, 20:7, 21:21, 21:24, 22:1, 23:6, 23:8, 24:5, 24:10, 24:12, 24:15, 24:18, 24:21, 24:24, 25:2, 25:7, 27:18, 29:8, 29:18, 29:21, 29:25, 30:5, 30:9, 30:19, 30:22, 30:25, 31:2, 31:5, 31:8, 31:15, 31:18, 31:21, 31:23, 31:25, 32:8, 32:11, 32:16, 32:20, 32:22, 33:25, 34:2, 36:25, 37:25, 38:4, 39:23, 46:5, 47:1, 47:13, 47:18, 47:25, 49:4, 49:6, 49:12
**Court** [4] - 1:11, 8:18, 10:18, 46:3
**Court's** [1] - 34:10
**credit** [3] - 12:2, 13:16, 30:2
**criminal** [3] - 45:1, 45:21, 45:23
**CRIMINAL** [1] - 1:5
**criminality** [1] - 10:5
**CROSS** [1] - 32:24
**Cross** [1] - 50:5
**CROSS-EXAMINATION** [1] - 32:24
**Cross-examination** [1] - 50:5
**CRR** [1] - 1:24
**custody** [4] - 7:7, 7:16, 7:21, 17:24
**Custom** [1] - 16:4
**customary** [1] - 35:21
**customer** [2] - 12:20, 14:18
**Customs** [15] - 4:1, 5:14, 7:6, 10:6, 16:11, 20:21, 20:22, 35:2, 35:4, 35:13, 36:3, 36:5, 36:6, 36:7, 45:9
**cyclone** [9] - 12:5, 12:18, 14:11, 15:23, 28:18, 29:2, 30:15, 30:18, 43:3

## D

**D.C** [2] - 1:20, 3:1
**data** [2] - 17:23, 48:20
**database** [1] - 4:8
**date** [9] - 8:12, 8:24, 20:10, 20:13, 20:14, 21:11, 22:25, 25:14, 51:5
**dated** [1] - 7:2
**deal** [1] - 42:11
**dealings** [1] - 14:15
**dealt** [2] - 12:11, 14:17
**December** [1] - 11:19
**decide** [1] - 16:15
**decision** [2] - 17:12, 18:13
**decisions** [2] - 34:13, 34:15
**Defendant** [2] - 1:9, 1:21
**defendant's** [1] - 9:24
**defendants** [1] - 31:3
**definitely** [1] - 38:24
**Delaware** [1] - 2:24
**depart** [1] - 26:19
**DEPUTY** [4] - 2:3, 2:7, 2:11, 2:14
**designate** [1] - 12:20
**designated** [2] - 5:14, 36:5
**destined** [6] - 15:5, 19:22, 20:6, 28:22, 28:24, 43:3
**destroyed** [6] - 18:6, 24:12, 24:14, 24:19, 25:4, 25:8
**details** [1] - 5:3
**detain** [2] - 5:25, 6:5
**detained** [13] - 5:1, 5:7, 7:7, 7:13, 7:15, 9:13, 15:13, 16:25, 18:12, 24:10, 24:11, 27:4, 27:12
**detains** [1] - 6:6
**detention** [1] - 7:6
**determination** [1] - 21:20
**determined** [1] - 46:1
**developed** [1] -

10:19
**devices** [2] - 25:2, 34:6
**difference** [1] - 18:12
**different** [5] - 2:22, 9:15, 11:14, 13:17, 15:14
**DIRECT** [1] - 2:15
**direct** [2] - 3:19, 9:18
**Direct** [1] - 50:5
**direction** [1] - 32:5
**directly** [1] - 2:8
**disclosed** [1] - 18:14
**discuss** [1] - 5:2
**discussion** [1] - 21:1
**displayed** [1] - 22:8
**distinct** [1] - 18:11
**distinguish** [1] - 19:7
**distinguishes** [1] - 44:24
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 1:11
**division** [2] - 44:22, 44:25
**DIVISION** [1] - 1:3
**divisions** [2] - 42:8, 42:11
**document** [4] - 7:5, 8:6, 8:10, 38:2
**documentation** [2] - 6:13, 10:3
**documenting** [1] - 7:20
**documents** [2] - 13:14, 13:25
**dollar** [1] - 13:23
**dollars** [1] - 13:23
**domestic** [3] - 12:22, 28:24, 43:4
**done** [9] - 4:25, 10:25, 11:3, 14:11, 19:18, 27:6, 27:16, 48:10, 48:15
**doubt** [1] - 34:5
**down** [4] - 11:18, 38:8, 41:23, 49:4
**drawn** [1] - 22:8
**drive** [9] - 16:12, 17:18, 17:22, 18:17, 24:7, 24:25, 33:8, 37:6
**DSAZ** [3] - 30:23, 30:24, 30:25

**Dulles** [1] - 5:22
**duly** [1] - 2:5
**during** [7] - 9:20, 14:13, 19:3, 22:7, 26:5, 26:13, 47:4
**duties** [3] - 10:8, 16:4, 46:10
**duty** [1] - 16:11

## E

**early** [4] - 11:12, 11:17, 11:19, 11:24
**Economic** [1] - 45:13
**either** [4] - 13:3, 21:6, 33:12, 47:2
**Electric** [2] - 12:5, 30:10
**electric** [1] - 13:20
**electronic** [9] - 5:1, 5:7, 8:20, 8:23, 17:21, 27:4, 33:5, 34:6, 44:15
**email** [5] - 3:25, 6:23, 7:1, 14:5, 14:12
**embargoed** [1] - 31:13
**Emergency** [1] - 45:12
**Emirates** [3] - 12:6, 30:11, 47:8
**employed** [2] - 2:17, 15:16
**employment** [4] - 16:17, 17:14, 21:2, 25:22
**encounter** [1] - 4:1
**encountered** [1] - 4:21
**end** [2] - 12:21, 12:22
**enforcement** [3] - 2:21, 44:22, 44:25
**Enforcement** [3] - 35:2, 35:3, 45:8
**engaged** [2] - 25:21, 26:2
**engaging** [1] - 22:3
**entered** [1] - 4:7
**entirety** [1] - 26:5
**entities** [5] - 21:7, 21:18, 21:19, 40:1, 44:13
**entitled** [1] - 1:10
**entity** [1] - 16:18
**entry** [1] - 9:14
**equipment** [2] -

19:24, 31:10
**Erich** [1] - 33:1
**ERICH** [1] - 1:18
**ESQUIRE** [3] - 1:14, 1:18, 1:18
**evade** [1] - 10:8
**evening** [1] - 4:18
**events** [1] - 47:5
**eventually** [1] - 11:1
**evidence** [9] - 7:5, 8:23, 9:2, 9:25, 10:5, 23:3, 27:25, 30:10, 48:23
**evidentiary** [2] - 49:9, 49:10
**EWING** [1] - 51:14
**Ewing** [2] - 1:24, 51:2
**examination** [11] - 9:15, 16:10, 18:15, 27:24, 32:3, 34:17, 35:17, 50:5, 50:5, 50:6, 50:6
**EXAMINATION** [4] - 2:15, 32:24, 46:7, 48:2
**examined** [3] - 2:6, 8:21, 15:9
**examiner** [1] - 15:10
**exceptions** [3] - 41:1, 41:8, 41:11
**exchange** [1] - 26:5
**exclusively** [1] - 40:17
**excuse** [2] - 3:12, 12:24
**exercise** [1] - 5:13
**Exhibit** [5] - 6:15, 6:19, 6:21, 7:4, 23:4
**expedite** [1] - 24:6
**Experia** [1] - 25:5
**experience** [3] - 2:21, 6:5, 16:7
**explain** [2] - 8:18, 44:9
**explicitly** [1] - 40:22
**explore** [1] - 34:4
**export** [13] - 9:25, 11:15, 11:23, 16:10, 19:23, 26:3, 29:21, 40:7, 42:17, 45:9, 46:11, 46:17
**exportation** [1] - 40:20
**exported** [1] - 40:24

**exporting** [3] - 40:5, 40:11, 40:18
**exports** [1] - 11:16
**Express** [3] - 12:1, 30:1, 30:9
**extracted** [1] - 17:16

## F

**fact** [4] - 10:15, 16:17, 34:4, 47:13
**fall** [1] - 10:21
**fallen** [1] - 29:16
**familiar** [6] - 3:2, 14:20, 45:12, 45:15, 45:17, 48:7
**family** [1] - 21:14
**FBI** [6] - 3:9, 3:17, 3:18, 10:21, 10:25, 12:13
**federal** [3] - 2:22, 2:23, 2:25
**Federal** [6] - 3:1, 12:1, 30:1, 30:9, 35:2, 45:7
**FedEx** [5] - 6:25, 8:11, 12:3, 15:22, 29:1
**fees** [1] - 16:4
**felt** [1] - 26:2
**FERRARI** [24] - 1:17, 1:18, 6:17, 19:11, 23:5, 28:6, 32:10, 32:21, 32:23, 32:25, 34:1, 34:18, 34:20, 37:2, 37:4, 37:23, 38:5, 38:6, 40:3, 46:4, 47:24, 48:1, 48:3, 49:3
**Ferrari** [10] - 19:12, 32:8, 32:12, 32:13, 32:18, 33:1, 33:25, 47:21, 50:5, 50:6
**few** [1] - 33:2
**file** [2] - 17:16, 18:15
**filled** [1] - 7:14
**final** [1] - 28:1
**findings** [1] - 49:2
**fine** [2] - 34:5, 47:18
**finished** [1] - 38:4
**first** [11] - 2:5, 2:9, 2:11, 3:25, 4:17, 7:10, 11:25, 25:12, 26:20, 43:2, 47:20
**five** [1] - 38:8
**flag** [1] - 11:21
**flip** [1] - 20:1

Floor [1] - 1:15
fly [1] - 41:4
focused [1] - 35:3
folks [1] - 31:5
follow [3] - 20:4, 32:19, 35:5
follow-up [2] - 20:4, 35:5
follows [1] - 2:6
FOR [2] - 1:2, 50:3
Force [1] - 3:18
foregoing [1] - 51:3
Foreign [4] - 21:8, 21:22, 22:4, 39:16
forensic [14] - 7:24, 9:2, 9:4, 9:7, 9:10, 9:23, 15:10, 15:12, 17:13, 17:23, 18:14, 25:4, 27:5
forensically [1] - 15:9
forgive [1] - 17:11
Form [1] - 7:6
form [4] - 7:9, 7:14, 7:15, 23:13
forms [1] - 10:25
forward [1] - 6:1
forwarded [2] - 6:3, 8:20
forwards [1] - 6:7
free [2] - 22:13, 47:3
frequent [1] - 10:14
friends [1] - 21:12
front [1] - 26:14
fued [1] - 48:21
funds [1] - 21:14
FYI [1] - 27:18

**G**

G-E-I-G-E-R [1] - 12:16
Geiger [20] - 12:14, 14:8, 14:21, 19:4, 19:18, 19:23, 20:4, 20:11, 20:14, 28:20, 30:12, 30:15, 31:5, 32:14, 42:20, 42:22, 42:23, 43:3, 47:6, 47:17
GEIGER [1] - 12:15
general [1] - 30:24
generally [1] - 10:19
Georgia [2] - 31:23, 35:3
given [2] - 7:14,

25:22
goods [6] - 40:18, 40:21, 40:23, 42:17, 43:1, 43:10
Google [1] - 14:5
GOVERNMENT [1] - 50:3
Government's [1] - 6:15
Grand [3] - 13:10, 13:12, 30:1
Greenbelt [1] - 1:7
Grimm [1] - 1:11
Gross [1] - 16:19
gross [2] - 14:19, 15:20
gross' [1] - 17:15
Group [4] - 16:20, 31:20, 32:17, 42:21
guess [1] - 43:8

**H**

hand [7] - 2:3, 5:20, 35:22, 35:24
hand-in-hand [3] - 5:20, 35:22, 35:24
hard [1] - 37:1
header [1] - 48:20
headquarters [1] - 35:6
health [1] - 41:1
heard [2] - 47:9
hearing [1] - 1:10
help [1] - 32:13
helpful [1] - 40:15
helps [1] - 19:15
hereby [1] - 51:3
herein [1] - 2:5
hesitancy [1] - 26:8
highlighting [1] - 19:14
hmm [1] - 39:5
hold [1] - 11:18
holster [1] - 22:10
Homeland [4] - 2:18, 17:6, 36:9, 36:10
Honor [38] - 6:14, 6:17, 14:25, 17:25, 18:3, 18:19, 18:22, 19:5, 21:25, 23:5, 23:7, 24:17, 24:20, 24:23, 25:1, 25:6, 27:15, 28:6, 28:15, 29:7, 30:4, 31:1, 31:7, 31:24, 32:10, 32:21, 34:1, 34:18, 37:2, 37:23, 46:4,

46:6, 46:25, 47:23, 47:24, 49:3, 49:5, 49:11
Honorable [1] - 1:11
hoping [1] - 24:6
hours [1] - 27:20
House [2] - 20:21, 20:22
HSI [13] - 4:8, 5:11, 6:6, 10:2, 11:10, 11:13, 11:20, 17:24, 18:12, 26:14, 34:9, 35:9, 40:17

**I**

ICE [2] - 35:8, 36:8
identification [1] - 23:16
identified [5] - 14:19, 18:4, 18:8, 18:16, 29:1
identify [1] - 23:10
identity [1] - 14:14
illegal [1] - 11:23
image [3] - 15:11, 24:19, 24:21
imaged [6] - 17:16, 17:23, 18:2, 18:15, 18:21, 24:14
imaging [1] - 25:5
immediately [1] - 7:24
Immigration [4] - 10:6, 35:2, 35:4, 45:8
Impact [1] - 34:7
include [1] - 30:5
included [4] - 12:1, 30:1, 30:10, 40:14
independent [1] - 35:25
independently [1] - 41:7
INDEX [1] - 50:1
indicate [6] - 5:25, 26:8, 37:6, 39:11, 40:4, 43:10
indicated [13] - 11:14, 14:17, 15:5, 20:5, 25:20, 28:24, 35:16, 38:9, 38:17, 38:22, 39:8, 44:3, 48:5
indicates [1] - 8:12
indicating [1] - 15:16
indictment [3] - 32:15, 45:15, 45:17

individual [4] - 5:16, 10:4, 11:4, 29:1
individual's [1] - 31:2
individuals [2] - 46:11, 46:14
industrial [1] - 10:23, 12:12, 31:10, 31:11
influenced [1] - 28:11
inform [1] - 44:18, 45:5
information [18] - 3:20, 4:8, 4:15, 10:21, 16:11, 17:15, 19:2, 19:17, 23:15, 23:19, 25:11, 28:19, 28:21, 30:2, 30:6, 30:10, 30:13
informational [1] - 41:1
initiated [1] - 29:13
input [2] - 48:13, 48:16
inquiries [1] - 12:8
inquiring [1] - 36:20
inquiry [8] - 10:22, 10:25, 11:4, 19:21, 20:10, 22:5, 43:16, 48:21
inside [1] - 44:22
inspection [4] - 9:20, 35:20, 44:2, 44:4
instance [3] - 4:7, 5:24, 9:17
instructed [1] - 4:25
integrity [1] - 8:22
interaction [5] - 20:18, 22:7, 26:11, 26:24, 37:16
interactions [1] - 14:9
interest [6] - 4:9, 11:7, 11:15, 11:22, 29:14, 29:20
interested [1] - 51:11
internal [1] - 4:3
International [2] - 5:23, 45:12
internship [2] - 36:20, 39:7
interview [10] - 12:25, 14:8, 14:13, 14:21, 19:3, 19:15,

20:14, 31:5, 31:9, 43:9
interviewed [2] - 12:14, 14:17
interviews [3] - 19:8, 30:12, 48:17
investigating [1] - 4:10
investigation [13] - 4:12, 5:3, 9:1, 10:20, 11:6, 11:8, 11:9, 11:10, 11:22, 28:11, 29:14, 30:14, 47:4
Investigations [2] - 2:18, 17:6
investigations [2] - 29:17, 29:19
involved [4] - 15:5, 47:7, 48:8, 48:11
iPhone [2] - 15:19, 24:16
Iran [32] - 10:14, 11:16, 11:23, 15:17, 21:3, 21:5, 21:15, 22:3, 25:22, 36:16, 37:7, 37:9, 37:13, 38:10, 38:14, 38:18, 38:21, 38:23, 39:2, 39:9, 39:14, 40:5, 40:11, 40:19, 40:20, 40:21, 40:24, 41:4, 41:12, 42:16, 42:17, 46:17
Iranian [9] - 16:18, 17:14, 21:7, 21:18, 39:12, 39:21, 40:1, 44:12
issue [1] - 48:24
issued [1] - 13:9
item [2] - 19:22, 24:24
items [12] - 13:6, 15:24, 16:16, 17:1, 17:5, 20:24, 23:20, 24:15, 28:22, 36:13, 47:11, 47:13
itself [2] - 35:9, 37:5

**J**

Joint [1] - 3:17
Judge [1] - 1:11
judge [1] - 32:12
juncture [2] - 13:10, 16:24
jurisdiction [1] - 46:20
Jury [3] - 13:10,

13:12, 30:1
**justice** [1] - 45:1
**justification** [1] - 34:9

## K

**Kavoosh** [2] - 36:23, 39:7
**KAVOOSH** [1] - 37:2
**keep** [2] - 16:8, 33:3
**keeping** [1] - 18:2
**KELLY** [4] - 1:10, 2:4, 2:13, 50:4
**Kelly** [1] - 2:10
**kin** [1] - 51:10
**kind** [2] - 13:11, 16:3
**kindly** [1] - 28:2
**knowledge** [4] - 10:11, 10:18, 27:8, 48:23

## L

**lab** [1] - 15:12
**land** [1] - 36:1
**last** [2] - 2:9, 2:12
**late** [2] - 11:12, 11:19
**law** [2] - 2:21, 34:4
**Law** [1] - 35:2, 45:7
**lawful** [1] - 22:24
**learn** [1] - 14:14
**learned** [2] - 16:1, 20:13
**least** [1] - 32:19
**leave** [1] - 22:13
**led** [1] - 30:14
**left** [1] - 10:15
**legal** [3] - 34:24, 35:5, 43:16
**length** [1] - 33:17
**less** [2] - 4:24, 20:25
**licensing** [3] - 41:14, 41:17, 42:12
**limited** [1] - 28:10
**line** [4] - 7:10, 7:17, 7:25, 29:9
**linked** [3] - 12:11, 12:23, 16:19
**links** [1] - 15:14
**list** [2] - 15:19, 27:22
**listed** [7] - 12:5, 12:6, 12:9, 13:16,

16:17, 23:19, 30:17
**located** [4] - 38:17, 38:21, 38:22, 39:2
**location** [2] - 3:16, 9:15, 38:25
**look** [9] - 5:8, 10:2, 10:8, 15:10, 15:13, 22:3, 25:15, 27:22, 32:2
**looking** [2] - 12:2, 30:12

## M

**ma'am** [1] - 49:6
**machine** [1] - 51:7
**maintain** [1] - 8:22
**maintained** [1] - 25:17
**majority** [3] - 48:10, 48:15, 48:18
**MANUELIAN** [30] - 1:14, 2:16, 6:13, 6:20, 13:5, 14:24, 15:2, 18:24, 19:5, 19:10, 19:13, 20:9, 22:6, 23:3, 23:7, 23:9, 25:9, 27:15, 28:7, 28:14, 28:17, 29:7, 32:12, 32:17, 46:6, 46:8, 46:24, 47:23, 49:5, 49:10
**Manuelian** [3] - 47:21, 50:5, 50:6
**March** [20] - 3:19, 9:18, 10:20, 11:17, 11:24, 12:13, 12:24, 13:25, 19:8, 20:16, 29:10, 29:25, 30:20, 30:21, 31:8, 31:9, 42:19, 43:9, 47:5
**MARGARET** [1] - 1:18
**MARYLAND** [1] - 1:2
**Maryland** [2] - 1:7, 1:15
**material** [1] - 24:14
**materials** [5] - 28:2, 41:1, 45:5, 45:10, 48:8
**Matney** [4] - 20:21, 21:17, 24:2, 40:6
**matter** [2] - 51:6
**mean** [2] - 34:5, 48:17
**means** [2] - 32:6, 34:2
**media** [29] - 5:1, 5:7, 5:8, 5:25, 6:10,

6:24, 7:13, 7:14, 8:2, 8:19, 8:20, 8:23, 9:1, 9:8, 9:9, 9:13, 9:23, 15:8, 15:12, 16:12, 16:22, 17:21, 18:5, 27:4, 27:12, 28:9, 28:10, 33:5, 44:15
**medical** [1] - 10:24
**meet** [1] - 17:4
**meeting** [3] - 17:8, 21:16, 42:20
**member** [1] - 3:17
**memos** [1] - 34:6
**mention** [2] - 41:8, 43:5
**mentioned** [12] - 13:13, 33:4, 36:11, 38:9, 40:7, 40:20, 41:3, 41:5, 41:14, 42:19, 43:15, 44:6
**merchandise** [2] - 10:9, 31:11
**met** [2] - 20:22, 36:11
**microphone** [1] - 2:8
**middle** [1] - 38:8
**might** [2] - 4:4, 32:13
**military** [1] - 10:24
**mind** [1] - 32:13
**mine** [1] - 47:3
**minute** [3] - 27:16, 27:21, 32:1
**minutes** [3] - 26:12, 32:6
**missed** [1] - 27:17
**misunderstand** [1] - 44:10
**misunderstood** [1] - 25:8
**moment** [2] - 14:25, 28:15
**Monday** [1] - 1:8
**money** [1] - 46:16
**motions** [1] - 1:10
**move** [3] - 6:15, 18:25, 23:3
**MR** [22] - 6:17, 19:11, 23:5, 28:6, 32:10, 32:21, 32:23, 32:25, 34:1, 34:18, 34:20, 37:2, 37:4, 37:23, 38:5, 38:6, 40:3, 46:4, 47:24, 48:1, 48:3, 49:3
**MS** [29] - 2:16, 6:13, 6:20, 13:5, 14:24, 15:2, 18:24,

19:5, 19:10, 19:13, 20:9, 22:6, 23:3, 23:7, 23:9, 25:9, 27:15, 28:7, 28:14, 28:17, 29:7, 32:12, 32:17, 46:6, 46:8, 46:24, 47:23, 49:5, 49:10

## N

**N-I-R-O-O** [1] - 37:3
**N.W** [1] - 1:19
**name** [13] - 2:9, 2:12, 7:17, 8:5, 12:4, 12:7, 12:8, 22:25, 25:10, 25:14, 31:2, 31:18, 42:6
**named** [2] - 10:25, 11:3
**national** [1] - 10:7
**nature** [5] - 5:10, 12:12, 13:6, 13:10, 48:9
**needed** [5] - 21:19, 22:3, 26:4, 27:10, 39:13
**never** [1] - 44:3
**next** [2] - 8:5, 20:2
**Niroo** [2] - 36:23, 39:8
**NO** [1] - 1:5
**normal** [1] - 5:18
**notate** [1] - 40:10
**notated** [2] - 25:13
**notation** [2] - 23:1, 25:15
**noted** [1] - 12:3
**notes** [1] - 32:2
**NOTES** [1] - 1:25
**nothing** [3] - 28:14, 29:7, 46:24
**notice** [1] - 7:7
**notified** [1] - 4:4
**number** [5] - 11:1, 12:9, 15:20, 16:18, 17:15
**numbers** [3] - 15:15, 15:19, 42:2
**numerous** [3] - 13:16, 13:22, 42:8

## O

**O'Rourke** [5] - 6:11, 6:23, 7:10, 7:22, 8:15
**oath** [1] - 2:6
**object** [1] - 32:14

**objection** [6] - 6:16, 6:17, 19:11, 23:5, 32:18, 32:21
**obtained** [3] - 16:12, 37:5, 48:23
**occasions** [1] - 27:3
**occurred** [1] - 17:9
**October** [1] - 51:15
**OF** [4] - 1:2, 1:5, 1:13, 1:25
**OFAC** [17] - 21:20, 21:23, 21:24, 22:4, 25:23, 39:17, 41:15, 41:19, 42:5, 42:8, 44:8, 44:9, 44:19, 44:21, 44:22, 44:25, 46:11
**offered** [1] - 22:24
**offhand** [2] - 14:6, 15:7
**OFFICE** [1] - 1:13
**office** [3] - 3:18, 6:12, 11:14, 29:24
**Office** [4] - 21:7, 21:22, 22:4, 39:16
**officer** [8] - 2:23, 3:13, 5:12, 5:14, 33:19, 36:4, 36:5, 36:6
**Officer** [7] - 4:1, 4:17, 5:3, 5:11, 5:24, 9:18, 29:11
**officers** [1] - 35:19
**OFFICIAL** [1] - 1:23
**official** [1] - 36:3
**once** [1] - 43:15
**one** [16] - 14:18, 19:14, 21:10, 24:12, 24:15, 28:8, 28:15, 29:5, 29:23, 30:14, 31:2, 43:2, 44:25, 46:6, 47:1, 48:1
**ongoing** [2] - 11:5, 29:19
**online** [1] - 35:6
**open** [2] - 9:1, 12:8
**operate** [1] - 34:12
**operating** [1] - 34:25
**opportunity** [2] - 15:8, 44:9
**opposed** [2] - 8:20, 34:24
**order** [2] - 21:17, 43:2
**orders** [1] - 14:10
**original** [1] - 7:15
**outcome** [1] -

51:11
**outside** [3] - 20:21, 26:13, 26:16
**own** [2] - 35:19, 42:14

## P

**P.C** [1] - 1:17
**p.m** [3] - 1:8, 32:7
**package** [2] - 7:23, 7:24
**PAGE** [1] - 50:4
**page** [6] - 8:10, 20:1, 20:2, 24:4, 25:10, 38:9
**pages** [1] - 51:4
**pages'** [1] - 34:8
**paid** [1] - 16:4
**paper** [1] - 41:23
**paperwork** [1] - 25:16
**paragraphs** [1] - 38:8
**parameters** [1] - 10:9
**part** [2] - 20:5, 46:9
**particular** [10] - 3:5, 3:16, 4:7, 5:24, 8:19, 9:17, 12:3, 34:24, 42:4, 43:11
**particularly** [1] - 34:15
**parties** [1] - 51:7
**parts** [1] - 12:12
**party** [1] - 51:11
**passed** [1] - 38:2
**Patrick** [3] - 14:19, 15:20, 16:19
**Paul** [1] - 1:11
**penalties** [2] - 45:21, 45:23
**pending** [1] - 16:25
**Pennsylvania** [1] - 1:19
**people** [5] - 10:7, 12:14, 16:7, 34:11, 35:22
**performing** [2] - 40:1, 42:18
**permanent** [2] - 22:24, 43:17
**permission** [7] - 21:7, 21:19, 22:5, 26:4, 39:13, 39:15, 40:25
**person** [1] - 10:25, 11:3, 11:7, 11:15, 11:22, 13:2,

29:14, 29:20, 40:2, 42:4, 44:13
**personally** [1] - 6:3
**personnel** [1] - 14:21
**persons** [1] - 21:14
**pertaining** [4] - 12:1, 14:5, 21:5, 45:9
**phone** [7] - 14:1, 18:4, 18:16, 24:22, 25:8, 30:5, 42:2
**phones** [5] - 16:13, 17:17, 17:21, 24:7, 33:8
**physically** [3] - 5:16, 6:6, 33:13
**pick** [1] - 36:12
**piece** [1] - 19:24
**place** [10] - 4:13, 7:12, 19:8, 20:19, 21:2, 21:5, 21:10, 26:11, 44:12, 47:5
**placed** [2] - 11:6, 14:10
**plain** [1] - 22:11
**Plaintiff** [2] - 1:6, 1:16
**plan** [1] - 28:5
**plans** [2] - 44:15, 44:18
**play** [1] - 45:6
**plugged** [1] - 8:23
**point** [13] - 4:18, 8:2, 10:19, 13:24, 16:15, 16:25, 17:1, 17:16, 22:15, 22:20, 25:21, 26:2, 27:25
**police** [1] - 2:23
**port** [1] - 5:22
**portion** [2] - 49:9, 49:11
**position** [2] - 2:19, 44:14
**possession** [3] - 9:24, 10:3, 33:12
**possible** [2] - 46:16, 46:17
**Powers** [1] - 45:13
**practice** [2] - 8:25, 9:9
**practices** [1] - 21:6
**prepared** [2] - 14:20, 32:3
**preparing** [1] - 48:8
**presence** [3] - 8:7, 8:9, 23:24
**presently** [2] - 3:10
**preservation** [1] -

9:2
**president** [1] - 14:16
**pretty** [1] - 44:1
**previously** [2] - 39:17, 51:5
**primary** [2] - 28:3, 35:22
**Privacy** [1] - 34:7
**proceed** [1] - 32:4
**proceedings** [1] - 51:5
**process** [1] - 48:11
**procuring** [1] - 48:25
**product** [1] - 15:14
**production** [1] - 25:15
**products** [3] - 40:5, 40:11, 43:6
**program** [2] - 41:14, 41:18
**prohibited** [3] - 40:5, 40:18, 40:24
**prohibitions** [1] - 42:15
**prompts** [2] - 46:15
**property** [10] - 6:7, 7:7, 8:11, 23:6, 23:11, 23:12, 23:16, 23:17, 25:18, 41:24
**prosecution** [1] - 45:1
**Protection** [3] - 4:1, 35:14, 36:7
**Protective** [1] - 3:1
**protocol** [1] - 34:12
**provide** [3] - 28:21, 44:15, 46:10
**provided** [8] - 23:18, 25:15, 35:6, 35:12, 35:13, 35:15, 42:6
**provider** [1] - 14:1
**pull** [1] - 35:20
**Pump** [7] - 14:8, 14:21, 19:4, 19:18, 20:5, 20:11, 28:20
**Pumps** [5] - 12:14, 42:20, 42:22, 42:23, 47:17
**purchase** [1] - 12:18
**purchased** [1] - 30:15
**purchases** [5] - 13:1, 13:3, 13:17, 13:19, 13:22

**purpose** [4] - 5:6, 8:22, 9:22, 44:11
**pursuant** [1] - 5:8
**pursuit** [1] - 48:21
**purview** [1] - 46:2
**put** [2] - 7:4, 29:9

## Q

**questioned** [1] - 19:23
**questions** [21] - 9:19, 9:20, 21:4, 22:18, 22:20, 26:9, 27:19, 27:22, 32:9, 33:2, 34:3, 36:15, 36:19, 43:19, 46:4, 46:5, 47:2, 47:20, 47:21, 49:3
**quick** [3] - 24:5, 26:12, 48:1
**quote** [1] - 18:15

## R

**R.G** [1] - 16:19
**radar** [1] - 16:8
**Rainbow** [1] - 3:21
**raise** [1] - 2:3
**random** [2] - 44:2, 44:4
**Rashti** [2] - 29:4, 31:4
**rather** [1] - 40:4
**re** [1] - 34:22
**re-ask** [1] - 34:22
**read** [3] - 28:2, 28:4, 45:10
**ready** [1] - 27:25
**REALTIME** [1] - 51:14
**Realtime** [1] - 51:2
**reason** [1] - 44:6
**reasonable** [1] - 27:11
**receipt** [6] - 7:7, 8:11, 23:6, 23:11, 25:18, 41:24
**receive** [6] - 3:20, 6:4, 6:10, 13:24, 15:9, 34:23
**Received** [1] - 23:18
**received** [19] - 3:25, 4:15, 7:23, 10:21, 13:13, 13:14, 13:24, 14:4, 14:5, 16:23, 19:3, 19:16, 22:23, 23:17, 23:21, 28:19, 35:1, 45:7

**receiver's** [1] - 12:6
**receiving** [3] - 11:25, 13:8, 21:13
**recess** [1] - 32:7
**recollection** [8] - 15:3, 19:1, 19:16, 38:1, 38:11, 38:16, 39:24, 43:24
**record** [1] - 11:6
**recorded** [1] - 51:7
**records** [7] - 12:2, 13:13, 13:15, 14:1
**RECROSS** [1] - 48:2
**Recross** [1] - 50:6
**RECROSS-EXAMINATION** [1] - 48:2
**Recross-examination** [1] - 50:6
**redirect** [1] - 27:24
**REDIRECT** [1] - 46:7
**Redirect** [1] - 50:6
**refer** [2] - 41:19, 42:13
**reference** [2] - 35:7, 47:4
**referenced** [1] - 32:14
**referred** [2] - 10:24, 39:17
**referring** [4] - 7:1, 15:4, 33:15, 43:9
**reflect** [1] - 7:11
**reflected** [6] - 15:22, 15:23, 16:5, 17:14, 18:13, 23:15
**reflects** [1] - 7:12
**refresh** [5] - 19:1, 19:15, 37:25, 38:11, 39:22
**regard** [1] - 19:8
**regarding** [2] - 3:25, 10:22
**regards** [1] - 39:6
**regulations** [3] - 26:4, 44:9, 44:19
**related** [3] - 10:7, 11:2, 12:20
**relates** [1] - 10:5
**relation** [2] - 19:20, 19:21
**relayed** [1] - 49:2
**relevant** [3] - 16:10, 34:15, 40:13
**remain** [2] - 26:13, 26:16

remember [1] - 37:15
RENEE [1] - 51:14
Renee [2] - 1:24, 51:2
report [7] - 14:20, 15:3, 37:15, 37:18, 37:21, 40:9, 40:14
reporter [2] - 27:21, 32:2
REPORTER [2] - 1:23, 51:14
Reporter [1] - 51:3
reporting [1] - 16:6
reports [1] - 19:14
representative [2] - 14:18, 19:23
representatives [2] - 12:19, 20:15
requested [3] - 8:19, 30:7, 33:5
requesting [1] - 27:12
require [1] - 45:23
required [2] - 21:7, 21:20
requirements [1] - 16:6
resale [1] - 13:3
research [1] - 42:14
researched [1] - 41:7
resident [2] - 22:24, 43:17
respect [10] - 3:4, 4:9, 5:12, 6:14, 14:7, 16:10, 23:16, 25:23, 28:21, 46:11
responds [1] - 6:6
response [3] - 14:5, 29:11, 43:25
responsibility [1] - 34:10
restrict [1] - 34:16
restrictions [11] - 21:10, 25:24, 31:12, 31:13, 36:15, 36:16, 39:8, 39:11, 40:7, 46:11, 46:12
result [1] - 17:12
resume [11] - 15:16, 17:14, 21:3, 25:20, 37:5, 37:6, 37:9, 37:10, 38:17, 38:22, 39:2
retain [1] - 7:15
retained [1] - 7:22
return [6] - 17:1, 17:5, 17:20, 23:12,

44:14, 49:6
returned [4] - 8:3, 18:18, 23:20, 25:3
returns [3] - 11:25, 13:9, 13:14
reverse [1] - 25:16
review [4] - 16:25, 37:18, 45:5, 48:20
RG [4] - 31:20, 31:22, 32:17, 42:20
rights [1] - 33:18
RMR [1] - 1:24
role [2] - 3:4, 5:12
routine [1] - 9:20
RPR [1] - 1:24
rule [1] - 28:5
rules [1] - 27:9

## S

Saboonchi [70] - 3:2, 3:21, 4:9, 4:22, 8:3, 9:19, 10:11, 11:2, 11:4, 11:7, 11:14, 11:21, 12:1, 12:17, 12:21, 13:1, 13:17, 13:20, 14:9, 14:15, 14:17, 15:4, 15:16, 16:21, 17:2, 17:4, 17:22, 18:5, 18:17, 18:25, 19:17, 19:22, 19:24, 19:25, 20:4, 20:10, 20:19, 20:20, 20:23, 21:9, 21:17, 22:8, 22:13, 22:17, 22:18, 23:23, 25:3, 25:21, 26:6, 26:24, 28:12, 28:22, 29:3, 29:12, 29:14, 31:16, 33:2, 33:15, 36:12, 37:7, 37:16, 40:18, 41:3, 41:15, 42:25, 43:8, 45:18, 46:13, 47:10
SABOONCHI [1] - 1:8
Saboonchi's [4] - 8:5, 24:13, 24:16, 28:20
sake [1] - 32:19
salesperson [1] - 14:14
sanctions [4] - 21:4, 21:10, 25:23, 44:11
screen [1] - 6:21
sealed [1] - 7:24
search [13] - 5:14, 9:5, 9:8, 9:12, 9:16, 9:23, 12:8, 33:19,

35:7, 35:17, 48:9, 48:24, 48:25
searched [1] - 27:12
searches [2] - 34:6, 36:3
seat [3] - 2:7, 32:11, 49:7
second [9] - 7:25, 8:10, 14:13, 20:1, 43:2, 43:9, 43:12, 43:13, 44:21
Security [4] - 2:18, 17:6, 36:9, 36:10
security [1] - 10:7
see [4] - 9:25, 26:19, 27:22, 46:16
seeing [1] - 13:19
seek [5] - 21:19, 22:5, 39:13, 39:15, 40:25
seeking [1] - 5:6
seize [1] - 17:12
seized [6] - 16:20, 16:22, 16:23, 18:12, 18:16, 24:8
seizure [4] - 18:1, 18:13, 24:11
sent [8] - 8:15, 9:9, 9:14, 27:5, 29:2, 30:15, 47:11, 47:13
separator [2] - 12:5, 30:18
separators [7] - 12:18, 14:11, 15:23, 28:19, 29:2, 30:15, 43:3
September [1] - 1:8
Service [1] - 3:1
service [2] - 14:1, 14:18
services [2] - 40:21, 40:23
set [1] - 32:5
seven [1] - 2:20
several [2] - 12:14, 29:16
shipment [1] - 47:7
shipped [1] - 30:11
shipper [2] - 12:4, 12:5
shipping [1] - 13:13, 30:2, 30:10
shorthand [1] - 51:8
side [1] - 25:16
sight [1] - 22:11
sign [1] - 23:23
signature [3] - 8:5,

24:1
signatures [1] - 7:8
signed [2] - 8:6, 20:25
similar [3] - 31:11, 36:2, 46:12
sit [2] - 3:16, 3:18
situation [1] - 8:25
slow [1] - 11:18
sold [1] - 20:6
someone [4] - 4:4, 4:9, 5:20, 6:4, 7:13, 23:12, 46:17
Sony [2] - 24:18, 25:5
sorry [3] - 21:21, 35:11, 42:10
sort [2] - 27:11, 46:19
source [1] - 34:11
SOUTHERN [1] - 1:3
speaking [4] - 4:17, 26:8, 26:17, 39:21
special [7] - 2:18, 3:12, 3:14, 5:11, 6:11, 17:6
specialized [2] - 10:23, 35:1
specific [4] - 9:19, 19:2, 42:6, 45:8
specifically [8] - 4:16, 23:19, 35:4, 37:14, 39:3, 39:21, 39:25, 42:11
specifics [1] - 47:16
spell [2] - 2:11, 36:25
stamps [1] - 8:24
standard [2] - 8:25, 9:9
started [2] - 11:25, 29:25
state [1] - 2:8
statements [1] - 51:7
STATES [3] - 1:1, 1:5, 1:13
States [1] - 1:11
stating [1] - 41:6
statute [2] - 45:18, 45:20
statutes [3] - 27:9, 34:22, 45:6
STENOTYPE [1] - 1:25
step [1] - 49:4

still [2] - 17:23, 25:22
stock [1] - 43:5
stocking [1] - 13:4
stop [7] - 4:13, 4:15, 5:16, 10:11, 28:20, 35:19, 36:1
stopped [2] - 3:21, 4:5, 10:16, 43:21
Street [1] - 1:14
street [1] - 20:22
students [1] - 21:13
stuff [1] - 16:8
subject [4] - 4:4, 31:11, 44:2, 44:4
submissions [1] - 28:3
submitted [1] - 28:2
subpoena [4] - 11:25, 13:8, 13:11
subpoenas [7] - 13:9, 13:12, 14:3, 30:1, 30:13, 48:9, 49:1
subsections [1] - 33:23
Suite [1] - 1:19
supervision [1] - 51:9
supplemental [1] - 28:3
supplier [3] - 12:25, 31:10, 31:19
suspect [1] - 46:17
suspicion [1] - 27:11
sworn [2] - 2:2, 2:5
system [4] - 4:3, 11:6, 11:21, 45:1

## T

table [1] - 37:22
tangible [1] - 25:2
Task [1] - 3:17
technology [1] - 10:23
TECS [1] - 4:8
Tehran [1] - 12:11
telephone [9] - 11:1, 12:9, 15:14, 15:19, 15:20, 16:18, 16:20, 17:15, 24:18
telephoned [1] - 4:2
ten [5] - 26:12, 27:21, 32:1, 32:6
ten-minute [2] -

27:21, 32:1
**tend** [2] - 5:20, 16:7
**terminology** [1] - 18:11
**Terrorism** [1] - 3:17
**terrorism** [1] - 10:7
**testified** [3] - 2:6, 5:11, 15:21
**testimony** [2] - 1:10, 51:6
**TESTIMONY** [1] - 50:1
**THE** [116] - 1:1, 1:2, 1:13, 2:1, 2:3, 2:7, 2:10, 2:11, 2:13, 2:14, 6:18, 11:18, 11:19, 12:15, 12:16, 15:1, 17:10, 17:19, 17:20, 17:25, 18:1, 18:3, 18:7, 18:9, 18:10, 18:19, 18:20, 18:22, 18:23, 19:7, 19:12, 20:7, 20:8, 21:21, 21:22, 21:24, 21:25, 22:1, 22:2, 23:6, 23:8, 24:5, 24:9, 24:10, 24:11, 24:12, 24:14, 24:15, 24:17, 24:18, 24:20, 24:21, 24:23, 24:24, 25:1, 25:2, 25:6, 25:7, 27:18, 29:8, 29:16, 29:18, 29:19, 29:21, 29:23, 29:25, 30:4, 30:5, 30:7, 30:9, 30:17, 30:19, 30:21, 30:22, 30:24, 30:25, 31:1, 31:2, 31:4, 31:5, 31:7, 31:8, 31:13, 31:15, 31:17, 31:18, 31:20, 31:21, 31:22, 31:23, 31:24, 31:25, 32:8, 32:11, 32:16, 32:20, 32:22, 33:25, 34:2, 36:25, 37:25, 38:3, 38:4, 39:23, 39:24, 46:5, 47:1, 47:12, 47:13, 47:15, 47:18, 47:25, 49:4, 49:6, 49:12, 50:3
**thereafter** [1] - 51:8
**thereof** [1] - 51:11
**third** [3] - 7:17, 16:20, 24:24
**thousands** [1] - 13:23

**three** [4] - 2:24, 20:24, 24:15, 25:2
**thumb** [7] - 16:12, 17:17, 17:22, 18:17, 24:7, 24:24, 37:6
**TO** [1] - 50:1
**today** [2] - 37:19, 48:24
**took** [8] - 4:13, 7:24, 8:2, 17:8, 19:8, 20:19, 28:9, 47:5
**top** [1] - 25:11
**trade** [2] - 31:12, 31:13
**traditionally** [2] - 5:19, 5:22
**trained** [1] - 9:2
**training** [10] - 16:7, 34:21, 34:23, 35:1, 35:7, 35:12, 45:3, 45:4, 45:7, 45:11
**Training** [1] - 45:8
**transaction** [7] - 15:4, 16:19, 43:12, 43:13, 47:6, 47:8, 47:16
**transactions** [1] - 19:17
**transcribed** [1] - 51:8
**transcript** [1] - 51:4
**TRANSCRIPTION** [1] - 1:25
**transcription** [1] - 51:9
**transfer** [1] - 46:16
**travel** [2] - 10:14, 41:11
**traveling** [1] - 5:21
**traversed** [1] - 10:12
**traversing** [1] - 10:12
**trial** [1] - 13:11
**triggered** [1] - 16:6
**trouble** [1] - 21:13
**true** [1] - 51:4
**trying** [1] - 10:8
**Turkey** [4] - 20:6, 43:10, 47:11, 47:14
**Turkish** [2] - 15:6, 43:14
**turn** [1] - 9:1
**turned** [3] - 8:1, 16:20, 20:23
**two** [8] - 12:18, 14:11, 17:17, 17:21, 21:10, 24:7, 24:15,

27:20
**type** [1] - 31:11
**types** [3] - 13:9, 13:14, 13:25

## U

**U.S** [7] - 9:14, 21:13, 21:14, 28:25, 40:2, 43:4, 44:13
**U.S.C** [1] - 33:23
**UAE** [4] - 12:10, 30:16, 30:22, 47:14
**ultimately** [1] - 47:7
**unaware** [2] - 41:12, 41:13
**under** [9] - 27:8, 27:9, 27:10, 34:12, 34:25, 36:7, 36:9, 51:8
**underlying** [1] - 45:5
**understood** [1] - 47:19
**undervalue** [1] - 16:8
**UNITED** [3] - 1:1, 1:5, 1:13
**United** [4] - 1:11, 12:6, 30:11, 47:7
**unlawful** [1] - 27:11
**unquote** [1] - 18:16
**unsure** [1] - 19:22
**unusual** [1] - 13:18
**up** [8] - 2:1, 6:21, 9:4, 11:21, 20:4, 33:3, 35:5, 36:12
**updates** [1] - 35:5
**USB** [1] - 33:8
**user** [2] - 12:21, 12:22
**uses** [1] - 4:8

## V

**value** [2] - 15:23, 16:1
**valued** [1] - 12:18
**various** [2] - 33:23, 45:18
**varying** [1] - 13:22
**vehicle** [4] - 20:23, 26:16, 33:12, 36:1
**vehicles** [1] - 35:19
**vendors** [2] - 13:17, 13:19

**Vermont** [1] - 10:22
**verse** [1] - 34:8
**versus** [2] - 5:11, 44:25
**VERVERIS** [1] - 1:18
**via** [1] - 6:25
**vice** [1] - 14:16
**viewed** [1] - 8:23
**viewing** [1] - 37:6
**violating** [1] - 45:18
**violation** [4] - 10:6, 11:15, 11:23
**violations** [7] - 10:1, 16:11, 26:3, 29:22, 45:10, 46:18
**volunteered** [1] - 21:12

## W

**warrants** [2] - 48:9, 48:25
**Washington** [2] - 1:20, 3:1
**weapons** [2] - 22:8, 22:10
**website** [6] - 22:4, 41:20, 41:21, 41:23, 42:1, 42:13
**week** [1] - 11:25
**welcome** [1] - 34:14
**whatnot** [1] - 15:15
**whole** [1] - 7:8
**wife** [1] - 22:23
**wife's** [2] - 25:14, 43:16
**willfulness** [2] - 45:24, 46:1
**wise** [1] - 29:8
**wish** [1] - 34:4
**witness** [5] - 2:5, 23:22, 37:24, 38:2, 49:4
**Witness** [1] - 20:3
**WITNESS** [42] - 2:10, 2:13, 11:19, 12:16, 17:19, 17:25, 18:3, 18:9, 18:19, 18:22, 20:8, 21:22, 21:25, 22:2, 24:9, 24:11, 24:14, 24:17, 24:20, 24:23, 25:1, 25:6, 29:16, 29:19, 29:23, 30:4, 30:7, 30:17, 30:21, 30:24, 31:1, 31:4, 31:7,

31:13, 31:17, 31:20, 31:22, 31:24, 38:3, 39:24, 47:12, 47:15
**WITNESSES** [1] - 50:3
**witnesses** [1] - 51:6
**works** [3] - 5:19, 6:5, 14:3
**write** [1] - 41:23
**writing** [1] - 37:15
**wrote** [1] - 41:24

## Y

**year** [2] - 26:25
**years** [3] - 2:20, 2:24, 21:10
**yourself** [2] - 29:13, 36:3

## Z

**zip** [1] - 18:17