IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   Criminal No PWG-13-0100 |
| | * |
| ALI SABOONCHI | * |
| | * |

*******

**GOVERNMENT'S MEMORANDUM REGARDING
FORENSIC BORDER SEARCHES**

The United States of America, by and through its undersigned counsel, submits the following memorandum in response to the Court's letter order of October 15, 2013.

The Supreme Court has long recognized that the government's search authority is at its "zenith" at the border given the sovereign's right to protect itself by stopping and examining persons and property crossing its borders. *United States v Flores-Montano*, 541 U.S. 149, 152-53 (2004). As such, individualized suspicion is not required for "routine searches and seizures" of persons and property at the border. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). The only exception to that principle has been in the context of body searches, where the Supreme Court has determined that some level of suspicion is necessary prior to engaging in a highly intrusive search that offends the dignity and privacy interests of the affected traveler. *Flores-Montano*, 541 U.S. at 152. *See Montoya de Hernandez*, 473 U.S. at 541 (holding that detention at border for monitored bowel movement requires reasonable suspicion that traveler is smuggling contraband).

The Supreme Court's opinion in *Flores-Montano*, in which it upheld the suspicionless border search of the gas tank in a traveler's vehicle, clearly indicates that the Court is not inclined to extend an individualized suspicion requirement to objects, and continues to limit

1

those circumstances under which some level of suspicion may be required to (1) highly intrusive searches of the person, (2) destructive searches of property, and (3) searches conducted in a particularly offensive manner. 541 U.S. at 152, 155 n.2, 155-56. By virtue of its holding in *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2012), that reasonable suspicion of wrongdoing is required for a forensic examination of a traveler's computer at the border, the Ninth Circuit seeks to improperly narrow the sovereign's broad border search authority by creating its own special category of what it believes should be considered a per se "unreasonable" border search.

The *Cotterman* holding is not the first time the Ninth Circuit has sought to narrow the border search exception to the Fourth Amendment. The Supreme Court's opinion in *Flores-Montano* was a reversal of the Ninth Circuit's ruling below in *United States v. Molina-Tarazon*, 279 F.3d 709, 713-17 (9th Cir. 2002). As the *Cotterman* dissent aptly noted, the Supreme Court not only reversed the Ninth Circuit's conclusion that reasonable suspicion was required for the fuel tank search in question, it "caution[ed the court] not to create 'complex balancing tests' for border searches of property except in the rarest of cases, where the search is 'so destructive as to require' reasonable suspicion." 708 F.3d at 981 (Smith, J., dissenting). See *Flores-Montano*, 541 U.S. at 152 (noting that dignity and privacy concerns that might support requirement of some level of suspicion in the case of highly intrusive searches of the person do not carry over to search of a vehicle, and balancing tests have no place in determining what is or is not a routine border search of same).

In supporting its finding in *Cotterman* that the search of electronic devices "implicate[s] substantial privacy interests," the Ninth Circuit pointed to: (1) the amount of private information capable of being stored on such devices ("warehouses full"); (2) the nature of the information

2

("the most intimate details of our lives: financial records, confidential business documents, medical records and private emails"); and (3) the devices' unique capabilities to retain browsing histories and deleted files, making it nearly impossible "for individuals to make meaningful decisions regarding what digital content to expose to the scrutiny that accompanies international travel." *Id*. at 964-65. "The point," the court concluded, "is technology matters," and the "uniquely sensitive nature of data on electronic devices carries with it a significant expectation of privacy and thus renders an exhaustive exploratory search more intrusive than with other forms of property." *Id*. at 966. None of the reasons articulated by the Ninth Circuit in support of its holding are consistent with those limited circumstances under which the Supreme Court has suggested the necessity for some level of suspicion prior to executing a border search.

As to the first point, there is no basis in the law to limit the border search authority of customs officers based on the size of the "container" to be searched. Travelers bring varying amounts of information with them across borders every day. Neither the Supreme Court nor Congress have constrained the sovereign's ability to search based on the amount of information contained within a container, be it a laptop or a trunk.[1] Such a conclusion would lead to the perverse result, contrary to law, that the more information a container holds or is capable of holding, the less authority customs officers will have to search it.

---

[1] Customs officials are authorized to search all merchandise entering the United States to ensure compliance with the law, see 19 U.S.C. § 1461, and can conduct suspicionless searches in connection with the inspection of persons, merchandise, baggage, conveyances, and containers, including laptop computers and other electronic devices. See generally 19 U.S.C. §§ 482 (search of vehicles and persons), 1496 (examination of baggage), 1499 (detention, examination and testing of merchandise), 1581 (authorizing search of any person, trunk, package, or cargo on board a vehicle or vessel), 1582 (search of persons and baggage), 1589a (general law enforcement authority), 1585 (searches and seizures), and 1305 (examine potentially obscene or immoral materials).

As to the second point, the concern about the exposure of confidential and personal information contained in an electronic device rings hollow given that all of the same information can be, and has been, found in paper or other types of documents for which reasonable suspicion is not required to search. In *United States v. McAuley*, 563 F.Supp.2d 672 (W.D.Tex. 2008), the defendant argued that he maintained "a higher degree of privacy in his computer" due to the large amount and type of personal information contained therein, and thus, the border search of his computer was non-routine and "akin to a bodily search of a person" requiring reasonable suspicion. *Id*. at 677. Relying on *Flores-Montano*, the district judge summarily dismissed these arguments:

> The Defendant would have this Court impute the same level of privacy and dignity afforded to the sovereignty of a person's being to an inanimate object like a computer. The Court finds this argument without merit. … The Court finds that the search of a computer is more analogous to the search of a vehicle and/or its contents. … Incredible amounts of personal and sensitive information are already subject to scrutiny at ports of entry…and subject to routine border searches. … The fact that a computer may take such personal information and digitize it does not alter the Court's analysis.

Id. at 677-78.

As the district court noted in *McAuley*, travelers, especially those traveling long distances for long visits, bring all types of personal material across borders on a regular basis that reference sensitive details of their lives. *Id*. at 678. By imposing restrictions on the search of that "intimate" information if brought to the border in electronic rather than paper form, the Ninth Circuit ascribes constitutional significance to the act of retaining information in digital format, thus providing those who do so with greater protection than those travelers still wedded to their daily planners, paper files and written records. Neither Congress nor the Supreme Court have sought to limit the sovereign's border search authority based on categories of objects or information.

4

Finally, with respect to its third point, the Ninth Circuit has concluded that travelers have a constitutional right to make a "meaningful decision" as to what digital information they can be assured of successfully concealing when they cross a border. Thus, as the defendant in *McAuley* argued, any examination that might reveal that information would be like a strip search of one's person requiring reasonable suspicion. This aspect of the court's opinion underscores the primary, and improper, basis for its holding – a clear discomfort with the ability of technology to capture and retain large volumes of information, and a misplaced and erroneous application of Fourth Amendment jurisprudence when the Supreme Court has specifically exempted it at the border.

"[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Montoya de Hernandez*, 473 U.S. at 538. "[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck more favorably to the Government at the border." *Id*. at 539-40 (internal citations omitted). Contrary to this long-standing principle, the Ninth Circuit attempts to restrict the sovereign's ability to adequately protect its border by substituting its own notion of privacy premised on a belief that international travelers do not "expect" deep searches of their electronic devices in the absence of particularized suspicion, 709 F.3d at 967, and have the right to be forewarned as to the level of scrutiny to which they will be subjected at the border in order to "make meaningful decisions regarding what digital content to expose." Id. at 965. This analysis flips the constitutional standard on its head.

As a constitutional matter, border search authority is premised in part on a *reduced* expectation of privacy associated with international travel. *Flores-Montano*, 541 U.S. at 154;

*Ramsey*, 431 U.S. at 623 n. 17 ("Not only is there the longstanding, constitutionally authorized right of customs officials to search incoming persons and goods, but there is no statutorily created expectation of privacy."). *See also United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) ("since a port of entry is not a traveler's home, his expectation of privacy there is substantially lessened") (internal quotation marks omitted). "The luggage carried by a traveler entering the country may be searched at random by a customs officer … no matter how great the traveler's desire to conceal the contents may be." *United States v. Ross*, 456 U.S. 798, 823 (1982). The Ninth Circuit ignores these principles by seeking to create a heightened expectation of privacy based solely on the form in which a traveler's property is brought to the border.

As noted by the *Cotterman* dissent, the Ninth Circuit's extension of "special privacy protections" to electronic devices at the border will essentially "eliminate the powerful deterrent of suspicionless searches," *id*. at 985 (Smith, J., dissenting), the adverse effects of which will be particularly acute in the context of national security. Forensic examinations of computers and other electronic devices are important tools for identifying national security threats. There will be cases in which a customs officer suspects illegal activity based on information that would fall short of reasonable suspicion, or where the government has a reasonable suspicion of illegal activity but cannot disclose the basis for it. By imbuing a traveler with a heightened privacy interest in information maintained in electronic form, the Ninth Circuit gives those who would do harm to this country – be it violent or economic – carte blanche to intentionally conceal, obfuscate and/or encrypt information that, once past the border, can be accessed with impunity to the detriment of our national interests. The information criminal actors could render undetectable in a non-forensic search could include not only tools that would further terrorist-related activity once within our borders, but also items such as malware, malicious code or other

6

tools of cyber-espionage. This result flies in the face of the underlying basis for the broad border search authority statutorily granted to the sovereign by Congress and long-recognized by the Supreme Court as excepted from the Fourth Amendment's warrant and probable cause requirements. *See Ramsey*, 431 U.S. at 621.

This Court has indicated its desire to opine favorably on the constitutional merits of the *Cotterman* opinion, despite its acknowledgment that its opinion would lack binding effect in this District and elsewhere, and the fact that the issue before it can be, and has been, resolved without addressing the merits of whether reasonable suspicion is necessary to undertake a forensic border examination. Though this Court possesses a wealth of knowledge regarding the technology at issue, it is only upon the record before it that the Court can rule, and the record in this case has not been adequately developed to support the constitutional conclusions the Court may be inclined to make. *See Ostregren v. Cucinelli*, 615 F.3d 263, 287-88 (4th Cir. 2010) (noting limitations on the jurisdiction of Article III courts requiring them to avoid premature adjudication by "entangling themselves in abstract disagreements" on matters that are inadequately developed or otherwise ambiguous in the record.)

The testimony at the motions hearing revealed that two pieces of information of significance were found in the forensic examination of the defendant's thumb drive and phone: a resume indicating employment in Iran, and a phone number associated with the defendant's contact at a U.S. company from whom he had obtained, or sought to obtain, items for export. Both of these pieces of information could have been easily carried by the defendant in paper form and would have been properly subject to review at the border absent reasonable suspicion. The forensic examiner did not testify in this case, and thus, the record is devoid of information regarding how the forensic examination of the defendant's electronic devices was conducted, the

specific forensic tools the examiner utilized, whether the seized information was obtained from deleted files or not, or whether the information obtained could have been obtained through a manual search absent application of forensic software. There was no need to present testimony on these details, given that the government is not using any information obtained from the forensic border search, and there was ample reasonable suspicion of the defendant's wrongdoing prior to the search.

The record is also lacking with regard to factual information relevant to resolution of the broader constitutional issue upon which the Court wishes to opine. There is no developed record on the types of computer searches that qualify as forensic, or what falls short of being a forensic search. For example, if a customs officer has advanced technical expertise, would the fact that he applied certain technical tools or knowledge in searching a computer at the border rise to the level of a forensic examination? If computer software were applied to simply speed up the process of retrieving data that could be obtained through a more arduous manual search, would that qualify as a forensic examination requiring reasonable suspicion? What if a customs officer was able to retrieve ostensibly deleted files without applying external forensic software – would that be considered a forensic search requiring reasonable suspicion?

The Court is well aware that it cannot interpose its own technical expertise to fill factual gaps in the record that might answer these questions, nor does the *Cotterman* opinion provide any guidance in resolving these issues for they were never addressed by the Ninth Circuit. Indeed, attempting to address these questions would be akin to engaging in the type of balancing tests the Supreme Court cautioned against in *Flores-Montano*. *See* 541 U.S. at 152. "Constitutional issues should not be passed upon until it is necessary to do so and then upon an adequate record." *United States v. Chibbaro*, 361 F.2d 365, 377 (3rd Cir. 1966) (citing

*Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885); *United States v. Raines,* 362 U.S. 17, 22-23 (1960)).

This Court has before it other considered opinions of district and appellate courts who have acknowledged the Supreme Court's reluctance to place limits on border searches of objects beyond what might be considered destructive or particularly offensive in execution. In *United States v. Verma*, 2010 WL 1427261 (S.D.Tex. 2010) (unpublished), the court held that the forensic border search of a traveler's computer and external drives, regardless of how exhaustive, would constitute a routine search, as it did not threaten the traveler's dignity nor inflict damage to his property, and would be far less intrusive than the dismantling of a gas tank upheld as a routine border search in *Flores-Montano. Id*., slip op. at 4. In *House v. Napolitano*, 2012 WL 1038816 (D.Mass. 2012) (unpublished), the court similarly held that a forensic border search of a computer did not involve the dignity and privacy interests associated with highly intrusive searches of the person, and requiring a higher level of suspicion for such searches would arbitrarily "provide travelers carrying such devices with greater privacy protection than others who chose to carry the same type of personal information in hard copy form." *Id*., slip op. at 7-8. In *United States v. Irving*, 2003 WL 22127913 (S.D.N.Y. 2003) (unpublished), the court held that developing and inspecting film found in a traveler's camera was a routine border search not requiring reasonable suspicion (though the court ultimately found that reasonable suspicion existed). *Id*., slip op. at 5. Though not precisely on point with this case, developing film to view its contents is certainly analogous to applying forensic tools to view material on a computer that otherwise might not be discernible in a manual search.

Finally, this Court has the benefit of the Fourth Circuit's ruling in *Ickes, supra*, which, though not directly on point with this case, confirms the appellate court's recognition "of the

Supreme Court's … instruction that searches of belongings at the border 'are reasonable simply by virtue of the fact that they occur at the border.'" 393 F.3d at 505 n. 1 (quoting *Flores-Montano*, 541 U.S. at 152-53)). *See also United States v. Linarez-Delgado*, 259 Fed.Appx. 506, 508 (3d Cir. 2007) (citing *Ickes* and holding that viewing of video footage on a camcorder detained at border was a reasonable border search not requiring a warrant, consent or reasonable suspicion).

In *Ickes*, the Fourth Circuit refused to extend First Amendment protection to a non-forensic border search of a computer, noting that to do so would harm national security by creating "a sanctuary at the border for all expressive material – even for terrorist plans," *id*. at 506, and would result in the "sorts of legal wrangles at the border" in trying to ascertain what is or is not protected material that "the Supreme Court wished to avoid by sanctioning expansive border searches." *Id*. (citing *Flores-Montano*). This rationale suggests that the Fourth Circuit would be equally averse to the border search restrictions imposed by the *Cotterman* majority. And unfortunately, if this Court adopts the *Cotterman* standard in a written opinion in this case, the government will be precluded from resolving the issue in the Fourth Circuit not because the Court's opinion lacks binding effect, but because the government prevailed on the merits, and the defendant's stake in the outcome has nothing to do with the issue of whether reasonable suspicion is required for a forensic search.

The Supreme Court accepted the appeal in *Camreta v. Greene*, ___ U.S. ___, 131 S.Ct. 2020 (2011), because the qualified immunity issue presented a personal stake for both sides. The Court's ruling directly affected the future actions of the official found to have violated the Constitution, and the victim who brought the suit would likely be subject to the challenged conduct in the future so had a stake in preserving the Court's constitutional holding. *Id*. at 2029.

As such, the parties had "the necessary stake not only at the outset of litigation, but throughout its course." *Id*. at 2028. As the Court noted, "[o]ur decision today does no more than exempt one special category of cases from our usual rule against considering prevailing parties' petitions." *Id*. at 2033.

The situation is different in this case. The government certainly has a stake in any limitation on its forensic search authority at the border, but the defendant does not retain an adequate stake. His more significant grievance is with this Court's finding of reasonable suspicion. The facts supporting that finding – the TECS alert on the defendant, the evidence of his export-related activities with a sanctioned country prior to being stopped at the border – will continue to follow him any time he crosses the border. Thus, contrary to this Court's assessment, this matter would not present the type of case or controversy necessary to provide the government an avenue to appeal an adverse constitutional ruling by the Court on this issue given that the government has prevailed on the facts. And even though the Court acknowledges that any opinion it issues on this matter has no precedential effect, it will not only be cited and relied on by any defendant raising a similar challenge to a forensic border search, but will likely be adopted, at a minimum, by other members of the District's bench absent the ability of the government to subject the opinion to adversarial review by the Fourth Circuit. See *Camreta*, 131 S.Ct. at 2029-30.

In sum, undersigned counsel understands and respects the Court's desire to issue a written opinion on this issue that it believes might provide guidance to the District bench regarding the effect of the *Cotterman* decision. Unfortunately, this case presents an imperfect factual scenario and record to support such an opinion, and has the serious potential to adversely affect the government in future cases. The government would be in the untenable position of

having prevailed on the facts with regard to evidence it has no intention of using in its case-in-chief (that could have been seized absent reasonable suspicion if in paper form), but having lost the larger constitutional argument, no longer of import to the case at hand, absent the ability to challenge it on appeal.

        Respectfully submitted,

        Rod J. Rosenstein
        United States Attorney

By: _____/s/_____
        Christine Manuelian
        Assistant United States Attorney
        National Security Section
        36 S. Charles Street, 4th Floor
        Baltimore, MD 21201
        410-209-4852