

U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 DEC 12 P 3: 06

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

CM/2012R00782

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **Criminal No. PWG-13-0100** |
| | * | |
| **ALI SABOONCHI,** | * | **Conspiracy to Export to an Embargoed** |
| **ARASH RASHTI MOHAMMAD,** | * | **Country, 50 U.S.C. §§ 1702, 1705 and** |
| **a/k/a Arash RASHTI,** | * | **31 C.F.R. §§ 560.203 and 560.204;** |
| **MEHDI MOHAMMADI,** | * | **Unlawful Export to an Embargoed** |
| **and** | * | **Country, 50 U.S.C. §§ 1702 and 1705;** |
| **EHSAN NAGHSHINEH,** | * | **Aiding and Abetting, 18 U.S.C. § 2** |
| | * | |
| **Defendants** | * | |
| | * | |

\*\*\*\*\*\*\*

### SECOND SUPERSEDING INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNT ONE

#### Conspiracy to Export to an Embargoed Country

**International Emergency Economic Powers Act
and the Iran Trade Embargo**

At all times material to this Indictment:

1.     The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701,
*et seq*, establishes criminal penalties for willful violations of Presidential Orders issued in times
of national emergency and for violations of regulations implementing those orders.

2.     Between March and May 1995, the President issued a series of Executive Orders,
pursuant to his authority under the IEEPA, finding that the actions and policies of the
Government of Iran constituted an unusual and extraordinary threat to the national security,

foreign policy and economy of the United States.  In order to deal with that threat, the President imposed economic sanctions against Iran (also referred to as the Islamic Republic of Iran), to include a trade embargo (the Iran Trade Embargo), and authorized the Secretary of the Treasury to take such action necessary to carry out the purposes of the Executive Orders.

3.      In order to implement the Iran Trade Embargo and other economic sanctions imposed by the Executive Orders, the Secretary of the Treasury, through the Office of Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions Regulations (ITSR).  The ITSR prohibit, among other things, the unauthorized export, re-export, sale or supply to Iran, directly or indirectly, of any goods or services from the United States or by a United States person, without prior authorization from the OFAC.  The ITSR further prohibit any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR, including the unauthorized export of goods or services from the United States to a third country if the goods or services were intended or destined for Iran.  The Iran Trade Embargo and the ITSR remained in full force and effect at all times relevant to this Indictment, and would have precluded the unauthorized export of goods or services to any Iranian entities.

4.      Documents relating to and/or facilitating an export of goods include air waybills, Shipper's Export Declarations, bills of lading, and sales or shipping invoices, which, among other things, identify the nature and value of the items to be exported, the individual shipping them, and the true end-destination of the goods.  A Shipper's Export Declaration (SED) is required if, among other things, the value of the item to be exported exceeds $2,500, and/or if the item was being exported pursuant to an export license.  The filing of the SED would alert

various federal agencies to the export and enable them to track the export and ascertain compliance with licensing and other export requirements and restrictions.

### Defendants and Entities

5.      Defendant **Ali SABOONCHI**, a citizen of the United States, resided in Maryland. **SABOONCHI** created and operated Ace Electric Company (Ace Electric) in Maryland.

6.      **Arash Rashti MOHAMMAD, a/k/a Arash RASHTI**, an Iranian national residing in Iran, was identified as a Sales Manager of the business Darya Saze Aria Zamin (DSAZ) located at an office in the Tejarat Bank (Sarv Branch) Building in Tehran, Iran. RASHTI also was identified as the Chief Executive Officer of the business General DSAZ, FZ-LLC, which had a post office box business address at the Amenity Center, a type of virtual office service, in Abu Dhabi, United Arab Emirates (UAE).

7.      **Mehdi MOHAMMADI**, an Iranian national, was a businessman residing in Iran.

8.      **Ehsan NAGHSHINEH**, an Iranian national, was a businessman residing in Iran.

9.      At no time relevant to this Indictment did **SABOONCHI, RASHTI, MOHAMMADI, NAGHSHINEH**, or the companies and individuals associated with them, apply for, receive, or possess a license or authorization from the OFAC to export, re-export, sell or supply goods or services, of any description, to or for Iran.

10.     Company A, located in Maryland, was a supplier of industrial pump and process equipment, including cyclone separators used in pipelines to separate impurities such as sand from liquid.

11.     Company B, located in Minnesota, was a manufacturer/supplier of industrial measurement instrumentation, including thermocouples used to measure temperatures of liquids

in chemical and petrochemical field applications.

12.     Company C, located in Texas, was a manufacturer/supplier of specialty filtering systems, including its patented Swirlklean Bypass Filter used primarily in the oil and gas industry, with possible uses in water, hydrocarbon and nuclear plants.

13.     Company D, located in Maryland, was a supplier of process control equipment, including flow meters primarily used in industrial applications to measure the flow of water, and/or liquids and other gasses.

14.     Company E, located in Pennsylvania, was a supplier of fluid-handling equipment, including springs for actuators, also known as regulators or valves, used to control the flow rate of a liquid.

15.     Company F, located in Pennsylvania, was a supplier of industrial motion control and fluid handling products, including hydraulic valves and connections.

16.     Company G, located in Pennsylvania, was a supplier of industrial fluid power, automation and motion control products, including liquid pumps and check valves having oil, gas, energy, aerospace and defense applications.

17.     Company H, located in Arizona, was a supplier of industrial electronic components, including LCD modules, or electronic display panels, having various industrial applications.

18.     Company I, located in New York, was a manufacturer/supplier of industrial pumps and related products for use in various laboratory and industrial environments.

19.     Company J, located in Oklahoma, was a manufacturer/supplier of industrial equipment, including digital camera sensors utilized to sense steel and other nonwoven material.

4

20.     Company K was a European manufacturer of industrial gas chromatograph and analyser products.   Company L, located in New Jersey, was its United States distributer.

21.     Company M, located in South Carolina, was a manufacturer/supplier of safety products for the nuclear and industrial sectors, including air-monitoring and radiation detection devices.

### The Charge

22.     Beginning in or about September 2009, and continuing up to and through in or about March 2013, in the District of Maryland and elsewhere,

**ALI SABOONCHI,**
**ARASH RASHTI MOHAMMAD, a/k/a Arash RASHTI,**
**MEHDI MOHAMMADI,**
**and**
**EHSAN NAGHSHINEH,**

defendants herein, did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to knowingly and willfully export and cause to be exported goods and services from the United States to Iran in violation of the Iran Transactions and Sanctions Regulations, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control, in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Sections   560.203 and 560.204.

23.     The objects of the conspiracy were:

a.     to provide services to Iranian individuals and businesses seeking to purchase industrial parts and components manufactured and/or supplied in the United States;

b.     to supply entities in Iran with industrial parts and components

manufactured and/or supplied in the United States;

   c.  to evade the prohibitions and licensing requirements of the Iran Trade Embargo, the ITSR, and the IEEPA; and

   d.  to conceal the prohibited activities and transactions from detection by the United States government through deceit and other means so as to avoid penalties and disruption of the illegal activity.

  24.  It was part of the conspiracy, among other things, that:

   a.  **SABOONCHI** created and operated Ace Electric Company for the purpose of obtaining goods to be sent to Iran.

   b.  **RASHTI, MOHAMMADI, NAGHSHINEH**, and/or other members of the conspiracy and their associates solicited purchase orders and business from customers in Iran for United States-origin industrial parts and components.

   c.  **RASHTI, MOHAMMADI, NAGHSHINEH**, and/or other members of the conspiracy and their associates requested that **SABOONCHI** and others obtain price quotes for, order, and/or purchase Unites States-origin industrial parts and components for subsequent export to Iran, all of which were subject to United States export regulations.

   d.  **SABOONCHI**, at the request of members of the conspiracy and other Iranian-based associates, obtained price quotes for, ordered, and/or purchased United States-origin industrial parts and components for subsequent export to Iran, all of which were subject to United States export regulations.

   e.  Members of the conspiracy arranged for **SABOONCHI** and others to make payment for orders that he or members of the conspiracy had placed with companies in the

6

United States.

   f.  **SABOONCHI** utilized locations in Maryland to accept delivery of the United States-origin industrial parts and components ordered by him and/or members of the conspiracy and their associates, and then shipped the goods to co-conspirators in UAE or China.

   g.  **RASHTI, MOHAMMADI, NAGHSHINEH**, and/or other members of the conspiracy and their associates arranged for **SABOONCHI** to ship, or have shipped, the goods he obtained to entities located in the UAE or China.  They further arranged for the entities in the UAE or China to forward the goods to them and/or their customers in Iran.

   h.  **SABOONCHI** and other members of the conspiracy provided, or caused to be provided, false information on invoices and shipping documents regarding the true value of the goods they exported, or caused to be exported, as a means by which to conceal and/or facilitate their unlawful export activities.

   i.  Members of the conspiracy paid for the United States-origin industrial parts and components obtained by them, and the associated shipping and related fees, by money transfers, including wire transfers and other deposits to bank accounts utilized by **SABOONCHI** and/or his wife.

  25. It was further part of the conspiracy that **SABOONCHI** worked with **RASHTI, MOHAMMADI, NAGHSHINEH**, and others on numerous occasions to acquire, or attempt to acquire, goods from the United States to be sent to customers in Iran, including the following transactions on or about the dates listed:

       **Attempt to Obtain Industrial Camera System for Export to Iran**

  26. On September 1, 2009, an Iranian individual known to the Grand Jury asked

7

**SABOONCHI** to assist in obtaining an industrial digital camera and accessories from Company J, since the company would not sell directly to Iran. He indicated that the camera system would be utilized in steel processing of Mobarakeh Steel, which is a company located in Isfahan, Iran. On September 10, 2009, the defendant forwarded to the individual technical questions from Company J regarding the product sought, and quoted a general price for the system. The individual subsequently advised **SABOONCHI** on how he should respond to Company J in order not to alert the company as to the end-user. On November 9, 2009, **SABOONCHI** and the individual discussed the preferred method of shipment if **SABOONCHI** was able to purchase the system. **SABOONCHI** asked the individual if he should ship the items to his own address and then mail them to the individual, or make the purchase in Europe for shipment to Iran. He also asked if the items should be sent through Dubai, which was his preference, or be shipped directly to Iran. The individual indicated that whatever **SABOONCHI** deemed advisable was fine with him.

### Solicitation of Iranian Business and Creation of Ace Electric

27.     On October 29, 2009, another Iranian individual known to the Grand Jury asked **SABOONCHI** if he was interested in doing business. **SABOONCHI** replied that he was in the "trade business" and would be at the individual's service. The individual asked if he could be **SABOONCHI's** partner in Iran. **SABOONCHI** agreed and advised that if anyone needed products from the United States, he could obtain them for shipment to Iran. **SABOONCHI** told the individual to look for customers and insure that he (the individual) received a deposit from them to guarantee payment for whatever products were sought.

28.     On November 19, 2009, **RASHTI** asked **SABOONCHI** for his decision

8

regarding a possible business relationship between them. **SABOONCHI** replied the next day stating that he would start with a few projects until they got a better sense of each other's business. On November 23, 2009, **SABOONCHI** told **RASHTI** that he was having difficulty getting a quote for products sought by **RASHTI** to be shipped overseas. **SABOONCHI** stated that once he registered his own company in the United States, he might be able to obtain the products for shipment to his own address. On December 18, 2009, **SABOONCHI** registered Ace Electric Company with the Maryland Department of Assessments and Taxation as a business involved in "residential and commercial electrical low and high voltage and trading (export and import)." On December 29, 2009, **SABOONCHI** advised **RASHTI** that he had opened his own company. On March 9, 2010, **RASHTI** sent **SABOONCHI** a list of sixteen of his customers in Iran, including oil refineries, a steel company, petrochemical companies, and shipping companies.

### Export of Cyclone Separators to Iran

29.     On February 20, 2010, **RASHTI** received a request from the Shazand Arak Oil Refining Company in Arak, Iran, which is an entity of the Iranian Ministry of Petroleum, seeking to acquire two cyclone separators. Beginning in September 2010, **SABOONCHI** sought to obtain a quote and purchase the two cyclone separators from Company A, which he ultimately did on November 17, 2010, for the total cost of $2,114.53.

30.     On November 17, 2010, **SABOONCHI** falsely advised Company A that the cyclone separators were for use in the United States and told Company A to ship them to an address he used in Boyds, Maryland. **SABOONCHI** received the cyclone separators from Company A on December 10, 2010. He subsequently caused the items to be shipped on

December 27, 2010, at a valuation of $100, to the General DSAZ address in UAE provided by **RASHTI**. The items arrived in UAE on January 2, 2011. **RASHTI** thereafter arranged for delivery to a co-conspirator in UAE for ultimate delivery to Iran.

### Export of Thermocouples to Iran

31. Beginning in June 2010, **RASHTI**, acting on behalf of Petrochemical Kala Company (PKC) in Iran, tried to obtain quotes for thermocouples. On September 20, 2010, **RASHTI** sent **SABOONCHI** a request to get a quote on six specific thermocouples from Company B. On November 11, 2010, **SABOONCHI** ordered six thermocouples of the model number that **RASHTI** had instructed him to order. Company B responded on November 15, 2010, with a quote for a total price of $1,284. On November 22, 2010, **SABOONCHI**, at **RASHTI's** direction, falsely told Company B that the ultimate destination for the thermocouples was Turkey.

32. On November 23, 2010, **SABOONCHI** told Company B to ship the items to an address he used in Boyds, Maryland, and send the bill to him at his home address in Rockville, Maryland. Company B shipped the thermocouples by FedEx to the address provided by **SABOONCHI** on January 19, 2011. On February 3, 2011, **SABOONCHI** provided **RASHTI** with the tracking number for his shipment of the products to the address used by **RASHTI** in UAE. The package arrived in UAE on February 6, 2011. **RASHTI** then emailed **SABOONCHI** confirming the delivery and offered to deposit the shipping costs an account held by **SABOONCHI's** wife at Bank Melli in Iran. On February 8, 2011, **RASHTI** arranged for delivery of the goods to a co-conspirator in UAE for ultimate delivery to Iran.

10

### Export of Stainless Steel Filter Elements to Iran

33.    On October 18, 2010, a buyer with PKC in Iran requested that **RASHTI** obtain 10 units of a specifically identified 30 micron stainless steel filter element from Company C.  The filter elements requests by PKC are used in Company C's Model 1 Swirlklean Bypass Filter. **RASHTI** thereafter arranged for another person to place the order with Company C.  However, the other person was unable to transfer funds to Company C to pay for the order.

34.    On December 6, 2010, **RASHTI** asked **SABOONCHI** to pay the invoice amount of $151.53 directly to Company C, which **SABOONCHI** did.  **RASHTI** thereafter reimbursed **SABOONCHI** for paying the invoice.  Company C shipped the goods directly to an address provided by **RASHTI** in UAE, for ultimate transport to PKC in Iran.

### Export of Swirlklean Bypass Filters to Iran

35.    On January 11, 2011, **RASHTI** contacted the buyer at PKC in Iran, referred to a telephone conversation they previously had, and attached a description of a Swirlklean Model I Bypass Filter and associated components.  Subsequent emails between them established that PKC wanted four of the filters.  **RASHTI** thereafter placed the order with Company C, which issued an invoice for $1,911.03 for four Swirlklean Model I Bypass Filters and associated components.

36.    On April 12, 2011, **RASHTI** asked **SABOONCHI** to pay the invoice amount directly to Company C, which **SABOONCHI** did.  **RASHTI** thereafter reimbursed **SABOONCHI** for paying the invoice.  Company C shipped the goods directly to an address provided by **RASHTI** in UAE, for ultimate transport to PKC in Iran.

## Export of Flow Meters to Iran

37.     On December 18, 2010, a representative of A.R.P.C., an Iranian petroleum company, sent an attachment to **RASHTI** that was a request, with specific model numbers and specifications, for three flow meters.  On April 14, 2011, one of **RASHTI's** employees emailed **SABOONCHI** asking for price and delivery time on an attached list, which was the same that A.R.P.C. provided.  On April 18, 2010 **SABOONCHI** emailed Company D and asked for a quote and delivery time on the same attached list.

38.     Further communications resulted in the issuance of a final invoice on August 2, 2011, by Company D to **SABOONCHI** for three of the specified flow meters at a cost of $5,856 plus shipping.  **SABOONCHI** paid a total of $6,224.88 for the three meters, including shipping, and was reimbursed by **RASHTI** for those costs.  On September 24, 2011, **SABOONCHI** shipped the three meters from Germantown, Maryland, to General DSAZ in UAE for ultimate delivery by **RASHTI** to A.R.P.C. in Iran.

## Export of Actuator Springs to Iran

39.     On January 13, 2011, a buyer at PKC in Iran sought a price quote from **RASHTI** for an item specifically identified by part number on an attached document and described as a spring for an actuator.  On February 26, 2011 a DSAZ employee emailed **SABOONCHI** for a price quote and delivery time, and attached a description of the same item that **RASHTI** had received from PKC.  On March 3, 2011, **SABOONCHI** sought a price quote from Company E and included the attachment he had received from DSAZ.  On March 4, 2011, Company E provided **SABOONCHI** a quote of $49.20 per spring.

40.     On March 17, 2011 **SABOONCHI** emailed Company E to complete an order for

three springs and provided his credit card information and a shipping address in Baltimore, Maryland. On March 25, 2011 Company E shipped the springs to **SABOONCHI**, and on March 28, 2011, Company E charged his credit card $166.46 for the parts, tax, and shipping costs. **SABOONCHI** thereafter shipped the springs to the address provided by **RASHTI** in UAE for ultimate transport to PKC in Iran.

### Export of Numerous Industrial Parts to Iran

41.   On March 16, 2011, **RASHTI** received an email with an attachment from a representative of A.R.P.C. in Iran, which contained a list of numerous industrial parts, including hydraulic valves and connectors. On March 17, 2011, **RASHTI** sent the list to **SABOONCHI** and asked him to get a quote on the parts from Company F, which **SABOONCHI** did. After receiving a quote and checking with **RASHTI**, **SABOONCHI** ordered the parts from Company F and instructed that they be shipped directly to General DSAZ in UAE.

42.   The parts were sent to UAE in several shipments beginning on March 31, 2011, and continuing into June 2011. **SABOONCHI** was charged separately for each shipment, resulting in total charges of $7,067, and was reimbursed by **RASHTI** for those costs. **RASHTI** thereafter made arrangements for delivery of the parts to A.R.P.C. in Iran.

### Attempt to Obtain Industrial Components for Export to Iran

43.   On May 3, 2011, **RASHTI's** employee asked **SABOONCHI** to determine a price offer and time of delivery for approximately twenty-nine industrial components manufactured by Company K. That same day, **SABOONCHI** submitted a request to Company L seeking a quote for the components. Company L asked **SABOONCHI** to identify the location of the end-user so a quote could be provided. **SABOONCHI** responded that the order was for General D-SAZ

13

FZ-LLC located in UAE. On May 4, 2011, Company L informed **SABOONCHI** that a quote would not be provided because the products had already been quoted by the manufacturer for a customer in Iran. On May 5, 2011, **RASHTI's** employee was advised by Company K that an offer would not issue since the project had already been quoted by its distributor for Iran and others.

44.     On May 7, 2011, **RASHTI** and **SABOONCHI** discussed how their dual inquiries to Company K and Company L had compromised acquisition of the products. **RASHTI** apologized, and told **SABOONCHI** that if asked, they should falsely represent that they got the order from a client in Iraq and did not know the order was from Iran.

### Export of Pumps and Valves to Iran

45.     In email exchanges starting on July 24, 2012, **SABOONCHI** attempted to fill an order for **MOHAMMADI** for liquid pumps and check valves. **MOHAMMADI** wanted to know if **SABOONCHI** accepted Rial (Iranian currency) payment to family members in Iran and if shipment would be direct to Iran or through Dubai. **SABOONCHI** advised he would not send anything straight through to Iran. The next day, **SABOONCHI** provided **MOHAMMADI** an outline of a possible delivery plan, and then subsequently advised **MOHAMMADI** that he would ship the goods by way of China, which he believed would be cheaper. In late August 2012, **SABOONCHI** ordered the requested pump and check valves from Company G. Company G sent the parts to **SABOONCHI** in Maryland in two shipments, with the first order ($396.53 including freight) being shipped on August 29, 2012, and the second order ($1,923.95 including freight) sent on September 17, 2012.

46.     On August 27, 2012, **SABOONCHI** requested **NAGHSHINEH's** assistance in

14

shipping certain items to Iran, and inquired about having those items shipped through China or elsewhere. **SABOONCHI** revealed that the purchaser of the goods was in Iran. On September 20, 2012, **SABOONCHI** advised **NAGHSHINEH** that the package in question had arrived. **SABOONCHI** mailed the items on September 22, 2012, to an address in Shenzhen, China, where it arrived in early October 2012. Images of the purchased items were then sent from China to **SABOONCHI**.

47.     On October 7, 2012, **SABOONCHI** inquired about the package and asked for **NAGHSHINEH's** telephone number in Iran in order to provide it to **MOHAMMADI**, which he subsequently did. On October 23, 2012, **NAGHSHINEH** advised **SABOONCHI** that the package had arrived and would be delivered that day to **MOHAMMADI**. On October 25, 2012, **NAGHSHINEH** confirmed to **SABOONCHI** that the package was delivered per their previous discussion.

## Export of LCD Modules, Pump and Other Industrial Parts to Iran

48.     On December 27, 2012, **NAGHSHINEH** asked **SABOONCHI** if he could obtain items for him that could be transshipped to him through Hong Kong. On December 28, 2012, **SABOONCHI** responded that it would be best to coordinate shipment of any items in two stages with **MOHAMMADI**.

49.     On January 3, 2013, **NAGHSHINEH** asked **SABOONCHI** to purchase fifty LCD modules and five magnifying lenses from Company H. He  provided web links to those products on Company H's website, as well as web links for carbide end mills (a type of drill bit for cutting metals) being sold on ebay that he also wanted **SABOONCHI** to purchase. **SABOONCHI** purchased the LCD modules from Company H that same day, at a total cost of

$421.15, for shipment to his Parkville, Maryland, residence.   Between January 3 and January 11, 2013, **SABOONCHI** purchased, or attempted to purchase, various carbide end mills via the ebay web links provided by **NAGHSHINEH**.

50.   On   January   9,   2013,   **SABOONCHI**   advised   **NAGHSHINEH**   that **MOHAMMADI** had two orders, one for lightweight plastic and metal washers, and the other for a "large and heavy motor" that would be combined with **NAGHSHINEH's** items for shipment to China.   **SABOONCHI** had previously ordered these items, to include a pump and related parts, from Company I on January 2, 2013, at a total cost of approximately $12,000.   Company I subsequently shipped the products, minus one pump cartridge kit that was out of stock, over the course of the following weeks in separate shipments to **SABOONCHI's** residence in Parkville, Maryland.   On January 13, 2013, **SABOONCHI** told **NAGHSHINEH** that he had not yet received payment from **MOHAMMADI** of between "15-20" for the merchandise to be shipped. On January 15, 2013, **NAGHSHINEH** told **SABOONCHI** that the items ordered by him and **MOHAMMADI** would be separated once received in Hong Kong.

51.   On January 21, 2013, **MOHAMMADI** advised **SABOONCHI** how much money he was transferring toward a total payment of $17,500 for the items ordered from Company I. On January 23, 2013, **SABOONCHI** directed **NAGHSHINEH** to determine how much he owed to **SABOONCHI** for their transaction, to include **SABOONCHI's** commission, and they discussed calculation of the expenses for subsequent shipment of the merchandise from Hong Kong to Iran.   On February 1, 2013, **SABOONCHI** shipped the industrial parts and components obtained for **MOHAMMADI** and **NAGHSHINEH** from Company H and Company I to an address in China for subsequent shipment to Iran.   On the airway bill for the shipment,

**SABOONCHI** listed the total value of the items as $1,850.

### Attempt to Export Radioiodine Air-Sampling Cartridges and Pump Cartridge Kit to Iran

52.     On February 7, 2013, Company I shipped to **SABOONCHI** the previously out of stock pump cartridge kit that he had ordered on **MOHAMMADI's** behalf on January 2, 2013 (referenced in paragraph 50 above).  The shipping carrier delivered the item on February 12, 2013, to **SABOONCHI's** Parkville, Maryland, residence.

53.     On February 20, 2013, **MOHAMMADI** advised **SABOONCHI** via email that he had located five additional suppliers of a specific model radioiodine air-sampling cartridge used in nuclear applications to detect radioactive contamination.  **MOHAMMADI** referenced that this was the same item **SABOONCHI** told him he was unable to obtain for him because the prior supplier had asked "too many questions."  On that same date, **SABOONCHI** began seeking quotes for the product.  On March 4, 2013, **MOHAMMADI** advised **SABOONCHI** via email that his customer had approved purchase of twenty of the requested radioiodine cartridges, and directed that **SABOONCHI** purchase them as soon as possible from a specific representative of Company M.  He also directed that **SABOONCHI** send the radioiodine cartridges to him along with the "remaining cartridge" (referring to the pump cartridge from Company I delivered to **SABOONCHI** on February 12, 2013, as referenced in paragraph 52 above).

54.     On March 6, 2013, **SABOONCHI**, acting on **MOHAMMADI's** behalf, ordered twenty radioiodine air-sampling cartridges from Company M.  **SABOONCHI** ordered the items under the name of Ace Electric, and provided his credit card number to pay the total purchase price of $144.78.  On March 13, 2013, Company M shipped the cartridges to the shipping

17

address provided by **SABOONCHI**, which was his home address in Parkville, Maryland.   The

shipping carrier delivered the cartridges to **SABOONCHI's** residence on March 19, 2013.


50 U.S.C. §§ 1702, 1705
31 C.F.R. §§ 560.203, 560.204

## COUNT TWO

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-10, 23-25, and 29-30 of Count One of

this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about February 2010, and continuing through in or about January

2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD, a/k/a Arash RASHTI,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to

export and cause the exportation, of certain goods, to wit, cyclone separators, and services from

the United States to Iran in violation of the ITSR, without having first obtained the required

licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.


50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F. R. §§ 560.203, 560.204

## COUNT THREE

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 11, 23-25, and 31-32 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about June 2010, and continuing through in or about February 2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD, a/k/a Arash RASHTI,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to export and cause the exportation, of certain goods, to wit, thermocouples, and services from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F. R. §§ 560.203, 560.204

20

## COUNT FOUR

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 13, 23-25, and 37-38 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about December 2010, and continuing through in or about September 2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD, a/k/a Arash RASHTI,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to export and cause the exportation, of certain goods, to wit, flow meters, and services from the United States to Iran in violation of the ITSR, without having first obtained the required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.


50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F. R. §§ 560.203, 560.204

## COUNT FIVE

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 14, 23-25, and 39-40 of Count One of

this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about January 2011, and continuing through in or about April

2011, in the District of Maryland,

**ALI SABOONCHI**
**and**
**ARASH RASHTI MOHAMMAD, a/k/a Arash RASHTI,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to

export and cause the exportation, of certain goods, to wit, actuator springs, and services from the

United States to Iran in violation of the ITSR, without having first obtained the required licenses

or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F.R. §§ 560.203, 560.204

## COUNT SIX

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 16, 23-25, and 45-47 of Count One of

this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about July 2012, and continuing through in or about October

2012, in the District of Maryland,

**ALI SABOONCHI,**
**MEHDI MOHAMMADI,**
**and**
**EHSAN NAGHSHINEH,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to

export and cause the exportation, of certain goods, to wit, pumps and valves, and services from

the United States to Iran in violation of the ITSR, without having first obtained the required

licenses or authorizations from the Department of the Treasury, Office of Foreign Assets Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F. R. §§ 560.203, 560.204

## COUNT SEVEN

### Unlawful Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 17-18, 23-25, and 48-51 of Count One

of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about December 2012, and continuing through in or about

February 2013, in the District of Maryland,

**ALI SABOONCHI,**
**MEHDI MOHAMMADI,**
**and**
**EHSAN NAGHSHINEH,**

defendants herein, did knowingly and willfully export and cause the exportation, and attempt to

export and cause the exportation, of certain goods, to wit, LCD modules, a pump, and other

industrial parts, and services from the United States to Iran in violation of the ITSR, without

having first obtained the required licenses or authorizations from the Department of the Treasury,

Office of Foreign Assets Control.

## COUNT EIGHT

### Unlawful Attempt to Export to an Embargoed Country

1.      The allegations set forth in paragraphs 1-9, 18, 21, 23-25, and 50-54 of Count One

of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Beginning in or about December 2012, and continuing through in or about March

2013, in the District of Maryland,

### ALI SABOONCHI
### and
### MEHDI MOHAMMADI,

defendants herein, did knowingly and willfully attempt to export and cause the exportation of

certain goods, to wit, a pump cartridge kit and twenty radioiodine air-sampling cartridges, and

services from the United States to Iran in violation of the ITSR, without having first obtained the

required licenses or authorizations from the Department of the Treasury, Office of Foreign Assets

Control.

50 U.S.C. §§ 1702, 1705
18 U.S.C. § 2
31 C.F. R. §§ 560.203, 560.204

_____
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

12/12/13
Date

25