**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No. PWG-13-0100** |
| **ALI SABOONCHI** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MOTION TO DISMISS THE INDICTMENT

Defendant Ali Saboonchi, by and through his undersigned counsel, hereby moves this Honorable Court, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, to dismiss the charges in the Second Superseding Indictment.  The grounds for this motion are that (1) the statute the Mr. Saboonchi is charged with violating – the International Emergency Economic Powers Act – is an unconstitutional delegation of legislative authority to the Executive Branch, and (2) the regulations that Mr. Saboonchi is charged with violating – the Iranian Transactions and Sanctions Regulations – are unconstitutionally vague as applied in this case.  In support of the motion, Mr. Saboonchi states as follows.

## LEGAL FRAMEWORK

Mr. Saboonchi is charged in an eight-count indictment with violations of the U.S. Trade Embargo on Iran (the "Trade Embargo").  The Trade Embargo is a complex legal framework that is not codified in a single section of the U.S. Code.  Instead, it comprises numerous legislative enactments, Executive Orders, and administrative regulations, as well as licenses and interpretive guidance issued by the U.S. Department of Treasury, through its Office of Foreign Asset Control (OFAC).  A comprehensive library of these authorities is available through OFAC's website.  *See*

http://www.treasury.gov/resource-center/sanctions/Programs/pages/iran.aspx. The discussion that follows highlights several of the provisions that are essential to this case.

## Legislative Enactments

The central statute is the International Emergency Economic Powers Act (IEEPA), which is codified at 50 U.S.C. chapter 35. IEEPA authorizes the President of the United States to take certain actions to address "any unusual or extraordinary threat" to the national security, foreign policy, or economy of the United States, originating outside the United States, "if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701. Upon declaring such an emergency, the President may take action to, among other things, restrict or prohibit foreign trade and commerce. *Id.* § 1702. The President is further authorized to issue such regulations as are needed to exercise the authority granted to him by IEEPA. *Id.* § 1704. Violations of regulations issued pursuant to IEEPA are subject to civil penalties, and willful violations are subject to criminal penalties. *Id.* § 1705.

The President's authority under IEEPA derives from the National Emergencies Act (NEA), codified at 50 U.S.C. chapter 34. The NEA provides generally that, "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency." 50 U.S.C. § 1621(a). The authorities conferred by IEEPA and other such enactments are effective "only when the President … specifically declares a national emergency," and "only in accordance with [the NEA]." *Id.* § 1621(b). The NEA contains additional provisions concerning the review

2

and termination of national emergencies (*see id.* § 1622), which are discussed in more detail below.

## Executive Orders

In March 1995, President Clinton issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring a national emergency to address that threat. 60 Fed. Reg. 14615 (Mar. 15, 1995). The Executive Order prohibits U.S. persons from participating in business related to the development of Iran's petroleum resources. *See id.* § 1. President Clinton issued a second Executive Order in May 1995, strengthening the restrictions on business with Iran. Executive Order 12959 prohibits exports and imports, as well as investment in Iran. 60 Fed. Reg. § 24757 (May 6, 1995). A third Executive Order clarifies the restrictions imposed by the preceding orders. *See* Executive Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997). The President's Orders further authorize the Secretary of Treasury to enact implementing regulations. *See, e.g.*, 60 Fed. Reg. 14615, § 3 ("The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to me by the International Emergency Economic Powers Act as may be necessary to carry out the purposes of this order."). The Trade Embargo has been modified and expanded through subsequent Executive Orders, including several issued by President Obama in recent years.

**OFAC Regulations**

Pursuant to the President's authorization, OFAC has issued several sets of regulations implementing the Trade Embargo, including the Iranian Transactions and Sanctions Regulations (ITSR), codified at 31 C.F.R. part 560.  The ITSR define transactions that are generally prohibited, as well as transactions that are exempt from these general prohibitions.  *See id.*, subpart B.  The ITSR also contain licensing provisions, including general licenses expressly authorizing certain types of transactions, as well as provisions identifying transactions for which specific licenses may be authorized on a case-by-case basis.  *See id.*, subpart E.  In support of these regulations, the ITSR include general definitions (*see id.*, subpart C), as well as interpretive guidance pertaining to specific regulations (*see id.*, subpart D).

## THE INDICTMENT

The Second Superseding Indictment ("Indictment" or "SSI") charges Mr. Saboonchi with one count of conspiracy to violate the Trade Embargo, and with seven substantive violations of the Trade Embargo.  Specifically, Mr. Saboonchi is charged with violating IEEPA (50 U.S.C. §§ 1702 & 1705) and two provisions of the ITSR, 31 C.F.R. §§ 560.203 and 560.204.

Section 560.203 prohibits transactions that evade or avoid the Trade Embargo:

> (a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

> (b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

Section 560.204 prohibits certain exports to Iran:

Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

The Indictment alleges that Mr. Saboonchi violated these regulations by exporting goods including industrial parts to Iran, through third countries, without a license. To determine whether the charged transactions violated these regulations, the general prohibition on exports must be read in conjunction with the exemptions and general licenses, as well as the definitions and interpretations, set forth in the ITSR.

## ARGUMENT

**I.    THE ITSR ARE AN INVALID EXERCISE OF LEGISLATIVE AUTHORITY BY THE EXECUTIVE BRANCH.**

IEEPA represents a significant congressional delegation of rulemaking authority to the Executive Branch. As such, IEEPA imposes strict congressional oversight as a condition of the President's exercise of this authority. First, the President, "in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such

authorities are exercised." 50 U.S.C. § 1703(a).  Second, the President must make a report to Congress whenever he exercises his statutory authority, explaining, among other things, why he believes that such action is necessary and appropriate.  *Id.* § 1703(b).  Third, the President is required to report to Congress every six months about the actions taken and any changes that have occurred since the last report.  *Id.* § 1703(c).  Finally, § 1703(d) provides that these requirements are in addition to the requirements imposed by Title IV of the National Emergencies Act (NEA), 50 U.S.C. § 1641.

Congress, for its part, is required to convene every six months from the date that a national emergency is declared "to consider a vote on a joint resolution to determine whether that emergency shall be terminated."  50 U.S.C. § 1622(b); *see also id.* § 1706(b) (providing for cessation of presidential authorities upon congressional action under § 1622(b)).

Since President Clinton initially declared a national emergency with respect to Iran in 1995, Congress has failed to satisfy its essential statutory oversight role.  The two houses of Congress have not convened every six months to consider whether to terminate President Clinton's declaration of national emergency.  Under these circumstances, the ITSR cannot be treated a valid exercise of congressionally delegated authority.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const., art. I, § 1.  "[T]he integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch."  *Mistretta v.*

*United States*, 488 U.S. 361, 371-72 (1989) (internal quotation marks omitted).  But, "[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power."  *Id.* at 372 (internal quotation marks and alterations omitted).[1]

The government may argue that IEEPA is a lawful delegation of legislative authority because it contains an intelligible principle.  Several courts, including the Fourth Circuit, have endorsed this position.  *See, e.g.*, *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993); *United States v. Dhafir*, 461 F.3d 211 (2d Cir. 2006).  However, these courts were not presented with the question of whether, in light of Congress's failure to observe its statutory oversight requirements, an unconstitutional delegation occurred.  *See Dhafir*, 461 F.3d at 217 n.3.

Mr. Saboonchi respectfully submits that Congress' failure to conduct the statutorily required periodic reviews of the President's declaration of national emergency with respect to Iran renders the ITSR an unconstitutional exercise of legislative authority by the Executive Branch.  Even if Congress initially laid out an intelligible principle to constrain the Executive Branch's discretion in implementing the ITSR, Congress has since abdicated its oversight authority.  This failure of oversight "raises complicated and sensitive issues concerning separation of powers."  *Id.*  Quite simply, the "power to

---

[1] The Supreme Court has left open the question of whether, with respect to criminal laws "more specific guidance is in fact required."  *See Touby v. United States*, 500 U.S.160, 165-66 (1991).  Mr. Saboonchi respectfully suggests that, in light of the severity of punishments attaching to criminal laws, more specific guidance is indeed required.

legislate for emergencies belongs in the hands of Congress." *Youngstown Sheet & Tube Co. v. Sawyer Sheet & Tube Co.*, 343 U.S. 579, 654 (1952) (Jackson, J., concurring). Congress, by ignoring the requirements of § 1622(b), has unconstitutionally delegated the power to legislate for emergencies to the Executive. *But see United States v. Amirnazmi*, 645 F.3d 564, 577-81 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 347 (2011) (rejecting this argument). As a result, Counts One through Eight should be dismissed under the nondelegation doctrine.

## II.     THE REGULATIONS THAT MR. SABOONCHI IS CHARGED WITH VIOLATING ARE UNCONSTITUTIONALLY VAGUE.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*  In this case, the application of the trade regulations set forth in the Indictment fails both requirements.[2]

### A.     As Applied Here, The ITSR's Prohibition On Providing Goods "Indirectly" To Iran Is Unconstitutionally Vague.

---

[2] While a number of courts, including the Fourth Circuit, have rejected vagueness challenges to other portions of the Iranian Transactions Regulations, *see, e.g.*, *United States v. Amirnazmi*, 645 F.3d 564, 589-91 (3d Cir. 2011) (informational materials exception), *cert. denied,* 132 S. Ct. 347 (2011); *United States v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998) (definition of "export"); *United States v. Quinn*, 401 F. Supp. 2d 80, 100-01 (D.D.C. 2005) (definition of "transship" and "reexport"), we are aware of no courts addressing the specific provisions or facts at issue here.

Counts One through Eight of the Indictment charge Mr. Saboonchi with exporting goods to Iran indirectly, by sending goods to third countries including the United Arab Emirates (UAE) and China, from where the goods allegedly were subsequently shipped by other individuals to Iran.  Mr. Saboonchi is not charged with exporting anything directly to Iran.  *See, e.g.*, SSI ¶ 30 (alleging that Saboonchi shipped thermocouples to codefendant Arash Rashti in UAE, and that Rashti subsequently "arranged for delivery of the goods to a co-conspirator in UAE for ultimate delivery to Iran"); *id.* ¶ 32 (similarly alleging that Saboonchi shipped cyclone separators to Rashti in UAE, and that Rashti subsequently "arranged for delivery of the goods to a co-conspirator in UAE for ultimate delivery to Iran"); *id.* ¶ 8 (alleging that Saboonchi shipped flow meters to Rashti in UAE "for ultimate delivery by RASHTI to [a customer] in Iran"); *id.* ¶ 40 (alleging that Saboonchi shipped actuator springs "to the address provided by RASHTI in UAE for ultimate transport to [a customer] in Iran"); *id.* ¶¶ 41-42 (alleging that Saboonchi ordered industrial parts to be shipped to Rashti in UAE, and that "RASHTI thereafter made arrangements for delivery of the parts to [a customer] in Iran").

The ITSR prohibit, in pertinent part, supplying goods to Iran "directly or indirectly," including the provision of goods to persons in third countries "undertaken with knowledge or reason to know that … [s]uch goods … are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran." 31 C.F.R. § 560.204(a). As this case illustrates, the ITSR's prohibition on providing goods to Iran "indirectly" is without any clear boundaries.  There are no limits on how attenuated the defendant's involvement in the transaction may be while still rising to the level of an unlawful export of goods to Iran.  In the

transactions referenced above, Mr. Saboonchi is not alleged to have had any involvement in supplying the goods to Iran; on the contrary, the Indictment expressly alleges that Mr. Rashti made those arrangements.  There is no allegation that Mr. Saboonchi was aware of what Mr. Rashti was doing.  There is no allegation that Mr. Saboonchi had any knowledge of what happened to the goods in question after they reached their destination in the UAE.  Nevertheless, Mr. Saboonchi's conduct in ordering goods for shipment to the UAE is charged as violating the Trade Embargo.

This application of the Trade Embargo is impermissibly vague.  The inherent uncertainty embedded in the restriction on supplying goods "indirectly" to Iran fails to provide individuals like Mr. Saboonchi with the requisite notice of what is required of them, and it allows arbitrary and discriminatory enforcement of the regulation – both of which the Due Process Clause emphatically prohibits.  *See, e.g.*, *Fox Television*, 132 S. Ct. at 2317; *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).  Accordingly, Counts One through Eight of the Indictment should be dismissed.

**B.      As Applied Here, The ITSR's Prohibition On Transactions That "Evade" The Trade Embargo Is Unconstitutionally Vague.**

Counts One through Eight also charge that Mr. Saboonchi's conduct violated the ITSR's prohibition on transactions that evade or avoid the Trade Embargo.  Section 560.203 prohibits, in relevant part, any transaction "that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part."

Criminal liability in this case cannot be predicated on the vague and undefined notion that Mr. Saboonchi acted to evade or avoid the law.  As the Supreme Court has explained, prohibitions on circumvention and evasion

> must be explicit and unambiguous in order to sustain a criminal prosecution; they must adequately inform those who are subject to their terms what conduct will be considered evasive so as to bring the criminal penalties of the Act into operation. The dividing line between unlawful evasion and lawful action cannot be left to conjecture.  The elements of evasive conduct should be so clearly expressed … that the ordinary person can know in advance how to avoid an unlawful course of action.

*M. Kraus & Bros., Inc. v. United States*, 327 U.S. 614, 621-22 (1946) (citation omitted) (overturning conviction for evasion of price limitations set forth in Emergency Price Control Act of 1942).

The terms "evades" and "avoids" are not defined in § 560.203 or elsewhere in the ITSR. Nor do the ITSR offer guidance as to what type of conduct might trigger criminal liability under this section.  Moreover, it is not clear from the regulations whether an actual violation of the ITSR is needed, or whether acting with mere purpose or intent to evade the law suffices to establish a criminal violation of § 560.203.  In sum, the prohibition on evasions neither informs individuals "what is required of them so they may act accordingly," nor provides the necessary "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations*, 132 S. Ct. at 2317. For this reason, as well, Counts One through Eight should be dismissed.

## CONCLUSION

For the foregoing reasons, Mr. Saboonchi respectfully requests that the Court dismiss

Counts One through Eight of the Second Superseding Indictment.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
ELIZABETH G. OYER #95458
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email:  Liz_Oyer@fd.org

## REQUEST FOR HEARING

Pursuant to Rule 105.6 of the Local Rules of the United States District of Maryland, a

hearing is requested on the defendant's Motion.

_____/s/_____
ELIZABETH G. OYER #95458
Assistant Federal Public Defender