**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| v. | *     Criminal Case No.: PWG-13-100 |
| | * |
| ALI SABOONCHI, *et al.* | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Defendant Ali Saboonchi is alleged to have violated Iranian Transactions and Sanctions Regulations (the "ITSR") promulgated under the International Emergency Economic Powers Act (the "IEEPA"). Saboonchi has moved to dismiss the indictment on the grounds that the IEEPA is an unconstitutional delegation of legislative power to the executive and that, in any event, the ITSR is unconstitutionally vague. Because I find that the IEEPA contains an intelligible principle to guide the President's actions, and that the ITSR clearly describes the conduct that it prohibits, I disagree and deny the motion.

## I.     BACKGROUND

Defendant Ali Saboonchi was indicted for violations of the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. part 560, which were promulgated pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. ch. 35. *See* Second Superseding Indictment, ECF No. 95.

Under the IEEPA, "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—(A) investigate, regulate, or prohibit—(i) any transactions in foreign exchange." 50 U.S.C. § 1702(a)(1). These powers only may be exercised

"to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat," 50 U.S.C. § 1701(a), and "may not be exercised for any other purpose." § 1701(b). When the President exercises his authority under the IEEPA, he is required to report to Congress every six months "with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred." 50 U.S.C. § 1703(c).

The ITSR was promulgated pursuant to three Executive Orders signed by President Clinton, two in 1995 and one in 1997. Executive Order 12957, signed March 15, 1995, declared a "national emergency" pursuant to the National Emergencies Act and prohibited certain transactions with Iran. 60 Fed. Reg. 14615. Executive Order 12959, signed May 6, 1995, and Executive Order 13059, signed August 19, 1997, "clarify" the prior orders, recognize "the usual and extraordinary threat to the national security, foreign policy, and economy of the United States," and prohibit certain transactions with Iran. 60 Fed. Reg. § 24757; 62 Fed. Reg. § 14615.

The ITSR provides that:

> Except as otherwise authorized . . . the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

31 C.F.R. § 560.204. Pursuant to 31 C.F.R. § 530.203, "Any transaction . . . that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any

of the prohibitions set forth in [the ITSR] is prohibited," § 530.203(a), as is any conspiracy to violate the ITSR, § 560.203(b).

Saboonchi argues that the IEEPA and the ITSR are invalid because (1) they are improper delegations of legislative authority to the executive, Def.'s Mot. to Dismiss 5, ECF No. 111, and (2) the ITSR is unconstitutionally vague, *id.* at 8.  The Government has responded, Gov't Opp'n, ECF No. 123, and Saboonchi has replied, ECF No. 127.  A hearing on, *inter alia*, Defendant's Motion to Dismiss was held before me on May 6, 2014.

## II.    NONDELEGATION DOCTRINE

Saboonchi makes two arguments: first, that the IEEPA is an unlawful delegation of legislative authority because it lacks an intelligible principle, and second, that Congress has abdicated its authority to review the President's actions.

### A.  Intelligible Principle Doctrine

In *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989), the Supreme Court explained:

> The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.  The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. Art. I, § 1, and we long have insisted that "the integrity and maintenance of the system of government ordained by the Constitution" mandate that Congress generally cannot delegate its legislative power to another Branch.  *Field v. Clark*, 143 U.S. 649 (1892).  We also have recognized, however, that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches.  Chief Justice Taft, writing for the Court, explained our approach to such cooperative ventures:  "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination."  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928).  So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."  *Id.* at 409.

*See id.* (alterations in original).

In *Touby v. United States*, 500 U.S. 160, 165–66 (1991), the Court upheld criminal sanctions under the Controlled Substance Act finding that it provided the Attorney General a sufficiently clear "intelligible principle."   The Court declined to recognize a heightened requirement in criminal cases, finding that the act "passes muster even if greater congressional specificity is required in the criminal context." *Id.* at 166.

The Fourth Circuit expressly upheld the IEEPA as a valid delegation of authority to the President in *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093–94 (4th Cir. 1992). According to the Fourth Circuit:

> The IEEPA, which was drawn from and constitutes an extension to the Trading with the Enemy Act of 1917, 50 U.S.C. app. § 1, *et seq.*, defines the specific circumstances in which the President may act and to what extent.  The President's authority is limited to meeting a foreign threat "to the national security, foreign policy or economy of the United States," that is "unusual and extraordinary," and only then if he is able to declare the threat a "national emergency" under the National Emergencies Act, 50 U.S.C. § 1601, *et seq. See* 50 U.S.C. § 1701.  He is required to consult with Congress *before*, if possible, exercising the powers conferred, to explain his acts in specified respects, and to report regularly thereafter during the period of the emergency. *See* 50 U.S.C. § 1703.  The powers granted to the President are explicitly defined and circumscribed. *See* 50 U.S.C. § 1702.  Moreover, the Act protects the conduct of any person whose violation of the President's order can be shown to be "in good faith."  50 U.S.C. § 1702(a)(3).

*Id.* at 1093.  Accordingly, Saboonchi's nondelegation challenge cannot succeed on this ground.

## B.  Congressional Oversight

The National Emergencies Act requires that "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated."  50 U.S.C. § 1622(b).  Saboonchi asserts that Congress has not reviewed the President's declaration of an emergency or voted on a joint resolution to terminate it, and therefore that Congress has "abdicated its oversight authority," Def.'s Mot. to Dismiss 7, invalidating its original delegation.

The only case law that Saboonchi has cited for this proposition is a footnote in *United States v. Dhafir*, 461 F.3d 211, 217 n.3 (2d Cir. 2006), in which the Second Circuit noted simply that "[w]hether the House of House of Representatives' possible inaction affects the validity of the Iraqi sanctions regulations raises complicated and sensitive issues concerning separation of powers."  But because the issue had not been raised properly below, the Second Circuit declined to address it in that case.

But it appears that no court has adopted Saboonchi's argument, and at least the First and Third Circuits expressly have rejected it.  *See United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011); *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1 (1st Cir. 1987).  In the most recent such case, *United States v. Amirnazmi*, the Third Circuit relied heavily on *Beacon Products Corp. v. Reagan* in noting that Congress could have provided for the automatic termination of a state of emergency in the absence of a congressional vote, and instead "reserve[ed] for itself 'the burden of acting affirmatively' by substituting in that provision's place the requirement that it pass a resolution to end an emergency."   645 F.3d at 578 (citing *Beacon Prods.*, 814 F.2d at 4). Further, citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring), and *United States v. Curtiss–Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936), the Third Circuit expressed reluctance to read into the law additional limitations on a president acting pursuant to congressional authorization in the field of international relations.  *Amirnazmi*, 645 F.3d at 578–79.  Finally, the court noted that, "[f]ar from sitting by as successive Presidents maintained a sweeping sanctions regime, Congress has expanded, deepened and formalized the sanctions in a comprehensive legislative effort to target Iran through economic measures."  *Id.* at 579.  As such, the Third Circuit held that the failure of Congress to consider a joint resolution

does not automatically terminate a state of emergency—particularly where finding otherwise would require the Court to interpose itself into the relationship between President and Congress.

I find the reasoning of the Third Circuit, and the First Circuit on which it relied, to be persuasive. Accordingly, I hold that the fact that Congress has not convened to consider a Joint Resolution pursuant to 50 U.S.C. § 1622(b) does not act to terminate the state of emergency declared by President Clinton. Accordingly, the ITSR remains valid and in effect.

## III.   VAGUENESS

Saboonchi also argues that the ITSR cannot be enforced because it contains terms that are unconstitutionally vague. First, he argues that the ITSR's prohibition on actions "undertaken with knowledge or reason to know that . . . [s]uch goods . . . are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran," 31 U.S.C. § 560.204(a), is vague insofar as it prohibits even the "indirect[]" export to Iran. Def.'s Mot. to Dismiss 9. Second, he argues that the prohibition any transaction "that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions," 31 C.F.R. § 530.203, in the ITSR is vague because it is not clear what constitutes "evading or avoiding." Def.'s Mot. to Dismiss 10.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox. Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

These concerns may be less pressing in a case such as this. First, "'where . . . a criminal statute regulates economic activity, it generally is subject to a less strict vagueness test.'" *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004) (quoting *United States v. Sun*, 278 F.3d 02, 309 (4th Cir. 2002)). And second, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir. 1992) ("Requiring the proof of specific intent satisfies the first element of the void for vagueness test, in that the convicted must have had notice that the conduct is proscribed in order to have the specific intent required for the . . . crime.").

Saboonchi argues that the term "'indirectly' is without any clear boundaries. There are no limits on how attenuated the defendant's involvement in the transaction may be while still rising to the level of an unlawful export of goods to Iran." Def.'s Mot. to Dismiss 9. However, he does not provide any specific case law on point. In contrast, in 1997, when Executive Order 13059 "restate[d] and expande[d] the embargo to include all exportation and reexportation, direct and indirect, with the specific destination of Iran," the Fourth Circuit held that "[t]his rephrasing of the language and scope of the export ban [] does not undermine the simple, unambiguous bar in Executive Order 12959 of all 'exportation . . . to Iran.'" *United States v. Ehsan*, 163 F.3d 855, 859–60 (4th Cir. 1998). Thus Saboonchi's argument that the term "indirectly" is vague is contradicted by Fourth Circuit precedent.

With respect to the prohibition on "evading or avoiding" the embargo on Iran, Saboonchi's vagueness argument relies on *M. Kraus & Bros. v. United States*, 327 U.S. 614 (1946), in which a poultry business was convicted of evading the Emergency Price Control Act

of 1942 after it required customers buying poultry parts to purchase the chicken skin and feet as well, above the ceiling price set by the Price Administrator.  *Id.* at 616.  In that case, the Supreme Court said:

> This delegation to the Price Administrator of the power to provide in detail against circumvention and evasion, as to which Congress has imposed criminal sanctions, creates a grave responsibility. . . .  Hence to these provisions must be applied the same strict rule of construction that is applied to statutes defining criminal action.  In other words, the Administrator's provisions must be explicit and unambiguous in order to sustain a criminal prosecution; they must adequately inform those who are subject to their terms what conduct will be considered evasive so as to bring the criminal penalties of the Act into operation.  *See United States v. Wiltberger*, 5 Wheat. 76, 94–96.  The dividing line between unlawful evasion and lawful action cannot be left to conjecture.  The elements of evasive conduct should be so clearly expressed by the Administrator that the ordinary person can know in advance how to avoid an unlawful course of action.

*Id.* at 621–22.  Saboonchi argues that the ITSR does not clearly define "evade," and that "it is not clear from the regulations whether an actual violation of the ITSR is needed, or whether acting with mere purpose or intent to evade the law suffices to establish a criminal violation of § 560.203."  Def.'s Mot. to Dismiss 11.

First, Saboonchi is incorrect that the regulation itself does not establish whether an actual violation must be consummated to give rise to criminal liability; insofar as 31 C.F.R. § 560.203(a) prohibits conduct that "has the purpose of evading or avoiding, . . . or attempts to violate" the ITSR, it clearly seems to include conduct that does not involve a completed violation.

Second, this case seems to be distinct from *M. Kraus*: In *M. Kraus*, the Court found that it was not clear that the prohibition on evading price controls encompassed a prohibition on combining items for sale, *M. Kraus*, 327 U.S. at 623, so there was a legitimate question as to whether the underlying conduct—requiring a buyer of poultry parts to pay for skins and feet as well—was itself a violation of the statute.  In this case, however, the legality of the underlying

8

conduct of which Saboonchi is accused—shipping an item abroad with the intention that it eventually be shipped to Iran—is clear.

Finally, counsel has not been able to point to any case that found the ITSR's prohibition on "evading or avoiding" the embargo to be unconstitutionally vague.  To the contrary, I believe that "a person of average intelligence is capable of understanding" that the conduct of which Saboonchi is accused—that is, shipping goods abroad with the intent that they eventually be shipped into Iran—is illegal under the ITSR.  *See, e.g.*, *United States v. Presgraves*, Nos. 3:11-CR-38-001, 3:11-CR-38-002, 2011 WL 4716222, at *3 (N.D.W. Va. Oct. 5, 2011) (finding that "a person of average intelligence is capable of understanding that structuring deposits to evade the reporting requirement [under 31 U.S.C. § 5313(a)] is illegal conduct under the statute").

Accordingly, Saboonchi has not shown that the ITSR is unconstitutionally vague.

## IV.     CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss the Indictment will be DENIED.

Dated: <u>May 6, 2014</u>                                    <u>        /S/                </u>
                                                                        Paul W. Grimm
                                                                        United States District Judge

dsy